**No. 04-166C**
**(Judge Horn)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**GEMINI ELECTRONICS, INC.,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S POST-TRIAL BRIEF

---

**PETER D. KEISLER**
**Assistant Attorney General**

**DAVID M. COHEN**
**Director**

**MARK A. MELNICK**
**Assistant Director**

**CAROLYN J. CRAIG**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**1100 L Street, N.W.**
**Attn: Classification Unit, 8th floor**
**Washington, D.C. 20530**
**Tel: (202) 305-7561**
**Fax: (202) 305-7644**
**E-mail: carolyn.craig@usdoj.gov**

**OF COUNSEL:**

**CHRISTOPHER J. BURTON**
**United States Postal Service**
**Commercial and Appellate Litigation**
**475 L'Enfant Plaza, Room 6323**
**Washington, D.C. 20260-1127**
**Tel: (202) 268-3069**
**Fax: (202) 268-5287**
**E-mail: christopher.j.burton@usps.gov**

**October 15, 2004**

**Attorneys for Defendant**

TABLE OF CONTENTS

Page

TABLES OF AUTHORITIES . . . iii

INDEX TO ATTACHMENTS . . . v

DEFENDANT'S POST-TRIAL BRIEF . . . 1

STATEMENT OF THE ISSUES . . . 1

STATEMENT OF THE CASE . . . 2

I. Nature Of The Case . . . 2

II. Statement Of The Facts . . . 4

A. Introduction . . . 4

B. Terms Of The Agreement . . . 5

C. Gemini's Expansion Efforts . . . 8

1. Conversations Involving J.T. Weeker . . . 8

2. Gemini's Placement Of Pay Phones At The Chicago Airmail Facility . . . 10

3. Gemini's Proposal For The Central Illinois District . . . 12

D. Termination Of The Agreement . . . 13

SUMMARY OF THE ARGUMENT . . . 13

ARGUMENT . . . 16

I. Elements Of A Contract And Burden Of Proof . . . 16

II. The Parties' Pre-Dispute Conduct Demonstrates Their Mutual Understanding That The October 1999 Written Agreement Applied Only To The Chicago District . . . 18

A. Application Of The Parol Evidence Rule . . . 19

B. The October 1999 Agreement Was Limited To The Chicago District . . . . . . . . 21

C. Oral Representations By J.T. Weeker Did Not Alter The Terms Of The Agreement Or Create A Separate Implied-In-Fact Agreement For Pay Phone Service Beyond The Chicago District . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

D. Oral Representations By J.T. Weeker Were Not Incorporated Into The Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

E. There Was No "Meeting Of The Minds" Regarding Gemini's Provision Of Pay Phone Service Beyond The Chicago District . . . . . . . . . . . . . . . . . . . . . . 27

1. There Was No Implied-In-Fact Contract . . . . . . . . . . . . . . . . . . . . . . . . 27

2. The "Exhibit A Rider – Illinois" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

3. There Was No Agreement For The Central Illinois District . . . . . . . . . . 29

4. Gemini Admits That The Agreement Was Limited To The Chicago District . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

5. Gemini Fails To Establish An Agreement Beyond The Chicago District . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

III. Rufus Porter, As District Manager Of The Chicago District, Had No Actual Authority To Enter Into An Agreement For Postal Service Facilities Outside The Chicago District . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

IV. The Government Did Not Breach Any Agreement For Telecommunications Services At Postal Service Facilities At the Chicago Airmail Facility At O'Hare Airport . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

V. The Government Did Not Breach Any Agreement For Telecommunications Services At The Central Illinois District Or For Any Other Great Lakes Area District . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF AUTHORITIES

## FEDERAL CASES

Balt. & Ohio R.R. v. United States,
261 U.S. 592 (1923) . . . . . . . . . . 28

City of El Centro v. United States,
922 F.2d 816 (Fed. Cir. 1990), cert. denied, 501 U.S. 1230 (1991) . . . . . . . . . . 16

City of Cincinnati v. United States,
153 F.3d 1375 (Fed. Cir. 1998) . . . . . . . . . . 28

D & N Bank v. United States,
331 F.3d 1374 (Fed. Cir. 2003) . . . . . . . . . . 16

Darling Shops, Inc., of Tennessee v. Brack,
95 F.2d 135 (8th Cir. 1938) . . . . . . . . . . 30

E.C. McAfee A/C Bristol Metal Industries of Canada, Ltd. v. United States,
832 F.2d 152 (Fed. Cir. 1987) . . . . . . . . . . 30

Garza v. Marine Trans. Lines, Inc.,
861 F.2d 23 (2d Cir. 1988) . . . . . . . . . . 20

General Warehouse Two, Inc. v. United States,
181 Ct. Cl. 180, 389 F.2d 1016 (1967) . . . . . . . . . . 19

Gutz v. United States,
45 Fed. Cl. 291 (1999) . . . . . . . . . . 19, 20

Hamilton Securities Advisory Services, Inc. v. United States,
60 Fed. Cl. 144 (2004) . . . . . . . . . . 19

Hanlin v. United States,
316 F.3d 1325 (Fed. Cir. 2003) . . . . . . . . . . 28

Lewis v. United States,
70 F.3d 597 (Fed. Cir. 1995) . . . . . . . . . . 16

McAbee Constr., Inc. v. United States,
97 F.3d 1431 (Fed. Cir. 1996) . . . . . . . . . . 19

Pacificorp Capital, Inc. v. United States,
25 Cl. Ct. 707 (1992), aff'd, 988 F.2d 130 (Fed. Cir. 1993) (table) . . . . . . . . . . . . . . 20, 21

PCL Construction Services, Inc. v. United States,
47 Fed. Cl. 745 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

San Carlos Irri. and Drainage Dist. v. United States,
877 F.2d 957 (Fed. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 37

Sylvania Elec. Products, Inc. v. United States,
198 Ct. Cl. 106, 458 F.2d 994 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

Total Medical Management, Inc. v. United States,
104 F.3d 1314 (Fed. Cir.), cert. denied, 522 U.S. 857 (1997) . . . . . . . . . . . . . . . . . . 16, 18

Trauma Service Group v. United States,
104 F.3d 1321 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## FEDERAL REGULATIONS

39 C.F.R. § 229.2(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## OTHER AUTHORITY

Restatement (Second) of Contracts § 216 cmt. 3 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

4 J. Wigmore, Evidence § 1064 (Chadbourn rev. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# INDEX TO ATTACHMENTS[1]


| Document | Attachment |
| --- | --- |
| Joint Trial Exhibit 17A | 1 |
| U.S. District Court, Northern District of Illinois (Chicago), Civil Docket for Case #: 02-CV-2151, Gemini Elec. Inc. et al. v. USPS | 2 |


[1] Attachments 1 and 2 are being jointly submitted along with defendant's post-trial brief at the Court's request. Attachment 1, Joint Trial Exhibit ("JE") 17A, is submitted to replace Joint Trial Exhibit 17. JE17A is a table of the Postal Service facilities (assorted according to telephone number, address of facility, zip code, facility name, and district). The table was compiled using the listing of phone numbers and addresses found on the "Exhibit A Rider – Illinois," JE14. JE17A is now organized according to Postal Service district for ease of reference. The last three columns of the table indicate whether the individual listings are contained on the Exhibit A Rider – Illinois, JE14, the listing found at JE12, dated October 22, 1999, or the listing found at JE9, dated June 13, 2000. Attachment 2 is a copy of the civil docket of the case as initially filed in the U.S. District Court for the Northern District of Illinois (Chicago).

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| GEMINI ELECTRONICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 04-166C |
| | ) | (Judge Horn) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S POST-TRIAL BRIEF**

Pursuant to the Court's order, dated September 24, 2004 and Appendix A of the Rules of the United States Court of Federal Claims, defendant, the United States, respectfully submits its post-trial brief. Based upon the evidence presented to the Court at trial, the evidence submitted in the form of joint trial exhibits or defendant's trial exhibits, the additional evidence provided to the Court following the close of evidence pursuant to the Court's request (in the form of separate, jointly agreed upon attachments to this brief),[2] and the relevant legal principles, we respectfully request that the Court enter judgment for the United States, and dismiss the complaint of plaintiff, Gemini Electronics, Inc. ("Gemini").

STATEMENT OF THE ISSUES

1. Whether the October 1999 Public Telecommunications Service Agreement ("agreement" or "contract") between the United States Postal Service ("Postal Service" or "USPS") and Gemini was limited to facilities within the Postal Service's Chicago District.

---

[2] Specifically, the United States is referring to the parties' joint re-submission of Joint Trial Exhibit 17 as Joint Trial Exhibit 17A (submitted with this brief as Attachment 2), a copy of the district court docket of the case prior to its transfer to this Court, (also submitted with this brief as Attachment 1), and a map of the Chicago District of the Postal Service (to be jointly submitted by leave of Court).

2. Whether the United States Postal Service ("Postal Service" or "USPS") breached the October 1999 public telecommunications service agreement with Gemini.

3. Whether Rufus Porter, the former District Manager and Postmaster for the Chicago District of the Postal Service, had the authority to enter into an agreement with Gemini for telecommunications services outside the Postal Service's Chicago District.

STATEMENT OF THE CASE

I. Nature Of The Case

On March 25, 2002, Gemini filed a complaint against the Postal Service in the United States District Court for the Northern District of Illinois. JE4.[3] Gemini's complaint, which was captioned as a "Verified Complaint for Price Discrimination," JE4, JX 4.1, described the nature of this case in the following manner:

> This is a post award action for declaratory relief relating to a series of service contracts entered into by the United States Postal Service with Ameritech for management of public pay telephones in various United States Postal Service facilities within the state of Illinois . . . .

JE4, JX4.1 ¶ 1.

The complaint filed in district court specifically alleged that "Gemini Electronics, Inc. was chosen as a provider for pay telephone management services at the United States Postal Service facilities in the Chicago District . . . ." JE4, JX4.3-4.4 ¶ 13. The complaint further alleged that the Postal Service had "discriminated between [Gemini] and Ameritech by

[3] "JE__" refers to the parties' joint trial exhibits. "JX__" refers to a specific page number of the joint trial exhibits. "DE__" refers to defendant's trial exhibits. "DX__" refers to a specific page number of defendant's trial exhibits. "Tr.__:__" refers to a specific page and line numbers from the trial transcript of August 16-18, 2004. The name in parentheses following the transcript cite denotes the name of the witness whose testimony has been cited.

purchasing the telecommunications service from Ameritech at a lower price than from . . . Gemini . . . ." JE4, JX 4.6 ¶ 25. The complaint sought declaratory and injunctive relief, JE4, JX4.11, as well as an award of treble damages. JE4, JX 4.10-4.11 ¶¶ 43-44.

On September 30, 2002, the Government moved to have the district court case transferred to this Court. Attachment 1, p. 3. On October 3, 2002, the district court granted the Government's motion and transferred the case to this Court. Id. The transferred case was docketed in this Court on January 9, 2003, and assigned case number 03-38C.

Gemini filed an amended complaint in case number 03-38C in this Court on April 7, 2003. In that complaint, Gemini alleged that, pursuant to its agreement with the Postal Service, "Gemini was given the responsibility of placing phones in USPS stations, offices and buildings in the Great Lakes Postal Area which covers Chicago." Complaint in 03-38C, p. 4, ¶ 7. Gemini further alleged that the Postal Service "refused to allow [ ] Gemini to put [its] telecommunications equipment in certain profitable facilities that the contract had designated. [ ] Gemini was denied access to install equipment at O'Hare airport . . . ." Id., p. 6, ¶ 13. Gemini's complaint sought $300,000 in compensatory damages. Id., p.8, ¶ 19.

On October 16, 2003, Gemini's complaint in case number 03-38C was dismissed without prejudice based upon Gemini's failure to submit a claim to the contracting officer for final decision prior to filing its complaint in this Court. Following a denial of Gemini's claim by the contracting officer, JE3, JX 3.18-3.19, Gemini filed its complaint in the present case on February 6, 2004. JE3. The allegations in the present complaint are largely the same as those in Gemini's amended complaint filed in case number 03-38C. Following oral and written discovery, a trial upon liability was held on August 16-18, 2004 in Chicago, Illinois.

## II. Statement Of The Facts

### A. Introduction

At some time in 1999, the Chicago District of the Postal Service solicited proposals for the provision of pay phone services. Tr. 295:14-24 (Flynn). Among the bidders were Ameritech, which was previously providing pay phone service, and Gemini Electronics, Inc. Tr. 189:16-20, 191:23-25 – 197:1 (Porter). After reviewing proposals, the Postal Service selected Gemini to provide pay phone services. Tr. 197:2-9 (Porter).

For purposes of the agreement with Gemini that is the subject of this litigation, the Postal Service was only interested in soliciting pay phone service for its facilities within the Chicago District. Tr. 198:14-25 – 199:1 (Porter). Rufus Porter presided over the Chicago District as District Manager and Postmaster. Tr. 175:1-3 (Porter). Phyllis Flynn, who worked in the Information Systems Department of the Chicago District as a Telecommunications Specialist, provided all bidders with the same information concerning the areas to be covered by the agreement – specifically, Ms. Flynn gave each bidder a "station listing" of all facilities within the Chicago District. Tr. 277:14-17, 297:18-25 – 298:1-8 (Flynn). Before Gemini submitted its proposal, Ms. Flynn had a conversation with Willie Wilson, President and Chief Executive Officer ("CEO") of Gemini, regarding the area to be covered by the agreement. Tr. 298:12-23 (Flynn). Specifically, Ms. Flynn told Mr. Wilson that the area to be covered by the agreement would be limited to the Postal Service's Chicago District because that was the limit of the authority of the Chicago District's staff. Tr. 301:19-24 (Flynn).

Prior to entering into an agreement with Gemini, the Postal Service received a list of telephone numbers and addresses from Ameritech. Tr. 192:1-2 (Porter). That list reflected the

phones upon which Ameritech was paying commission to the Postal Service. Tr. 281:24-25 – 282:1-2 (Flynn). The Ameritech list contained phone numbers located both within the Chicago District and outside the Chicago District. Tr. 192:5-7 (Porter). Upon receipt of the list from Ameritech, Rufus Porter, District Manager for the Postal Service's Chicago District, instructed his Information Systems Department to "sanitize" the list to remove all locations outside the Chicago District. Tr. 192:22-25 – 193:1-15, 223:21-23 (Porter). Phyllis Flynn worked on getting the Ameritech list "cleaned up" because it contained locations outside the Chicago District. Tr. 282:11-14 (Flynn). Maria Fuhrmann (now Infanger), the Postal Service attorney who was involved in negotiating the terms of the agreement, requested that the Information Systems Department provide her with a list of telephone numbers and locations which would define the scope of the agreement. Tr. 452:3-10 (Infanger). On October 22, 1999, Ms. Fuhrmann received a list from the Information Systems Department containing Ameritech pay phone numbers from within the Chicago District. Tr. 452:22-25 – 454:1-8 (Infanger); JE12.

B. <u>Terms Of The Agreement</u>

The parties executed a "Public Telecommunications Service Agreement" on or about October 21, 1999. JE5. Paragraph one of the agreement states in relevant part:

> USPS hereby grants to Gemini the right to use, occupy, and have access to the Premises (as defined below) that will allow Gemini the ability to install and maintain equipment for purposes of providing public telecommunications services . . . . Gemini and USPS shall mutually agree on the initial quantities of phones to be installed based upon a survey of existing phones and projected needs. The parties shall agree jointly on the initial locations of any equipment . . . .

JE5 ¶ 1. The term of the agreement ran from October 21, 1999 until October 21, 2004. JE5 ¶ 3.

Gemini agreed to pay the Postal Service a monthly commission of 25 percent of its revenue, including "the actual coin revenue collected from pay telephones installed at the Premises, compensation received from presubscribed operator services providers, and compensation received by Gemini pursuant to 47 U.S.C. § 276." JE5, JX5.2 ¶ 4.

Paragraph eight of the agreement states, "The parties agree that the rights granted under this agreement to Gemini are not exclusive." JE5, JX5.2 ¶ 8. Paragraph 15 of the agreement states, "This Agreement shall constitute the sole Agreement of the parties relating to the Premises. Neither party shall be bound by statements, warranties, or promises, oral or written unless such statements, warranties or promises are set forth specifically in this Agreement." JE5, JX5.3 ¶ 15.

Paragraph six of the agreement states:

> The Premises are described as the following locations that are owned, managed, leased or operated by USPS and that are subject to this agreement:
>
> See Attached Exhibit A
>
> The parties agree that the defined Premises may be supplemented with additional locations from time to time, and that these additional locations shall be subject to the terms and conditions of this Agreement. The installation of additional phones shall be agreed upon mutually by USPS and Gemini.

JE5, JX5.2 ¶ 6. There is a disagreement between the parties concerning what, if any, document was attached to the agreement as "Exhibit A."

Chicago District Manager Rufus Porter testified that a document dated October 22, 1999, see JE12, appeared to be the list that was to go with the agreement. Tr. 222:15-22 (Porter). That list reflects all of the Ameritech pay phones that were located within the Chicago District. JE12;

Tr. 314:4-7 (Flynn). However, Mr. Porter also stated that there was no list attached to the agreement at the time he signed it. Tr. 223:14-19 (Porter).

Phyllis Flynn also testified that there was no list attached to the agreement at the time it was signed; however, Ms. Flynn stated that the Chicago District was expected to provide Gemini with a list. Tr. 317:10-16 (Flynn). Ms. Flynn testified that she was involved in putting together a list following the execution of the agreement. Tr. 317:17-19 (Flynn). Ms. Flynn compiled a list and provided the list to Mr. Porter's office – that list contained only phone numbers and locations within the Chicago District. Tr. 319:8-16 (Flynn).

Postal Service attorney Maria Infanger testified that she asked Phyllis Flynn's office to provide her with an "Exhibit A" for the agreement. Tr. 452:20-24 (Infanger). Ms. Infanger identified a list, JE 12, as the list she received in response to that request. Tr. 453:14-25 – 454:1-8 (Infanger). Ms. Infanger identified the same list Mr. Porter had previously identified as the purported "Exhibit A." Ms. Infanger was unsure, however, whether there was a document actually attached to the agreement as "Exhibit A" at the time the agreement was signed. Tr. 455:11-15 (Infanger).

Gemini's complaint refers to a list of “designated premises” in which Gemini was given the authority to install its telephones (attached to the complaint as "Exhibit B"). JE3, JX 3.4 ¶ 8. The referenced list appears under a cover letter, dated June 13, 2000, from Mary E. Giorgi (of Ameritech) to Phyllis Flynn. JE 3, JX 3.12.[4] The list referenced in Gemini's complaint contains only phone numbers and locations from within the Chicago District. Tr. 321:17-25 – 327:1-19 (Flynn).

[4] The same cover letter and list also appear at JE9.

Gemini's Willie Wilson testified that there was a list attached to the agreement as "Exhibit A" at the time the agreement was signed. Mr. Wilson described the list attached to the agreement as "a list of telephone numbers with different area codes that included Exhibit A, which included Northern Illinois, Central Illinois, O'Hare Field and Chicago area." Tr. 66:17-23 (Wilson). However, Mr. Wilson did not identify any document in the record as being the "Exhibit A" that was attached to the agreement at the time it was signed – in fact, Mr. Wilson testified that he did not know which version of the list was attached to the agreement at the time it was signed. Tr. 170:21-25 (Wilson).

The agreement was signed upon behalf of Gemini by its President and CEO, Willie Wilson, and upon behalf of the Postal Service by Rufus Porter, District Manager and Postmaster of the Chicago District. JE5, JX 5.4.

C. Gemini's Expansion Efforts

1. Conversations Involving J.T. Weeker

In 1999, J.T. Weeker was the Postal Service's Vice President for the Great Lakes Area, and, as such, he was the direct supervisor of both Rufus Porter and other district managers within the Great Lakes Area. Tr. 219:1-15, 230:11-14 (Porter). Mr. Weeker had meetings with Mr. Porter and Mr. Wilson during which Mr. Weeker expressed "in general principle that he was very interested" in having Gemini install its phones in additional locations. Tr. 218:11-16 (Porter). Mr. Weeker and Mr. Porter had several direct conversations, during which Mr. Weeker stated that he wanted Mr. Porter "to facilitate Gemini expanding their pay phone services to the other districts." Tr. 219:19-22 (Porter). Mr. Weeker told Mr. Porter that it was his (Mr. Weeker's) intent that Gemini have access to facilities beyond the Chicago District.

Tr. 241:23-25 – 242:1-3 (Porter). Mr. Weeker asked Mr. Porter to contact other district managers concerning Gemini's expansion to other districts. Tr. 219:22-23 (Porter).

In response to Mr. Weeker's request, Mr. Porter contacted Jim Holmes, the District Manager for the Postal Service's Central Illinois District; Mr. Porter also contacted the District Manager for the Postal Service's Northern Illinois District.[5] Tr. 219:24-25 – 220:1-5 (Porter). Mr. Porter spoke to Mr. Holmes regarding Gemini in the spring of 2000. Tr. 409:3-8 (Holmes). When Mr. Porter spoke to Mr. Holmes, he informed Mr. Holmes that Mr. Weeker had asked him to "encourage [his] fellow district managers to allow Gemini to expand into their area." Tr. 252:17-19 (Porter). Mr. Porter told Mr. Holmes he was very pleased with the agreement the Chicago District had with Gemini and suggested that Mr. Holmes might be interested in doing business with Gemini in the Central Illinois District. Tr. 409:8-20 (Holmes). Mr. Porter made "a very strong recommendation" of Gemini to his fellow district managers, Tr. 220:8-20 (Porter), however, Mr. Porter understood that it was ultimately up to each district manager to determine whether they wanted to enter into their own separate agreement with Gemini. Tr. 220:20-25 (Porter).

Following the death of J.T. Weeker in January 2000, Mr. Porter spoke to Mr. Weeker's successor, Danny Jackson. Tr. 136:5-8 (Wilson); 229:5-9 (Porter). Mr. Porter informed Mr. Jackson that Gemini's expansion beyond the Chicago District "was something that [Mr. Weeker] really, really wanted to happen and that [Mr. Weeker] had asked [Mr. Porter] to help facilitate Gemini expanding to the other districts." Tr. 229:10-17 (Porter).

---

[5] There is no evidence of record regarding any attempt by Gemini to expand its telecommunications services into the Postal Service's Northern Illinois District.

2. Gemini's Placement Of Pay Phones At The Chicago Airmail Facility

There are two separate Postal Service facilities at Chicago's O'Hare Airport – a plant located at 11560 West Irving Park Road and a plant referred to as the Chicago Airmail Facility (sometimes referred to as the "Airport Mail Center" or "AMC") located at 11600 West Irving Park Road. Tr. 366:9-21, 369:3-6 (Kubick). The facility located at 11560 West Irving Park Road (the "Irving Park Plant") handles the mail on the north side of Chicago – zip codes beginning with 606 and 607. Tr. 368:8-16 (Kubick). The other facility, the Chicago Airmail Facility, services all of the Postal Service districts in the Great Lakes area – specifically, all mail flying in and out of Chicago, Indiana, or Milwaukee. Tr. 369:3-14 (Kubick). These two Postal Service facilities at Chicago's O'Hare Airport are separate facilities – they are separately run, and separately managed, yet connected by a common wall. Tr. 371:20-25 – 372:1-3 (Kubick).

Gerald Kubick is the Plant Manager for the Chicago Metro Surface Hub and the Chicago Airmail Facility and also served as Plant Manager for those facilities at the time of the October 1999 agreement. Tr. 366:7-11; 367:7-15 (Kubick). In October 1999, Mr. Kubick, like Rufus Porter, reported to J.T. Weeker, then Area Vice President for the Great Lakes Area. Tr. 367:16-24 (Kubick). Mr. Kubick testified that because the Chicago Airmail Facility services the entire Great Lakes Area, it was not part of the Chicago District in October 1999. Tr. 369:17-25 – 370:1-9. However, the facility at 11560 West Irving Park Road was part of the Chicago Performance Cluster in October 1999 and reported to the Chicago District of the Postal Service.[6] Tr. 372:4-7 (Kubick). As indicated above, Rufus Porter was the District Manager and

[6] It is undisputed that pursuant to the agreement, Gemini installed its pay phones at the O'Hare Irving Park Plant. JE7; Tr. 370:10-25 – 372:1-11 (Kubick).

Postmaster for the Chicago District in October 1999. Tr. 175:1-3 (Porter).

In 1999, Mr. Porter called Gerald Kubick, Plant Manager at the Chicago Airmail Facility, to ask Mr. Kubick to meet with representatives from Gemini about whether Mr. Kubick had any needs for additional pay phones in his facility. Tr. 372:15-20 (Kubick). Mr. Kubick did not report to Porter and his facility was not part of the Chicago District; Mr. Kubick, like Mr. Porter, reported directly to the Great Lakes Area Vice President. Tr. 368:4-7 (Kubick) In response to Mr. Porter's request, Mr. Kubick looked around his facility and determined that there was a need for four or five additional pay phones. Tr. 373:1-25 – 375:1-3 (Kubick). Mr. Kubick, therefore, allowed Gemini to install those four or five phones in his facility – these pay phones were in addition to the Ameritech phones already in the facility. Id. Mr. Kubick's permission to allow Gemini to place four or five pay phones in his facility was not made part of any written agreement. Tr. 377:12-16 (Kubick). Indeed, at the time he authorized the installation of four or five Gemini phones at the Chicago Airmail Facility, Mr. Kubick was not aware of any existing agreement between Gemini and the Postal Service. Tr. 376:20-23 (Kubick).

In November 2000, Mr. Kubick came into his facility on a Monday morning and discovered that all of the Ameritech phones in his facility had been removed. Tr. 378:14-25 – 379:1-5 (Kubick). The only phones remaining in the facility were the four or five Gemini phones Mr. Kubick had previously authorized. Id. Shortly thereafter, the Ameritech phones were replaced with Gemini phones. Tr. 380:16-18 (Kubick). Mr. Kubick learned that the Gemini phones should have been placed at the Irving Park Plant at O'Hare (which was part of the Chicago District and separate from the Chicago Airmail Facility at O'Hare managed by Mr. Kubick). Tr. 379:6-25 – 380:1-8 (Kubick). Accordingly, Mr. Kubick directed that the

Ameritech phones be put back into the Chicago Airmail Facility; several days later, Mr. Kubick directed that the four or five Gemini phones he had previously authorized be removed. Tr. 380:11-12, 19-25 (Kubick). Mr. Kubick never heard from Gemini after he had its phones removed. Tr. 381:5-7 (Kubick).

3. Gemini's Proposal For The Central Illinois District

Following a conversation with Rufus Porter, Jim Holmes, District Manager for the Postal Service's Central Illinois District, agreed to meet with Gemini in July 2000. Tr. 406:7-14, 411:24-25 – 412:1-4 (Holmes). At the time Mr. Holmes met with representatives from Gemini, the Central Illinois District already had Ameritech phones in its facilities. Tr. 417:2-10 (Holmes). At that meeting, Mr. Holmes explained to Gemini the geographic area covered by the Central Illinois District and the facilities located therein. Tr. 412:1-14 (Holmes). Representatives from Gemini indicated that Gemini would only be interested in making a proposal for three of the facilities in the Central Illinois District (the Bulk Mail Center, the Bedford Park facility, and the Fox Valley facility). Tr. 412:5-23 (Holmes).

The day after the meeting between Mr. Holmes and representatives from Gemini, Willie Wilson sent Mr. Holmes a letter thanking Mr. Holmes for meeting with Gemini and presenting Gemini's proposal to Mr. Holmes. DE202, DX202.2. Specifically, Mr. Wilson's letter proposed installation of Gemini pay phones at the Bedford Park facility and at the Bulk Mail Center. Id. Two weeks later, on July 27, 2000, Gemini General Counsel Nikki Zollar sent Mr. Holmes another letter. DE203. Attached to Ms. Zollar's letter was contractual language "as a template to be used in whole or part." Id.

Mr. Holmes responded to Ms. Zollar in writing on August 1, 2000. DE204. In his letter to Ms. Zollar, Mr. Holmes indicated that he had not yet had an opportunity to review Gemini's proposal. Id. Mr. Holmes stated that Gemini would be contacted upon Mr. Holmes's return from vacation after August 11. Id. Neither Mr. Holmes nor anyone from his office contacted Ms. Zollar after Mr. Holmes returned from his vacation, Tr. 423:25 – 424:1-3 (Holmes), and Mr. Holmes did not hear from Gemini after returning from his vacation. Tr. 420:19-21 (Holmes).

D. Termination Of The Agreement

On September 9, 2002, Jon Michelle Richardson, an attorney representing Gemini, sent a letter to Vernon Sims, Manager of the Information Systems Department in the Postal Service's Chicago District Office. JE6. Through Ms. Richardson's letter, Gemini notified the Postal Service of its intent to terminate the October 1999 agreement effective October 11, 2002. Id. The only explanation Gemini's letter offered for its decision to terminate the agreement was the following:

> Due to the poor economic climate of the country and most notably in the telecommunications industry, Gemini Electronics, Inc. has experienced severe financial loss in servicing the subject Public Telecommunications Service Agreement dated October 18, 1999, entered into between Gemini Electronics, Inc. and the USPS.

Id. Gemini's letter did not allege any breach of the agreement by the Government. Id.

## SUMMARY OF THE ARGUMENT

The parties entered into an express agreement for the installation of pay phones in Postal Service facilities in October 1999. The dispute in this case concerns whether that agreement applies only to facilities within the Chicago District of the Postal Service or to some area broader

than the geographic boundaries of the Chicago District. Because there was never a valid, binding agreement between the parties for any facilities outside the Chicago District, the Court should find that the agreement applies only to that district.

The conduct of both parties at all times prior to the onset of the present dispute was consistent with their mutual understanding that the October 1999 agreement was limited to the Chicago District and that expansion of Gemini's pay phone business beyond the Chicago District would come only as a result of separate agreements with the other districts. The Postal Service's conduct, particularly in the days leading up to and immediately following execution of the agreement, demonstrates that it understood that its agreement with Gemini applied only to the Chicago District. In contrast to its current allegations, Gemini's conduct and statements in the months and years following execution of the agreement demonstrate that although Gemini hoped (and perhaps even expected) that it would be able to expand its pay phone business beyond the Chicago District, it also understood that such expansion would require separate agreements because the October 1999 agreement it signed applied only to the Chicago District.

To support its claim that the October 1999 agreement applied to an area broader than the Chicago District, Gemini relies upon oral statements allegedly made by J.T. Weeker, the Postal Service's Vice President for the Great Lakes Area – an area which includes the Chicago District as well as several other districts both in Illinois and in other nearby states. However, Mr. Weeker's statements were not incorporated into the written agreement between the parties. Moreover, although Mr. Weeker apparently intended for Gemini to eventually expand its pay phone business beyond the Chicago District, Mr. Weeker's instructions to Rufus Porter and Mr. Porter's actions in accordance with those instructions make clear that Mr. Weeker intended

for Gemini to expand its business by way of separate agreements with other districts and at the discretion of each individual district manager.

Additionally, there is no evidence that Rufus Porter, who signed the October 1999 agreement upon behalf of the Postal Service, had any authority to bind the Postal Service with respect to facilities outside the Chicago District. There is simply no evidence in the record to demonstrate that Mr. Porter, as District Manager for the Chicago District, had any authority outside the geographic boundaries of his district, either in his day-to-day responsibilities or with respect to the particular agreement he executed with Gemini. Therefore, even if the Court were to conclude that Mr. Porter somehow agreed to permit Gemini to install its pay phones in facilities outside the Chicago District, the Postal Service would not be bound by such an agreement.

Finally, Gemini has failed to establish that the Postal Service breached the October 1999 agreement. Although the Plant Manager at the Airport Mail Center near O'Hare Airport orally agreed to allow Gemini to install a handful of pay phones in his facility, the Airport Mail Center was not part of the Chicago District in October 1999 and was, therefore, not subject to the October 1999 agreement. Thus, the Plant Manager's subsequent decision to have Gemini's pay phones removed from his facility was not a violation of the October 1999 agreement. Similarly, because the Central Illinois District was and is separate from the Chicago District, the October 1999 agreement did not apply to any facilities in the Central Illinois District. Accordingly, the Central Illinois District Manager's decision not to accept Gemini's proposal to install its pay phones in a few of the facilities in Central Illinois did not violate the October 1999 agreement.

## ARGUMENT

### I. Elements Of A Contract And Burden Of Proof

An express and implied-in-fact contract are based upon the same elements (i.e., mutuality of intent to contract, consideration, and actual authority, as well as a lack of ambiguity in the offer and acceptance). D & N Bank v. United States, 331 F.3d 1374,1378 (Fed. Cir. 2003) (citing Lewis v. United States, 70 F.3d 597, 600 (Fed. Cir. 1995)). When the United States is a party to the contract, there is an additional requirement that the Government representative whose conduct is relied upon must have actual authority to bind the Government in contract. Id. To succeed upon an express contract claim, plaintiff must prove the above elements by a preponderance of the evidence. Total Medical Management, Inc. v. United States, 104 F.3d 1314, 1319 (Fed. Cir.), cert. denied, 522 U.S. 857 (1997); City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990), cert. denied, 501 U.S. 1230 (1991). "To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, (4) and damages caused by the breach." San Carlos Irr. and Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989).

In this case, it is undisputed that in October 1999, the Postal Service and Gemini entered into an express agreement for the provision of public telecommunications services for a term of 60 months, beginning October 21, 1999 and expiring on October 21, 2004. JE3, JX 3.3-3.4; JE5. What the parties dispute is the scope of the "premises" to be covered by the agreement. As indicated above, the "premises" is defined in paragraph six of the agreement and references an "Attached Exhibit A." JE5, JX5.2 ¶ 6.

Gemini's complaint alleges that shortly after performance began, the Postal Service "willfully, wantonly and discriminatorily denied Plaintiff Gemini access to, occupancy of and prevented Plaintiff Gemini from installing and maintaining telecommunication[s] equipment at Defendant USPS facilities." JE3, JX3.4 ¶ 9. The complaint also alleges that when the agreement was executed, J.T. Weeker, Vice President of the Great Lakes Area of the Postal Service, met with Gemini's CEO, Willie Wilson, and "assured him that [ ] Gemini would have free and unfettered access to place [its] telecommunications equipment in the designated areas."[7] (footnote omitted) (emphasis added). JE3, JX3.5 ¶ 10. Further, Gemini alleges that, following execution of the agreement, the Postal Service "undertook a deliberate course of conduct to deny [ ] Gemini from fulfilling the contract." JE3, JX3.5 ¶ 13. Gemini generally complains that the Postal Service refused to allow Gemini to place its telecommunications equipment in "certain profitable [Postal Service] facilities that the contract had designated" – such as Chicago's "O'Hare Airport" and "a significant part of the Great Lakes Region." JE3, JX3.5-3.6 ¶¶ 13-14. Gemini claims that the failure of the Postal Service to "abide by and execute its obligations under the terms of the contract forced [ ] Gemini to constructively discharge the contact." JE3, JX3.6 ¶ 17. In addition, Gemini claims that the actions of the Postal Service constitute a breach of contract with the result that Gemini was forced to "cancel the contract and suffer damages." Id.

---

[7] Gemini's complaint does not explain the reference to "designated areas" other than to cite to an attached "Exhibit B" to the complaint. Exhibit B is a list of telephone numbers and locations which Gemini represents to be the "Attached Exhibit A" referred to in paragraph six of the October 1999 agreement. JE3, JX3.4 ¶ 8; JE3, JX3.12-3.17; JE5, JX5.2 ¶ 6. According to Phyllis Flynn, a Telecommunications Specialist with the Postal Service's Chicago District, Tr. 277: 14-17 (Flynn), the telephone numbers and locations contained in this list (Exhibit B), are all telephone numbers and locations from within the Postal Service's Chicago District. Tr. 321:17-25 – 327:1-21 (Flynn); JE3, JX3.12-17; JE9.

Although Gemini purports to have entered into an agreement for telecommunications services that extended beyond the Chicago District of the Postal Service, it cannot demonstrate that such an agreement was ever executed by the Postal Service or that any such agreement was ever properly authorized by the Government. As the person negotiating for a contract with the Government, Gemini's CEO, Willie Wilson, assumed the risk that the Government official(s) he was dealing with had actual authority to enter into the contract alleged. Total Medical Management, 104 F.3d at 1321; Trauma Service Group v. United States, 104 F.3d 1321, 1327 (Fed. Cir. 1997). Mr. Wilson, however, made no attempt to ascertain the limits of Mr. Porter's contracting authority prior to entering the agreement in this case. Tr. 144:9-18 (Wilson). As we demonstrate below, Rufus Porter, who executed the written agreement upon behalf of the Government, was clearly limited in his authority to the Postal Service's Chicago District.

## II. The Parties' Pre-Dispute Conduct Demonstrates Their Mutual Understanding That The October 1999 Written Agreement Applied Only To The Chicago District

There was conflicting trial testimony concerning the intent of the parties with respect to the areas to be covered by the October 1999 agreement. Whereas witnesses testifying upon behalf of the Postal Service stated that both parties understood that the agreement would apply only to facilities in the Chicago District, Tr. 301:19-24 (Flynn), Gemini's Willie Wilson testified that there was an understanding between the parties that the October 1999 agreement would cover some area broader than only the Chicago District. Tr. 59:19-25 – 60:1-18 (Wilson).

Although the parties now disagree about the scope of the agreement, evidence of the parties' conduct and statements prior to the onset of this dispute establishes that both parties understood that the October 1999 agreement would apply only to the Chicago District, and that Gemini would need to enter into separate agreements in order to expand its services to areas

beyond the Chicago District. This pre-dispute conduct, which is entitled to "great weight" in the interpretation of the agreement, PCL Construction Services, Inc. v. United States, 47 Fed. Cl. 745, 786 (2000) (quoting General Warehouse Two, Inc. v. United States, 181 Ct. Cl. 180, 187, 389 F.2d 1016, 1020 (1967)), establishes that in the weeks and months prior to and following execution of the agreement, both Gemini and the Postal Service understood that the October 1999 written agreement was limited in scope to the Chicago District.

A. Application Of The Parol Evidence Rule

The function of the parol evidence rule, which is not a rule of evidence, but a rule of substantive law, is to prevent inconsistent contemporaneous or prior statements from changing the terms of an integrated agreement. Gutz v. United States, 45 Fed. Cl. 291, 297 (1999). There is, however, a heavy burden to overcome when arguing that a contract is not fully integrated. The existence of an integration clause is "likely to conclude the issue whether the agreement is completely integrated." Hamilton Securities Advisory Services, Inc. v. United States, 60 Fed. Cl. 144, 157 (2004) (citing Restatement (Second) of Contracts § 216 cmt. 3 (1981)). To determine whether a contract is fully integrated, the court may look to extrinsic evidence. McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1434 (Fed. Cir. 1996). Extrinsic evidence is not admissible to add to or modify a fully integrated contract. Id. Nor may outside evidence be brought in to create an ambiguity where the language is clear. Id. at 1435. However, because an ambiguous or uncertain writing sometimes can only be understood upon consideration of the surrounding circumstances, including prior negotiations, extrinsic evidence will be allowed to interpret ambiguous clauses in written agreements. Gutz, 45 Fed. Cl. at 297; see Sylvania Elec. Products, Inc. v. United States, 198 Ct. Cl. 106, 458 F.2d 994, 1005 (1972). If a contract is deemed

ambiguous, "[e]xpressions of the parties during negotiations for the contract are thus a frequent source for interpretation of its text." Id.

The parol evidence rule demands that contract interpretation be unaffected by the contentions of one of the parties that he or she meant something else. "The unexpressed, subjective, unilateral intent of one party is insufficient to bind the other contracting party, especially where the latter reasonably believes otherwise." Pacificorp Capital, Inc. v. United States, 25 Cl. Ct. 707, 716 (1992), aff'd, 988 F.2d 130 (Fed. Cir. 1993) (table) (citations omitted). "The purpose and essence of the rule is to avoid the possibility that fraud might be perpetrated if testimony as to subjective intent could be substituted for the plain meaning of a contact." Garza v. Marine Transp. Lines, Inc., 881 F.2d 23, 26 (2d Cir. 1988). However, the court may look to parol evidence to determine the parties' intent. Sylvia Elec. Products, 458 F.2d at 1005 (because the court concluded, as a matter of law, that the release relied upon by the Government was ambiguous, the court may look to parol evidence to determine the parties' intent).

To the extent that there is any ambiguity as to the "premises" be covered by the agreement,[8] the Court may consider evidence such as the statements allegedly made by Mr. Weeker prior to the execution of the agreement, as well as the actions of the Postal Service prior to the execution of the agreement. However, as demonstrated below, Mr. Weeker's statements do not alter the express terms of the agreement because they were not specifically incorporated into the agreement as required. In addition, Mr. Wilson's testimony that the

[8] It is undisputed that the "premises" to be covered by the agreement, JE5, JX 5.2 ¶ 6, included all Postal Service facilities within the Chicago District. The only dispute between the parties concerns whether the "premises" also included any facilities outside the Chicago District, and if so, which facilities outside the Chicago District were included.

agreement extended beyond the Chicago District, was contrary to the understanding of the Postal Service, and thus, cannot serve to bind the Government. Pacificorp, 25 Cl. Ct. at 716. Further, Mr. Porter's authority in executing the express agreement with Gemini clearly did not extend beyond the geographic boundaries of district over which he presided – the Chicago District. Tr. 214:17-22 (Porter). Lastly, there is no documentary evidence to support Gemini's contention that it had an agreement with the Postal Service for any area or district beyond Chicago.[9]

In essence, Gemini has not and cannot support its contention that the Postal Service agreed to and authorized Gemini to place its pay phones in areas or districts other than Chicago. As such, Gemini has not sufficiently established that the scope of the agreement exceeded the boundaries of the Chicago District of the Postal Service.

B. The October 1999 Agreement Was Limited To The Chicago District

Prior to the execution of the agreement, Postal Service attorney Maria Fuhrmann (now Infanger) testified that she requested a list from the Postal Service's Information Systems Department that would serve as "Exhibit A" to the agreement.[10] On October 22, 1999, immediately following the execution of the agreement, Ms. Infanger received a list from the Information Systems Department in response to her request. Tr. 452:22-25 – 454:1-8 (Infanger); JE12, JX12-12.6. The cover letter accompanying that list states that the list consists of

---

[9] Although Mr. Wilson claims that Gemini placed its pay phones in areas it understood to be outside the Chicago District (in the form of commission statements), Gemini has produced no evidence in support of that claim. Tr. 137:14-25 – 138:1-18 (Wilson). Nor does the testimony of any of the other witnesses support this claim.

[10] Rufus Porter had similarly requested the Information Systems Department to compile a list of Chicago District pay phones. Tr. 192:22-25 – 193:1-15, 223:21-23 (Porter).

"Ameritech pay phones that are located within the Chicago District."[11] JE12.

Postal Service Telecommunications Specialist Phyllis Flynn sent a letter to Ameritech on October 25, 1999 (less than a week after the agreement was signed by Mr. Porter and Mr. Wilson). JE11. Copies of Ms. Flynn's letter were sent to Rufus Porter and Gemini. Id. In that letter, Ms. Flynn stated that Gemini was authorized to order phone service for Postal facilities within the Chicago District. Id.; Tr. 330:7-15 (Flynn). Although Ameritech had been providing pay phone service to Postal facilities both within and beyond the Chicago District, Tr. 191:23-25 – 192:1-13 (Porter), Ms. Flynn's letter made no reference to any agreement authorizing Gemini to provide pay phone service for any facilities outside the Chicago District. JE11. In addition, Ms. Flynn put together a list of pay phone numbers and locations from within the Chicago District which was to serve as "Exhibit A" to the agreement. Tr. 317:10-19, 319:8-16 (Flynn).

### C. Oral Representations By J.T. Weeker Did Not Alter The Terms Of The Agreement Or Create A Separate Implied-In-Fact Agreement For Pay Phone Service Beyond The Chicago District

At trial, Gemini's CEO, Willie Wilson, testified that in addition to the written agreement he executed with the Government, he had an oral agreement with the Government regarding the scope of pay phone service areas to be covered by the agreement. Mr. Wilson first alleged that, prior to the execution of the written agreement in October 1999, he had conversations with Rufus Porter and Mr. Porter's supervisor, J.T. Weeker – conversations which indicated that the Postal Service facilities to be covered by the agreement included: the Chicago District, Chicago's

[11] In fact, Phyllis Flynn of the Postal Service confirmed at trial that the phone numbers and locations on this list (including the numbers and locations at O'Hare Airport) were all from within the Postal Service's Chicago District. Tr. 313:5-25 – 315:1-12 (Flynn).

O'Hare Airport, the Northern District of Illinois, and the Central District of Illinois. Tr. 59:9-26 – 60:1-25 (Wilson). Second, Mr. Wilson alleged that he had two additional meetings with Mr. Weeker before Mr. Weeker passed away in January 2000 – meetings which also indicated that Gemini "should be able to have . . . [the] Chicago area, Northern Illinois, [and] Central Illinois." Tr. 69:4-25 – 71:1-25; Tr. 136:5-8 (Wilson). Mr. Wilson further alleged that Mr. Weeker told Mr. Porter to "hurry up and get it [Gemini's expansion beyond the Chicago District] done." Tr. 71:16-25 (Wilson).

In January 2000, after the death of J.T. Weeker, Willie Wilson sent a letter to Mr. Weeker's successor, Danny Jackson. JE10. Mr. Wilson's letter referred to an October 29, 1999 meeting he had with Mr. Weeker. Id. Mr. Wilson's letter stated that, during that meeting, Mr. Weeker "was extremely encouraging and instructed his staff to help [Gemini] expand [its] services immediately to the outlying Chicagoland areas such as Fox Valley, Carol Stream, South Suburban and Palatine as we made long range plans to provide public phone service to [Postal Service] facilities in other [s]tates of the Great Lake[s] Region." Id. Mr. Wilson's letter further stated, "[Mr. Weeker] suggested we continue to work with Mr. Porter as we talked with Sharon Kao and Greg[g] Sackrider about existing contracts and timetable[s] for the installation of our pay phones as well as long distance service."[12] Id. The meeting referenced in Mr. Wilson's letter to Mr. Jackson took place approximately one week after the execution of the agreement, yet the statements Mr. Wilson attributes to Mr. Weeker speak of future expansion to areas outside Chicago and future agreements to provide service in other parts of the Great Lakes Area. Id.

---

[12] In January 2000, Sharon Kao was the Manager of the Postal Service's Procurement Department. Tr. 194:23-25 – 195:1 (Porter); Tr. 414:14-17 (Holmes). Gregg Sackrider was the head of the Postal Service's legal department in Chicago. Tr. 209: 9-20 (Porter).

Indeed, the conversations cited in Mr. Wilson's letter only make sense if the parties understood the written agreement as being limited in scope to the Chicago District and that Gemini would need to enter into separate agreements in order to expand its services beyond that district.

Assuming that the above statements were made by Mr. Weeker, Mr. Wilson concedes that he is unaware of any written documentation regarding the statements allegedly made by Mr. Weeker in support of Gemini's claim that the agreement extended beyond the Chicago District.[13] Tr. 138:11-18 (Wilson). Moreover, as discussed more fully below, the only evidence in support of an expansion of Gemini's telecommunications services beyond the Chicago District occurred subsequent to the execution of the express agreement executed in October 1999. Simply put, there is insufficient evidence of the contractual requirements necessary for any alleged oral agreement for the provision of Gemini's telecommunications services outside of the Postal Service's Chicago District.

Contrary to Mr. Wilson's assertion that the agreement (based upon Mr. Weeker's oral representations) was to extend beyond the Postal Service's Chicago District, Phyllis Flynn, a Telecommunications Specialist with the Postal Service in Chicago, testified that prior to the selection of a bidder for the telecommunications services at issue, she specifically informed all bidders, including Gemini (through Mr. Wilson), that the agreement was to cover only pay phone service for Postal Service facilities within the Chicago District and would not extend to areas

[13] In support of his claim, Mr. Wilson purports to have receipts of commission payments for pay phones outside the Chicago District; however, no such receipts were ever produced by Gemini or submitted as evidentiary proof of this claim. In fact, the only commission statement Gemini produced in evidence in this case is a commission statement, dated May 2001, reflecting commissions on Postal Service facilities all from within the Chicago District. Compare JE7 with JE17A (attached to this brief); see also Tr. 175:1-12 (Porter); Tr. 368:8-25 – 372:1-11 (Kubick).

beyond the Chicago District, such as the Northern and Central Illinois Districts. Tr. 296:16-25–298:1-19 (Flynn). In support of this, Ms. Flynn testified that she provided all bidders, including Gemini, with a "station listing for all postal facilities for the Chicago district" which provided "the addresses, contact name and numbers for all of the [Postal Service] stations" being considered for the agreement. Tr. 297: 22-25–298: 1-8 (Flynn).

As noted above, Maria Infanger, an attorney with the Postal Service in Chicago, testified that the specific sites to be covered by the agreement were sites from "[with]in the Chicago District" and were to be incorporated into an "Exhibit A" to be attached to the agreement. Tr. 452:2-24 (Infanger); JE5, JX5.2 ¶ 6. In fact, Ms. Infanger instructed Ms. Flynn to provide her with a list of the locations which would comprise "Exhibit A" to the agreement. Tr. 452:3-9 (Infanger). According to Ms. Infanger and Ms. Flynn, the list of locations and phone numbers subsequently produced to Ms. Infanger as "Exhibit A," JE12, contained only phone numbers and sites from within the Chicago District. Id.; Tr. 453:7-25 – 454:1-14 (Infanger); Tr. 313:5-25 – 315:1-12 (Flynn).

Rufus Porter testified that he put together a committee of Postal Service employees who were responsible for preparing the solicitation and selecting an awardee for the provision of pay phone service in the Chicago District. Tr. 175:1-3; 194:17-25 – 196:1-3; 196:20-25 – 197:1-9 (Porter). Like Ms. Flynn and Ms. Infanger, Mr. Porter clearly indicated that the Postal Service's area of concern for the purposes of the agreement was the Chicago District of the Postal Service – the district over which Mr. Porter presided. Tr. 198:18-25 – 199:1 (Porter). Indeed, Mr. Porter testified that his authority was limited to his own district, Chicago, and that the Chicago District was separate from and did not include other Postal Service districts such as the Northern Illinois

or Central Illinois Districts or the O'Hare Airport Mail Center, which was a separate entity managed by Gerry Kubick. Tr. 175:16-25 – 177:1-10; 183:25 – 184:1-24 214:17-22 (Porter).

Although Mr. Porter acknowledged that it was his understanding that Gemini would eventually expand their pay phone service to cover all Postal Service facilities which were, at that time, being serviced by Ameritech, and that Mr. Weeker was interested in assisting Gemini in expanding to areas beyond the Chicago District, Gemini would have had to enter separate agreements with the other Postal Service districts in order to expand their pay phone service beyond the Chicago District. Tr. 217:21-25 – 218:1-21 (Porter). This Gemini did not do. Tr. 151:2-6 (Wilson); Tr. 218: 22-25 (Porter).

D. Oral Representations By J.T. Weeker Were Not Incorporated Into The Agreement

The parties agree that all conditions and terms of the public telecommunications service agreement were to be reduced to writing and made part of the written agreement. JE3, JX3.3 ¶ 2. Further, paragraph 15 of the agreement specifically states as follows:

> 15. ENTIRE AGREEMENT. This Agreement shall constitute the sole Agreement of the parties relating to the Premises. Neither party will be bound by statements, warranties, or promises, oral or written unless such statements, warranties, or promises are set forth specifically in this Agreement.

JE5, p. JX 5.3 ¶ 15. As noted above, the term "premises" is defined in paragraph six of the agreement and references an "Attached Exhibit A." JE5, JX5.2 ¶ 6.

Ms. Infanger, the Postal Service attorney who assisted in drafting and finalizing the October 1999 agreement between the Postal Service and Gemini, testified that prior to the agreement being executed in October 1999, there were no written incorporations to the agreement from Mr. Weeker. Tr. 437:17-25 – 438:1-17; Tr. 460:4-11 (Infanger); DE200-201.

Accordingly, even assuming that Mr. Weeker possessed the authority to allow Gemini to expand its pay phone service beyond the Chicago District, it is undisputed that any promises allegedly made by Mr. Weeker regarding such an expansion were not incorporated into the agreement. Further, without evidence of a "meeting of the minds" as to any Postal Service areas or districts (other than the Chicago District) to be covered by the agreement, Gemini cannot support its claims for breach of contract in this case.

E. There Was No "Meeting Of The Minds" Regarding Gemini's Provision Of Pay Phone Service Beyond The Chicago District

The core of the dispute in this case involves the scope ("premises") of the public telecommunications service agreement – in other words, which specific areas or districts of the Postal Service were subject to the agreement. To the extent that Gemini purports to rely upon oral promises allegedly made by J.T. Weeker as evidence that the agreement was not limited to the Chicago District, Gemini is precluded from doing so as a matter of law. As demonstrated above, the express agreement in this case did not incorporate any promises or oral representations allegedly made by Mr. Weeker, as required by paragraph 15 of the agreement (JE5, JX5.3), nor is there any concession upon the part of any of the Postal Service personnel that the agreement was to cover any areas beyond the Chicago District. Indeed, the actions of the Postal Service with respect to the agreement demonstrate that the intent of the Postal Service was to enter an express agreement with Gemini which was limited to the Chicago District. The only person who appears to have a different understanding of the agreement is Gemini's CEO, Willie Wilson.

1. There Was Not Implied-In-Fact Contact

Inasmuch as Gemini may be implicitly suggesting that there was an implied-in-fact contract for the provision of telecommunications services outside the Chicago District, Gemini

fails to meet its burden of proof. As indicated above, the requirements for an implied-in-fact contract are the same as those for an express contract – only the nature of the evidence differs. Hanlin v. United States, 316 F.3d 1325, 1328 (Fed. Cir. 2003). An implied-in-fact contract is founded upon a meeting of the minds and "is inferred, as a fact, from the conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." Id. (quoting Balt. & Ohio R.R. v. United States, 261 U.S. 592, 597 (1923)). There is simply no evidence indicating that Gemini and the Postal Service agreed upon a contract for Gemini's services for any specific Postal Service facilities outside the Chicago District. There is no agreed upon list of facilities and phone numbers from any district of the Postal Service (other than possibly Chicago) that reflects a meeting of the minds as to which facilities would be serviced by Gemini. Nor is there any evidence of any such agreement reflecting: mutuality of intent, consideration, an unambiguous offer and acceptance, and actual authority upon the part of the Government's representative to bind the Government in contract. Hanlin, 316 F.3d at 1328 (citing City of Cincinnati v. United States, 153 F.3d 1375, 1377 (Fed. Cir. 1998)). For Gemini to assert that it understood the October 1999 agreement to extend to all Postal Service facilities which, at the time, were being serviced by Ameritech pursuant to a contract between Ameritech and the Postal Service, reflects a fundamental misunderstanding regarding the most critical term – scope – of the agreement upon the part of Gemini.

2. The "Exhibit A Rider – Illinois"

Mr. Wilson purports to have relied upon the Ameritech list (Exhibit A Rider – Illinois) in preparing his bid for the agreement with the Postal Service. Tr. 117:15-19 (Wilson). However, Ms. Flynn specifically testified that she discussed the agreement's area of coverage (Chicago)

with all bidders (including Mr. Wilson) and provided the bidders with a list of the applicable pay phone numbers and locations which was limited to the Chicago District. Tr. 296:16-25 – 297:1-3; 296:18-25 – 299:1-7; 301:19-25 – 302:1-2 (Flynn). Ms. Flynn further testified that Mr. Wilson had no questions regarding the area of coverage. Tr. 301:9-13 (Flynn). For Mr. Wilson to now claim that he understood the Chicago District of the Postal Service to include Chicago, O'Hare Airport, Northern Illinois, Central Illinois, and perhaps beyond, Tr. 123: 21-24 – 124:1-5 (Wilson), only highlights the lack of understanding between the parties regarding the scope of any agreement beyond the Chicago District. As such, there was clearly no meeting of the minds upon this critical element of the agreement with respect to any areas beyond the Chicago District. The only areas upon which both parties agree regarding the "premises" to be covered by the October 1999 agreement and which was properly authorized by the Government (through Rufus Porter, District Manager of the Chicago District) was the Chicago District.

3. <u>There Was No Agreement For The Central Illinois District</u>

The letters sent to Jim Holmes, District Manager of the Postal Service's Chicago District, by Gemini's Willie Wilson and Nikki Zollar demonstrate that Gemini knew that it would have to enter into a separate agreement in order to expand its pay phone service into the Central Illinois District. Nowhere in either Mr. Wilson or Ms. Zollar's letters did Gemini assert that it already had an agreement in place that authorized it to provide pay phone service to the Central Illinois District; to the contrary, Ms. Zollar's letter clearly indicates Gemini's willingness to negotiate the terms of its proposed written agreement with the Central Illinois District. <u>See</u> DE202; DE203. Once again, Gemini's conduct and statements demonstrate that it understood that the October 1999 agreement was limited to the Chicago District and it would need to enter into separate

agreements in order to expand its service into Central Illinois or elsewhere.

4. Gemini Admits That The Agreement Was Limited To The Chicago District

In March 2002, Gemini filed a verified complaint against the Postal Service in the Chicago district court. JE4. Mr. Wilson's verification that accompanied that complaint, submitted under penalty of perjury, represents that the factual allegations contained in that complaint are true. JE4, JX4.13; Tr. 109:7-25 – 111:1-9 (Wilson). Paragraph 12 of that complaint states, "On or about August 26, 1999, Gemini Electronics, Inc. entered into a [sic] bidding process for the contract for providing pay telephone management services to the United States Postal Service facilities within the Chicago District." JE4, JX4.3 ¶ 12 (emphasis added). Paragraph 13 states that Gemini "was chosen as a provider for pay telephone management services at the United States Postal Service facilities in the Chicago District . . . ." JE4, JX4.3-4.4 ¶ 13 (emphasis added).

During his trial testimony, Mr. Wilson tried to explain Gemini's admissions[14] in its district court complaint that the agreement was for services to Postal Service facilities in the Chicago District, JE4, JX 4.3-4.4 ¶¶ 13, 14, by claiming that he understood that the Chicago District covered "Chicago, O'Hare, Northern Illinois and Central Illinois, et cetera . . . ." Tr. 124:3-5 (Wilson). However, after meeting with the District Manager in Central Illinois at some time during the year 2000, Tr. 78:5-18 (Wilson), Mr. Wilson must have understood that the

[14] In E.C. McAfee A/C Bristol Metal Industries of Canada, Ltd. v. United States, 832 F.2d 152, 154 (Fed. Cir. 1987), the United States Court of Appeals for the Federal Circuit cited to Darling Shops, Inc., of Tennessee v. Brack, 95 F.2d 135 141 (8th Cir. 1938), and 4 J. Wigmore, Evidence § 1064, at 67 (Chadbourn rev. 1972), to support the finding that pleadings, such as complaints and answers to complaints, are judicial admissions which may be invoked to render the facts contained therein indisputable and to be construed against the pleader.

Central Illinois District was separate from the Chicago District. Mr. Wilson's admissions in his district court complaint in March 2002 confirm that Gemini bid upon and received an agreement covering Postal Service facilities only within the Chicago District. JE4, JX 4.3-4.4, 4.17. Gemini's verified district court complaint is further evidence that it understood the October 1999 agreement as being limited in scope to the Chicago District. Id.

5. Gemini Fails To Establish An Agreement Beyond The Chicago District

Perhaps as telling as the pre-dispute evidence that is actually in the record, is the absence of other evidence in the record. Gemini now claims that it understood the October 1999 agreement as applying to some area beyond the Chicago District, and that its inability to install its pay phones beyond the Chicago District caused it financial damage. Tr. 104:11-15 (Wilson). However, the record is devoid of any evidence that Gemini ever asserted its contractual right to install phones outside the Chicago District before terminating the agreement in 2002. In fact, when Gemini notified the Postal Service of its intent to terminate the agreement in September 2002, Gemini made no reference to any entitlement to install phones in facilities beyond the Chicago District. JE6. To the contrary, Gemini's termination notice letter, which was signed by Gemini's attorney at the time, Jon Michelle Richardson, cited "the poor economic climate of the country and most notably in the telecommunications industry" as the cause of Gemini's financial loss in performing under its agreement with the Postal Service. Id. At trial, Mr. Wilson claimed that he had informed Ms. Richardson that he wanted to terminate the agreement because the Postal Service had stopped Gemini from expanding into other districts. Tr. 104:24-25 – 105:1-18 (Wilson). Mr. Wilson offered no explanation as to (1) why his attorney would have asserted some other cause for Gemini's financial loss or (2) why he failed to correct the alleged

misstatement(s) in Ms. Richardson's letter.

For more than two years after the execution of the October 1999 agreement, both parties to the agreement acted in a manner consistent with their understanding that the agreement applied only to the Chicago District. Although it may have been possible for Gemini to expand its services beyond the Chicago District, the parties clearly understood that such expansion would come only as a result of separate written agreements. It is only since the onset of this litigation that Gemini has taken the position that the October 1999 agreement, on its own, entitled Gemini to install its pay phones outside the Chicago District. See JE3. Because Gemini's current position is contrary to the parties' mutual understanding at all times prior to the onset of this dispute, it should be rejected.

## III. Rufus Porter, As District Manager Of The Chicago District, Had No Actual Authority To Enter Into An Agreement For Postal Service Facilities Outside The Chicago District

There is no dispute that Rufus Porter, as District Manager and Postmaster for the Postal Service's Chicago District, had authority to enter into an agreement for the installation of pay phones within his district. However, both the management structure of the Postal Service's Great Lakes Area at the time the agreement was executed, and the Postal Service's internal rules, make clear that Mr. Porter's authority did not extend beyond the geographic boundaries of the Chicago District. Therefore, even if the Court were to find that Mr. Porter intended the October 1999 agreement to apply to Postal Service facilities outside the Chicago District, the Postal Service could not be bound by such an unauthorized commitment.

At the time the October 1999 agreement was executed, J.T. Weeker was the Postal Service's Vice President for the Great Lakes Area. Tr. 177:17-19 (Porter). The Great Lakes Area covers the state of Illinois, as well as Wisconsin, Michigan, and parts of both Missouri and

Indiana. Tr. 337:5-22 (Flynn). The map, to be submitted separately by leave of Court and at the Court's request, reflects the geographic boundaries of the Chicago District. As Vice President for the Great Lakes Area, Mr. Weeker was the direct supervisor for Rufus Porter, District Manager for the Chicago District, as well as the district managers for other districts within the Great Lakes Area. Tr. 219:1-15, 230:11-14 (Porter). Among the other district managers who reported directly to Mr. Weeker was James Holmes, District Manager for the Central Illinois District. Tr. 406:10-12, 409:21-23, 421:5-9 (Holmes). Central Illinois and Northern Illinois are not now and were not part of the Chicago District in October 1999; they are and were separate districts, each with its own district manager. Tr. 176:11-19, 184:18-24 (Porter). Gerald Kubick, the Plant Manager at the Chicago Airmail Center at O'Hare reported directly to the Great Lakes Area Vice President in October 1999; he did not report to any district manager. Tr. 366:9-25 – 367:1, 368:4-7 (Kubick). In light of this organizational structure, the authority of any individual district manager must be limited to the particular district to which he or she is assigned. Otherwise, the Postal Service would be exposed to multiple and potentially inconsistent commitments. If the district manager for the Chicago District can enter into a binding agreement with one company that would apply to the Northern Illinois and Central Illinois districts (or, for that matter, to the entire Great Lakes Area), the district managers in Northern Illinois and Central Illinois would simultaneously have authority to enter into agreements with two other companies that would also cover the same districts. A determination that the authority of each district manager is limited to his or her particular district would prevent and does prevent such a result.

The regulations of the Postal Service further support the conclusion that each district manager is limited in authority to his or her particular district. 39 C.F.R. § 229.2(a) states, "The

field divisions are responsible for the day-to-day management of all operations and facilities within a geographic area." Field divisions are essentially the same as districts except for a name change that occurred during the 1992 restructuring of the Postal Service. Tr. 279:10-14 (Flynn). Thus, the primary limitation upon the authority of the official appointed to manage a Postal Service district is the geographic scope of that district.

Postal Service rules specifically addressing the provision of telephone service also support the conclusion that each district manager is limited in authority to his or her own district. Administrative Support Manual § 863.2, states the following with respect to telecommunications: "The district manager, through the information systems manager at the district, manages voice, video, facsimile, and data telecommunications systems within a geographic boundary, including processing and distribution installations." JE15, JX 15.3. Again, the primary limitation upon the authority of the district manager is geographic in nature.

The conclusion that Mr. Porter's authority, with respect to the agreement with Gemini, was limited to the geographic boundaries of the Chicago District is also consistent with Mr. Porter's own understanding of his authority. Mr. Porter was not a contracting officer. Tr. 178:9-11 (Porter). Mr. Porter understood that his authority to enter into the agreement with Gemini existed by virtue of his status as District Manager for the Chicago District. Tr. 178:12-15 (Porter). As District Manager, Mr. Porter also understood that he was limited in his authority to the geographic boundaries of his particular district of Chicago. Tr. 183:25 – 184:1-5 (Porter). With respect to the agreement he signed with Gemini, Mr. Porter understood that his authority was limited to facilities within the Chicago District. Tr. 183:25 – 184:1-5 (Porter). Mr. Porter clearly testified that he had no authority outside his district. Tr. 214:17-22 (Porter).

There is no single document that addresses the limits upon the authority of a district manager to enter into agreements such as the one Rufus Porter signed with Gemini in October 1999.[15] However, all available evidence points to the conclusion that a district manager's authority with respect to such agreements is limited to the geographic boundaries of the particular district he or she manages. There is no evidence establishing that a district manager has any authority to enter into agreements that extend beyond those boundaries. Therefore, even assuming arguendo that Mr. Porter intended that the October 1999 agreement he signed would apply to facilities beyond the Chicago District, Mr. Porter would have been acting outside his authority.

IV. The Government Did Not Breach Any Agreement For Telecommunications Services At Postal Services Facilities At The Chicago Airmail Facility At O'Hare Airport

Mr. Kubick testified that sometime in 1999, he received a telephone call from Rufus

[15] When she was assigned to work on the pending agreement with Gemini, Maria Infanger of the Postal Service's legal department attempted to locate official Postal Service guidance for agreements of that type. Ms. Infanger reviewed the Postal Service's Purchasing Manual and Administrative Support Manual, but determined that neither contained any guidance for agreements such as the one being negotiated with Gemini. Tr. 431:11-432:23 (Infanger); see also JE15; JE18. She also reviewed a Postal Service Management Instruction on "Acquiring Pay Telephones." JE16. However, Ms. Infanger determined that the Management Instruction was inapplicable to the agreement with Gemini because the Management Instruction addressed only the purchase or lease of pay telephones. Tr. 433:16-25 – 434:1-14 (Infanger). Ms. Infanger then contacted individuals in the Purchasing, Legal and Information Systems Departments of the Postal Service to determine whether there was a standard agreement that the Postal Service had used in similar situations, however, she was unable to locate any such standard agreement. Tr. 434:15-25 – 435:1-25 (Infanger). Finally, Ms. Infanger contacted individuals in other Postal Service districts outside the Chicago District who had dealt with agreements concerning pay telephones; those individuals informed her that "they basically signed agreements that they were given by the phone company. It wasn't a Postal Service contract that they used." Tr. 436:1-6 (Infanger). Despite her efforts, Ms. Infanger was unable to find any guidance that defined the contracting authority for an agreement such as the one contemplated between Gemini and the Postal Service. Tr. 475:14-21 (Infanger).

Porter of the Chicago District. Tr. 372:12-22 (Kubick). Mr. Porter asked Mr. Kubick to meet with Gemini representatives about whether there was a need for any pay phones in the Chicago Airmail Facility at O'Hare. Id. Shortly thereafter, Gemini representatives showed up at Mr. Kubick's plant asking whether there was a need for any pay phones at the plant. Tr. 373:1-5 (Kubick). Gemini was told that Mr. Kubick did not need any pay phones since he already had an agreement with Ameritech for the pay phones in his facility. Tr. 373:6-18 (Kubick). A couple days later, Mr. Porter called Mr. Kubick back and asked him to take another look at the plant to see if it could use any additional pay phones. Tr. 373:19-25 – 374:1-18 (Kubick). Mr. Kubick went through his facility with his In-Plant Manager and identified a few areas where the plant could use four to five additional pay phones. Tr. 374:15-20 (Kubick). Subsequently, Mr. Kubick allowed Gemini to place those four to five pay phones in his plant. Id. Mr. Kubick's permission to allow Gemini to place four or five phones at his facility was not reduced to writing. Tr. 377:12-16 (Kubick).

Because all matters involving the plant's budget had to come through him, Mr. Kubick testified that he was the person who would have had to authorize the placement of Gemini pay phones in his plant and that he had the authority to allow Gemini to place pay phones in his plant. Tr. 375:4-12; 377:12-23 (Kubick). Mr. Kubick further testified that Rufus Porter had no authority over his plant – the Chicago Airmail Facility at O'Hare. Tr. 375:13-15 (Kubick). Similarly, Mr. Porter testified that his authority was limited to his own district of Chicago. Tr. 214:17-22 (Porter).

In November 2000, Mr. Kubick came into the plant and found that all of the Ameritech pay phones had been removed from the plant and that the only remaining pay phones were the

four or five Gemini pay phones he had previously authorized. Tr. 378:14-25 – 379:1-5 (Kubick). Gemini pay phones were then installed at Mr. Kubick's plant to replace the Ameritech phones that had been removed. Tr. 380:13-18 (Kubick). When Mr. Kubick contacted Rufus Porter and Phyllis Flynn about this incident, he learned that the removal of the Ameritech pay phones had been a mistake and that the Gemini pay phones (which replaced the Ameritech pay phones) should have been placed at the Irving Park Plant at O'Hare and not at the Chicago Airmail Facility at O'Hare. Tr. 379:16-25 – 380:1-8 (Kubick). Mr. Kubick testified that shortly after Gemini's phones were installed in the Chicago Airmail Facility to replace all the Ameritech phones (without Mr. Kubick's approval or authorization), he had them removed and the Ameritech phones reinstalled.[16] Tr. 379:16-26 – 380:1-25 (Kubick).

Other than the evidence provided through Mr. Kubick's testimony, there is no additional evidence regarding any specific terms of any agreement between Gemini and Mr. Kubick as it relates to the provision of pay phone service at the Chicago Airmail Facility at O'Hare. There is no evidence of any specific terms of an agreement such as: scope or length of an agreement (other than what Mr. Kubick specifically authorized – the placement of four or five pay phones for an unspecified term at the Chicago Airmail Facility), payment, or any other terms. Without any specific evidence of an agreement, Gemini cannot complain of a breach of any such alleged agreement regarding the placement of pay phones at the Chicago Airmail Facility at O'Hare Airport.[17] San Carlos Irr. and Drainage Dist, 877 F.2d at 959.

---

[16] During that time, Mr. Kubick still had a current agreement with Ameritech for the pay phones in his facility. Tr. 381: 1-4 (Kubick).

[17] Gemini was unaware that there were two separate Postal Service facilities at Chicago's O'Hare Airport. Gemini was also unaware of whether the pay phones it installed at O'Hare were at the Irving

V. The Government Did Not Breach Any Agreement For Telecommunications Services At The Central Illinois District Or For Any Other Great Lakes Area District

The only other specific evidence submitted at trial regarding Gemini's efforts to expand its pay phone service beyond the Chicago District included testimony from James Holmes, District Manager for the Postal Service's Central Illinois District. Tr. 406:10-14 (Holmes). As previously discussed, Mr. Holmes testified that in the spring of 2000, he was contacted by Rufus Porter, who indicated that he was pleased with a contract he had entered into for the [Chicago] cluster involving Gemini and that Holmes might be interested in having Gemini do something in his [Central Illinois] cluster as well. Tr. 409:3-14 (Holmes). Mr. Holmes subsequently met with Gemini's Willie Wilson and others who made a sales pitch of sorts to Holmes and discussed a possible proposal for pay phone service for Central Illinois District facilities such as: the Bulk Mail Center ("BMC") in Forest Park, the Bedford Park plant, and the Fox Valley plant. Tr. 411:3-25 – 412:1-14 (Holmes). Gemini also requested and Mr. Holmes agreed that Gemini could survey those facilities. Tr. 412:15-21 – 413:1-9 (Holmes). During the meeting with Gemini, Mr. Holmes advised Gemini that if it was going to submit a proposal, the procurement department of the Postal Service would need to approve any such proposal.[18] Tr. 414:6-13 (Holmes). On approximately July 13, 2000, Mr. Holmes received a handwritten note from Mr. Wilson attached to a letter he had forwarded to Sharon Kao thanking Holmes for the meeting

Park Plant in the Chicago District or at the separate Airport Mail Center managed by Gerald Kubick. Tr. 139:2-7; 140:13-22 (Wilson). Likewise, Gemini acknowledged that it was unaware that Rufus Porter had no authority over the Airport Mail Center at O'Hare. Tr. 141:11-14 (Wilson). Not surprisingly, Gemini's complaint is also vague in its allegation that "Gemini was denied access to install equipment at O'Hare Airport." JE3, JX3.6 ¶ 13.

[18] Mr. Holmes provided Gemini with the name of the Postal Service's manager of procurement, Sharon Kao. Tr. 414:14-17 (Holmes).

of July 12, 2000 and submitting a proposal for the Bedford Park facility and Bulk Mail Center. Tr. 414:3-6; 415:2-25 – 416:1-15 (Holmes); DE202. At the time Gemini submitted its proposal to Mr. Holmes, however, there were Ameritech pay phones in the Central Illinois District of the Postal Service. Tr. 417:2-10 (Holmes). Mr. Holmes testified that he was not interested in having Gemini place its pay phones at his facilities at that point since he had not received a formal proposal from Gemini and because he wanted the procurement department to review any proposal from Gemini and those things had not been done at that time. Tr. 416:19-25 – 417:1 (Holmes).

On or about July 27, 2000, Mr. Holmes received additional documentation from Gemini, including a draft of an earlier agreement, dated September 27, 1999 (DE203, DX203.3-203.6), and a rider, dated June 21, 2000 (DE203, DX203.7). Tr. 418:18-25 – 419:1 (Holmes). Mr. Holmes responded to Gemini's correspondence of July 27, 2000 with a letter, dated August 1, 2000, acknowledging receipt of the documents (which he had yet to review) and indicating that he would be on vacation until August 11, 2000. Tr. 420:9-18 (Holmes); DE204. Mr. Holmes heard nothing else from Gemini, Rufus Porter, or anyone else from the Postal Service regarding Gemini's proposal after that time. Tr. 420:19-25 – 421:1 (Holmes). Nor did Mr. Holmes ever have any conversations with his immediate boss, J.T. Weeker, regarding Gemini. Tr. 421:2-9 (Holmes). Lastly, Mr. Holmes testified that he never entered into any agreements with Gemini based upon the proposal they provided to him. Tr. 421:9-12 (Holmes). Accordingly, nothwithstanding Gemini's initial efforts to submit a proposal for pay phone service in the Central Illinois District of the Postal Service, there is no evidence that Gemini or the Postal Service entered into any type of agreement for pay phone service in the Central Illinois District.

Nor does the evidence support any claim regarding the denial of any expansion of Gemini's pay phone service in any other area or district of the Postal Service within the Great Lakes Area as vaguely alleged in the complaint. JE3, JX3.4 ¶ 9, JX3.5-3.6 ¶¶ 13-14.

Gemini's notice of intent to terminate the agreement fails to mention any alleged breach of the agreement upon the part of the Government. JE6 (indicating that Gemini's termination of the agreement was based upon the poor economic climate of the country , most notably in the telecommunications industry). Similarly, Gemini's initial complaint filed in the district court in Chicago fails to allege a breach of the agreement by the Government (Gemini's district court complaint alleges price discrimination). See JE4. There is simply no evidence to support Gemini's claim of breach of contract prior to the time it filed its complaint in this Court – even that complaint fails to specifically state the basis for any alleged breach. See JE3. Further, Gemini has failed to support its claim of breach with documentary or testimonial evidence from the trial in this case. As such, Gemini's claim for breach of contract should be dismissed.

CONCLUSION

For the foregoing reasons, we respectfully request that the Court enter judgment for the United States upon Gemini's complaint alleging breach of contract.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Mark A. Melnick
MARK A. MELNICK
Assistant Director

s/ Carolyn J. Craig
CAROLYN J. CRAIG
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7561
Fax: (202) 305-7644
E-mail: carolyn.craig@usdoj.gov

OF COUNSEL

CHRISTOPHER J. BURTON
Commercial and Appellate Litigation
U.S. Postal Service
475 L'Enfant Plaza, S.W.
Room 6323
Washington, D.C. 202050-1127
Tel: (202) 268-3069
Fax: (202) 268-5287
E-mail: christopher.j.burton@usps.gov

October 15, 2004

Attorneys for Defendant