No. 04-166C
(Judge Horn)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

GEMINI ELECTRONICS, INC.

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

Lewis Myers, Jr.
Counsel for Plaintiff
25 E. Washington Street
Suite 1225
Chicago, IL 60602
(312) 236-8004 Tel.
(312) 236-8804 Fax.
lmyersatt@aol.com

November 17, 2004

**PLAINTIFF'S POST-TRIAL BRIEF**

**TABLE OF CONTENTS**

I. Statement of Facts........................................................................Page 1

II. Table of Authorities......................................................................Page 3

III. Plaintiff's Post-Trial Brief......................................................... .Page 4

III. Statement of Issues.......................................................................Page 4

IV. Statement of Facts........................................................................Page 9

V. Argument..........................................................................................Page 25

A. Rufus Porter had expressed and implied authority to enter the contract with Gemini.

B. Because of the Ambiguity in the contract, the Parole Evidence applies

C. The ambiguities in the contract should be interpreted most strongly against the government because the government drafted the contract.

D. Public Telecommunications Agreement was to apply beyond the Chicago District

# TABLE OF AUTHORITIES


Anderson v. United States 344 F.3d, 1343, 1353, (Fed. Cir. 2003)

Baltimore & Ohio R.R. v. United States 361 U.S. 592 (1923)

Buesins v. United States 42 Fed. Cl. 679, (Fed. Cl. 1999)

Cal Fed Bank v United States 39 Fed. Cl. 753, 1977 (Fed. Cl. 1997)

City of El Centro v United States, 922 F.2d 816 (Fed. Cir. 1990),
cert. denied, 501 U.S. 1230 (1991)

D&N Bank v United States, 331 F.3d 1374 (Fed. Cir. 2003)

First Commerce Corp. v. United States 60 Fed. Cl. 570,
(Fed. Cl. 2004) (No. 92-731 c) "ITN: 2,3,5 F.3d

Gould, Inc., v. United States, 67 F.3d 925, 929, (Fed. Cir.1995),
Spuill v. Merritt Sys. Protection Board., 978 F.2d 679, 686, (Fed. Cir. 1992)

Hanlin v. United States 316 F.3d 1325 (Fed. Cir. 2003)

Hayman 524 F.2nd 1320 (2nd Cir. 1975)

McAfee v. United States 46 Fed. Cl. 428 (Fed. Cl. 2000)

Sylvania Electric Products, Inc., v. United States 198 Ct. Cl. 106, 458 F.2d 994(Ct. Cl 1972)

Tarza v. Marine Transport Line, Inc. 861 F.2d 23 (2nd Cir. 1988)

United States Fire Insurance Co. v. General Reinsurance Corp.
949 F.2d 569, 1991 (2nd Cir. 1991)

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| GEMINI ELECTRONICS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 04-166C |
| v. | ) | Judge Marian Blank Horn |
| | ) | |
| UNITED STATES POSTAL SERVICE, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S POST-TRIAL BRIEF**

Pursuant to this Court's order dated September 24, 2004 and Appendix A of the Rules of the United States Court of Federal Claims, Plaintiff Gemini Electronics, Inc., respectfully submits its Post-Trial Brief.

Based upon the evidence presented to the Court at trial, the evidence submitted in the Joint Trial Exhibits, Plaintiff's Trial Exhibits, and the additional evidence provided to this Court and in the relevant case law, we respectfully request that this Court enter Judgement for the Plaintiff.

**STATEMENT OF ISSUES**

As this Court declared at trial, the issues in this case are as follows:

1. Whether Plaintiff's agreement with the Postal Service was limited to the Chicago District;
2. Whether the Postal Service breached the agreement;
3. Whether Rufus Porter and J.T. Weeker had the authority to bind the Postal

Service to the contract.

## STATEMENT OF THE CASE

### I. NATURE OF THE CASE

On or about March 25, 2002, Gemini Electronics, Inc. ("Gemini") filed an action against the United States Postal Service ("USPS") in the United States Federal District Court for the Northern District of Illinois, Eastern Division. JE4. The complaint in this action was entitled "Verified Complaint for Price Discrimination". JE4. In relevant part, the complaint in this action alleges... "Plaintiff Gemini Electronics seeks a declaration that in awarding the contract to Ameritech, the Defendant, the United States Postal Service, acted contrary to law and its own procurement regulations, arbitrarily and in breach of its contractual obligations to Gemini Electronics...". JE4, JX4.1, JX4.2

The complaint filed in the United States District Court specifically references that Gemini Electronics had been awarded a pay telephone contract service agreement. This service agreement is the same public telecommunications service agreement that is the subject of the litigation in the current action before this Federal Court of Claims. JX4.14. The complaint further alleges in Paragraph 26 "...that the conduct of the defendant and Ameritech as alleged constitutes a violation of 15 U.S.C. Section 4, 15 U.S.C. Section 13, 15 U.S.C. Section 15 and 28 U.S.C. Section 1332. JE4, JX4.6.

More importantly, the complaint before the district court further alleged that "the United States procurement manual...which was effective June 1, 1988, applies to all Postal Service procurements of goods and services... The procurement manual is incorporated by reference in the Code of Federal Regulations and has the force and affect as law...Section 17.2a of the Postal Service Procument Manual requires that purchases must be made on the basis of adequate competition whenever feasible and that adequate competition means the solicitation and participation of a sufficient number of capable sources to ensure that the required quality and quantity of goods and services is obtained...JE4, JX4.7. This section of the complaint continues in relevant part, to cite sections of the United States Procurement Manual that the United States Postal Service violated in its contractual obligations with Gemini Electronics. JE4, JX4.7, JX4.8.

Finally, the complaint requested that the district court...preliminarily and permanently enjoined the United States Postal Service from further implementing the Ameritech management contracts and order the United States Postal Service to require Ameritech to immediately cease any performance under any and all of its management contract...(c) order the United States Postal Service to require Ameritech to tender the pay telephone sites that were the subject of the October 18, 1999 contract between Gemini Electronics, Inc. and the United States Postal Service...JE4, JX4.11, JX4.12.[1]

On or about September 30, 2002, the government moved to have the district court case transferred to this Court.

[1]The above sections of the March25, 2002 complaint before the United States Federal District Court for the Northern District of Illinois, Eastern Division is relevant to matters in this litigation because the government, through its witnesses before this Court, has steadfastly maintained that they were unaware of the restrictions, limitations, requirements and instructions promulgated by the United States Procurement Manual. This earlier complaint in 2002 clearly put the government on notice of the United States Postal Procurement Manual's existence and specifics.

On October 3, 2002, the district court granted the government's motion and transferred the case to this Court. The transferred case was docketed in this Court on January 9, 2003 as Case No. 03-38C.

On October 16, 2003, Gemini's complaint in this case was dismissed without prejudice for failure to submit the claim to the contracting officer for final decision. Following the dismissal of this action, Gemini filed an action under the Contract Disputes Act of 1978 with the United States Postal Service. JE3, JX3.18.

On or about December 5, 2003, Alexis V. Knighton, Manager, Labor Relations of the United States Postal Service issued a letter to counsel for Gemini Electronics denying Gemini's claim "in its entirety" under the Contract Disputes Act of 1978. JE3, JX3.18. Specifically, this letter served as the contracting officer's final decision on the claim by Gemini. JE3, JX3.18.[2]

> **"Attached 'Exhibit A' for a list of those facilities to which Gemini would have access. However, the parties never agreed upon the contents of that Exhibit, and the Exhibit was never actually attached to the agreement"**.

On February 6, 2004, Gemini Electronics filed its current amended complaint before this Court. JE3, JX3.19.[3]

---

[2]Following the dismissal without prejudice of this action by the Court on or about October 16, 2003, Gemini Electronics filed an action under the Contract Disputes Act of 1978 with the United States Postal Service. Essentially, Gemini Electronics attached its complaint that was dismissed in this action and made it the subject of the action which was filed under the Contracts Dispute Act of 1978. The letter, which is JE3, JX3.18, JX3.19 is a response to the referenced complaint initially filed before this Court.

[3]In JE3, JX3.19, Alexis V. Knighton, Manager, Labor Relations for the United States Postal Service notified counsel for Gemini Electronics through his December 5, 2003 that counsel could... "you may appeal this decision to the Postal Service Board of Contract Appeals by mailing or otherwise furnishing a written notice...to the contracting officer within 90 days from the date you receive this decision...alternatively, you may bring an action directly in the United States

The February 6, 2004 complaint filed by Gemini alleged that Defendant United States Postal Service violated the terms and conditions of the Public Telecommunications Service Agreement entered into by the United States Postal Service and with Gemini Electronics, Inc. on or about October 21, 1999. JE3, JX3.3. The complaint allege in specific part:

> "...the parties agree that the defined Premises may be supplemented with additional locations from time to time, and that these additional locations shall be subject to the terms and conditions of this agreement. **The installation of additional phones shall be agreed upon mutually by USPS and Gemini".** JE3, JX3.9.

More specifically, the Public Telecommunications Service Agreement in Paragraph Six, references:

> "...the premises are described as the following locations that are owned, managed, leased, or operated by USPS and that are subject to this agreement: see attached Exhibit A."...JE3, JX3.9.

Finally, the February 6, 2004 complaint in Paragraph Seven states...

> "Pursuant to the terms of said agreement, Plaintiff Gemini was given the responsibility of placing phones in USPS stations, offices and buildings in the Great Lakes postal area which covers Chicago."

This included more than 110 facilities. Over a period of time, the pay phone services contract as defined by the herein referred to agreement covered more than 300 payphones...JE3, JX3.4.

The complaint concludes by requesting that:

> "...that this Honorable Court enter an order awarding Plaintiff Gemini compensatory damages in the amount of $300,000..." JE3, JX3.7.

This Court commenced a trial of this matter in the United States Federal District Courthouse in Chicago, Illinois on August 16, 2004. The trial continued on a day to day basis from August 16,

---

Court of Federal Claims within 12 months from the date you receive this decision..." JE3, JX3.19.

2004 to its conclusion on August 18, 2004.

## STATEMENT OF FACTS

A. **Introduction**

Gemini Electronics Inc. is a telecommunications company located in the State of Illinois. More specifically, Gemini Electronics is a telecommunications company which was purchased by Mr. Willie Wilson on behalf of Gemini Electronics for pay telephone services. Tr.54:17-25 (Wilson).

Sometime in 1999, Mr. Willie Wilson, CEO of Gemini Electronics, Inc., attended a meeting at the Chicago District Office of United States Congressman Danny Davis. Tr.55:4-19 (Wilson). In attendance in the meeting at Congressman Davis's office was Mr. Rufus Porter. Mr. Porter was the then district manager of the Chicago Post Office as well as its "lead executive". Tr.176:20-22 (Wilson).

It was Mr. Willie Wilson's recollection that in the meeting at Congressman Davis's office, he had a discussion with Rufus Porter concerning telecommunications business and a telecommunications contract with USPS. Tr.56:5-25 (Wilson). During this conversation with Rufus Porter, Mr. Wilson inquired about whether or not his company Gemini Electronics would be allowed to bid on a specific telecommunications contract with USPS. Tr.56:24-25 (Wilson). Gemini was informed that they could bid on a public telecommuncations agreement with the Postal Service. Moreover, Mr. Wilson testified that he had subsequently requested information from USPS in order to prepare for the submission of a bid to USPS pursuant to his conversation with Rufus Porter. Tr.57:2-8 (Wilson). Mr. Wilson specifically requested that USPS provide him with a list of all of the

different telephones and locations for which his company would bid. Tr.57:6-10 (Wilson).

After receiving the requested information from USPS, Mr. Wilson consulted with his banker in an attempt to put together a bid on the contract. Tr.57:13-16 (Wilson). The bid that Mr. Wilson was to submit was predicated on his understanding of the areas that his company would have to cover in order to fulfill the obligations and terms of the public telecommunications agreement that was the subject of the bid.

Following the receipt of the information concerning the service areas on which Mr. Wilson would be bidding, he recalls having a telephone conversation with Phyllis Flynn.[4] Through the communications with Phyllis Flynn, Mr. Wilson was told that the Public Telecommunications Service Agreement that was being bid on would cover areas including the Chicago District, Northern Illinois, O'Hare Field, and Central Illinois. Tr. 58:3-5 (Wilson).

Some time in the summer of 1999, Willie Wilson, as CEO of Gemini Electronics, Inc. was notified that he had been the successful bidder for a Public Telecommunications Service Agreement that was being let by USPS. Tr.58:14-19 (Wilson).

Phyllis Flynn testified during the trial proceedings that she was given the responsibility by USPS that entailed "taking care of all issues regarding voice communications...installation, repair.". Her testimony also states that she was given the responsibility of handling almost any matters covering voice traffic. Tr. 278:9-22 (Flynn). She specifically testified that her responsibilities included identifying sites for the telephones and assisting with the repair of any installations within a USPS facility. Tr.278:16-22 (Flynn).

---

[4]Phyllis Flynn was the Information Data Specialist for USPS at the time of the execution of the October, 1999 agreement. Ms. Flynn's testimony is referenced herein commencing at Tr.277.

Prior to USPS entering into the agreement in October, 1999 with Gemini Electronics, Inc., USPS had contracted with Ameritech in 1992 to provide telecommunication services. Tr.279:1-9 (Flynn). More specifically, Phyllis Flynn stated that Ameritech had other agreements with USPS for districts which covered Northern Illinois, the Central District and the Chicago District. Tr.280:1-9 (Flynn). As stated herein, Willie Wilson was also aware that Ameritech had been the previous successful bidder in 1992 for the telecommunications contract with USPS. Moreover, Mr. Wilson had relied on the Ameritech agreement with USPS to prepare for the submission of his bid on the contract which is the subject of dispute in this litigation. Tr.57-58:1-23 (Wilson).

Prior to Gemini Electronics being awarded the Public Telecommunications Agreement contract that was consummated on October 21, 1999 with USPS, Willie Wilson and representatives of Gemini Electronics had a series of meetings with Rufus Porter and J.T. Weeker. Tr. 59:9-25 (Wilson). J.T. Weeker was the Regional Vice President of USPS's Great Lakes region. Tr.177:17-19 (Porter). Weeker was the immediate supervisor of Rufus Porter. Tr.180:24-25 (Porter). Moreover, J.T. Weeker was in charge of giving instructions and managing contracts for the Great Lakes area of which Porter's Chicago District was a part. Tr.181:1-7 (Porter). Porter stated in his trial testimony that all contracts had to go through J.T. Weeker, who was a part of the "chain of authority" process. Tr.180:15-25 (Porter). If a contract of procurement matter came up in the Great Lakes area, it had to go through J.T. Weeker who was the Vice President for the Great Lakes region. Tr.180:24-25 (Porter). Rufus Porter outlined the chain of authority for the Great Lakes Region of USPS in terms of purchasing, procurement and contracts. By Porter's own definition, J.T. Weeker was the individual that gave the instruction and direction in handling the business affairs for the region with particular emphasis on procurement and purchasing. Tr.181:1-13 (Porter). According to Porter,

after Weeker gave his authorization or approval for a purchasing contract or a procurement matter, the matter was forwarded to Sharon Kao who was the procurement person for USPS for the Great Lakes Region. Tr.181:1-3 (Porter).

During the course of the conversation that Mr. Willie Wilson had on behalf of Gemini Electronics, Inc. with Mr. J.T. Weeker and Rufus Porter, Mr. Weeker made it clear to Mr. Wilson that the Public Telecommunications Service Agreement between USPS and Gemini Electronics, Inc. would cover the Chicago District, O'Hare, the Northern District and Central Illinois. Tr. 60:16-20 (Wilson). In fact, Weeker was supposed to have told Rufus Porter, prior to the execution of the contract in October, 1999, "to look into helping Gemini Electronics, Inc. get contracts in the Detroit area and around the country". Tr. 60:16-20 (Wilson). Rufus Porter also testified that in the conversations that he had with J.T. Weeker and Willie Wilson, Weeker specifically told him that he wanted Gemini to expand their pay phone services to other districts. Tr. 219:19-23 (Porter). Not only did Porter state that Weeker was his supervisor, but Weeker was the supervisor for other district managers other than Chicago. Tr. 219:9-15 (Porter).

Some time in September, 1999, there was a mock signing of the supposed contract between USPS and Gemini Electronics. This mock signing ceremony took place at Chicago's Navy Pier. Tr. 62:5-8 (Wilson). At this signing, there were no attachments to the mock public telecommunication service agreement used at the ceremony. Tr. 62:15-17 (Wilson).

Following the mock signing in September, 1999, the finalized agreement was executed on October 21, 1999. At the time of the signing of the agreement, Mr. Wilson remembers that Phyllis Flynn, Bill Goldsmith, a couple of people on his staff, and possibly Vernon Sims as being present for the October 21, 1999 signing. Tr. 65:7-13 (Wilson). Mr. Wilson testified that he believes an

Attachment A may have been present at the October 21, 1999 signing. Tr. 66:20-25 (Wilson). However, Rufus Porter testified at the trial that on October 21, 1999 that no Attachment A was attached to the agreement signed on that date. Specifically, Porter stated

> **"Q: ...Mr. Porter, when you signed the agreement in the latter part of October, 1999, was this list that we see attached with Joint Exhibit 12 attached to the agreement itself?**
> **A: The agreement that I signed, <u>we did not have a list attached to it..."</u>**. Tr.223:8-19 (Porter).

In fact, Porter was not sure whether or not the list was actually attached after the contract had been signed. Tr. 223:4-7 (Porter). Indeed, Phyllis Flynn testified that around October 18, 1999, she took the proposed Public Telecommunications Service Agreement to the office of the legal department at USPS. Tr. 316:10-12 (Flynn). At the time that she delivered the document to the legal department on October 18, 1999, according to Phyllis Flynn, Rufus Porter had affixed his signature to the document. However, Willie Wilson had not signed the document on behalf of Gemini Electronics, Inc. Tr. 316:21-25 (Flynn). The document was actually delivered to Maria Infanger, an attorney for the legal department of USPS. Tr. 316:3-11 (Flynn). Phyllis Flynn further testified that at the time that she served the proposed public telephone service agreement on Maria Infanger, there was not a list provided of the locations or designated locations for the agreement. Tr. 317:10-14 (Flynn). Flynn testified that prior to October 18, 1999, she had never seen an actual attachment to the agreement. In part, she states:

> **Q: So you never saw a final list of any type?**
> **A: No...**
> **Q: Do you even know if one was put together?**
> **A: No...I had never seen the actual attachment to go with this agreement...** Tr. 318:15-22 (Flynn).

More telltale for this case, Flynn testified that she didn't deliver the proposed "Attached A" until a

couple of weeks after the contract had been signed (October 21, 1999). Tr. 319:22-25 (Flynn).[5]

As of October 21, 1999, the principal witnesses for the government all attest to the fact that there was not an "Attached A" attached to the Public Telecommunications Service Agreement executed between Gemini Electronics, Inc. and signed by Willie Wilson on behalf of Gemini Electronics, Inc. and Rufus Porter, who signed on behalf of USPS. Tr.223:14-19 (Porter), Tr.318:8-20 (Flynn), Tr. 455:11-25 (Infanger). The testimony of witnesses Infanger and Flynn coincide to the extent that both witnesses agree that the so-called "Attached A" which was referenced in the Public Telecommunications Service Agreement on October 21, 1999, was not produced until after the signing of the agreement. Tr. 319:8-25 (Flynn), Tr. 493:1-25 (Infanger). Neither Ms. Flynn nor Ms. Infanger showed or provided to Willie Wilson or any agent or representative of Gemini Electronics, Inc. with an original or copy of the "Attached A" that was produced after the execution of the contract on October 21, 1999. Each of these witnesses tacitly, if not explicitly, admits that they received the documents after the signing of the contract.

Indeed, Maria Infanger, the attorney for USPS and it's law department stated in her trial testimony as follows:

> **Q: ...so this document could not have been attached or it came after the signing, it could not have been attached to the document on October 21, could it?**
> **A: I would assume not.**
> **Q: Did you ever have a conversation with Phyllis Flynn, after October 21, 1999 about an attachment?**
> **A: I can't say with certainty, but I don't believe I did.**
> **Q: Do you have a recollection as to whether or not Ms. Flynn may have been on vacation after the second week of**

---

[5]Flynn stated that after she delivered the agreement to Maria Infanger on October 18, 1999, she went on vacation and did not return to work until some time during the second week of November, 1999. Tr. 358:18-22, Tr. 360:10-15 (Flynn).

**October until November?**
A: **That I don't know.**
Q: **When you got a copy of Joint Exhibit 12, your testimony was that–what did you do with?**
A: **That I attached it to the agreement.**
Q: **And where did you send it?**
A: **I would have sent it to Mr. Porter's office and I don't remember if I sent it to Mr. Wilson.**
Q: **...but you would have sent it in the normal course of business. You would have sent it to him.**
A: **To my...what would be my client, Mr. Porter? Yes.**
Q: **You never had conversations with Mr. Porter about Joint Exhibit 12, did you?**
A: **No I did not.** Tr.493:1-25 (Infanger).

Infanger does not remember whether or not she had a conversation with Phyllis Flynn after the contract had been executed on October 21, 1999. Tr. 493:1-25 (Infanger).

Following the execution of the Public Telecommunications Service Agreement on October 21, 1999 by Mr. Wilson and Mr. Porter, as referenced herein, Mr. Wilson met with J.T. Weeker and Mr. Porter on at least two successive occasions. Tr. 69:7-25 (Wilson). At these meetings, the parties discussed the terms of the areas of coverage that Gemini would be handling. Tr. 69:23-25 (Wilson). In the meetings, J.T. Weeker told Mr. Wilson that Gemini Electronics, Inc. "should be able to have the Chicago area, Northern, Illinois, Central, Illinois"...Tr.71:1-15 (Wilson). In the second of the successive meetings that Wilson had with J.T. Weeker, Weeker told Rufus Porter, Chicago District Manager, "to kind of hurry up and get it done, and get it done in a hurry"...Tr. 71:16-25 (Wilson). Shortly after this meeting with J.T. Weeker, Mr. Weeker died. Tr. 71:24-25 (Wilson).

Following the death of J.T. Weeker in January, 2000, Mr. Wilson telephoned Maria Infanger at her USPS legal department office and told her that he had entered into an agreement with Mr. Weeker and USPS for the installation of pay telephones in the Great Lakes Region. Moreover,

Infanger relates in her testimony the following:

> **"...he (Wilson) had indicated that he'd just come from the memorial service and that prior to Mr. Weeker passing away, that he had conversations with him about entering into an agreement for installation of pay phones in the Great Lakes area. And now that Mr. Weeker had passed away, he didn't want to have it end. He wanted the ball to continue to roll, so to speak, and asked my assistance in that regard...".** Tr. 456:17-23 (Infanger).

This conversation occurred approximately sixty (60) days after the signing of the October 21, 1999 agreement absent "Attached A". Because the so-called "Attached A" was not a part of the October 21, 1999 contract, and the fact that Maria Infanger had not participated in the negotiations in the formation of the contract, as well as Maria Infanger had not talked to Rufus Porter or J.T. Weeker about the terms and conditions of the contract, she felt it necessary to discuss this matter with her supervisor. She stated...

> **"I went into my boss's office, Greg Sackrider, mentioned the conversation that I had had, because we are now dealing with more of a higher level, Mr. Weeker's office, and my boss and myself that next day contacted Paul Vogel, who, I believe, at that time, was below Mr. Weeker. And relayed the conversation that I had had the day before with Mr. Wilson..."** Tr. 457:2-10 (Infanger).

Following the death of J.T. Weeker, Danny Jackson was appointed to replace J.T. Weeker as Regional Vice President of the Great Lakes area for USPS. Tr.81:5-138. After Mr. Wilson's conversation with Maria Infanger in January, 2000, he subsequently contacted Danny Jackson regarding the problems that he was encountering with placing phones in the Great Lakes Region of USPS. Tr. 81:14-18 (Wilson). The meeting with Danny Jackson and Willie Wilson was prompted

because Willie Wilson had been informed that he could not any longer place phones at O'Hare Field. Tr. 82:1-7 [6] (Wilson). When Wilson met with Danny Jackson at his office, Mr. Wilson attempted to provide Jackson with a background history of discussions and conversations that had transpired between Porter, Weeker and Wilson. Tr. 82:11-20 (Wilson). Jackson told Wilson that the authority to execute contracts had been "taken out of his hands". Tr. 82:13-15 (Wilson). Jackson told Wilson in this meeting that "all of the authority had been taken out of his hands, regarding contracts and that we (Wilson) had to go to Washington, D.C. and had to talk to someone there...about a national contract"...Tr. 82:14-19 (Wilson).

Some time in January, 2000, Willie Wilson did go to Washington D.C. per his conversation with Danny Jackson. Tr. 83:4-12 (Wilson). Wilson met with Keith Strange of USPS. Mr. Strange,

---

[6]On January 20, 2000, Willie Wilson wrote a letter to Danny Jackson concerning his pay phone service agreement with USPS. In that correspondence, Mr. Wilson states in relevant

> **"Under the vision of Mr. Weeker and direction of Rufus Porter, Gemini was awarded its first major contract–it and we have been extremely successful in its implementation. On October 29 of last year, J.T. convened a meeting with Mr. Porter and others of his staff in order to discuss our partnership. He was extremely encouraging and instructed his staff to help expand our services immediately to the outlying Chicago land areas such as Fox Valley, Carol Stream, South Suburban and Palatine. As we made long range plans to provide phone service to your facilities and the other states of the Great Lakes Region...J.T. suggested that we continue to work with Mr. Porter as we talked with Sharon Kao and Greg Sackrider about existing contracts and timetable for the installation of our payphones as well as your long distance service. Unfortunately, J.T.'s untimely death has caused us to pause instead of moving forward. I am writing now to ask for your help and direction as we attempt to get back on track...JE10 (letter to Danny Davis from Willie Wilson).**

Chief of the Procurement Department of USPS. Tr. 83:14-25, Tr. 84:13-18[7] (Wilson). In the meeting in Washington, Mr. Strange told Mr. Wilson that he did not understand the problem that Mr. Wilson was experiencing in getting his contract executed in Illinois. Tr. 85:8-12 (Wilson). Strange told Mr. Wilson that he would have to go back to Illinois and talk to Mr. Jackson. After Mr. Wilson returmed from his meeting with Keith Strange in Washington, D.C., he had another meeting with Danny Jackson. At that meeting with Danny Jackson, he told him what Keith Strange had said concerning the Gemini and USPS contract. Tr. 90:13-22 (Wilson). According to Wilson, at this meeting, he told Danny Jackson that he was hopeful that Jackson would continue to allow Gemini Electronics, Inc. to install their pay telephones in the areas discussed. Tr. 90:18-25 (Wilson). Jackson told Wilson to contact Sharon Kao, one of the the procurement officers for USPS. Tr. 91:3-9[8] (Wilson).

B. **<u>O'Hare Facility</u>**

Per the Public Telecommunications Service Agreement executed between Gemini Electronics and USPS on October 21, 1999, Gemini Electronics had the exclusive right to put phones at the Chicago O'Hare Airport and all of its facilities. Tr. 226:1-6 (Porter).[9] There were obviously two

---

[7]Keith Strange was the Chief Procurement Officer for USPS.

[8]Mr. Wilson further testified that in his second meeting with Danny Jackson, Mr. Jackson had told him to go and see Sharon Kao. When Mr. Wilson visited with Ms. Kao, she told Mr. Wilson that "she didn't know what the problem was". Tr. 92:6-13 (Wilson).

[9]Specifically, Porter stated as follows:

**Q: Do you recall Gemini attempting to expand at O'Hare at any point?**

**A: Absolutely, they were part of the...it was part of the original procurement. The committee we put together, which included security people that had to get them access badges to the facilities, O'Hare was part of**

mail facilities at O'Hare Field. One facility was at 11516 W. Irving Park Road and the other facility was known as the O'Hare Airport Mail Center. Tr. 226:9-24 (Porter).

Gerald Kubick testified that he was the plant manager for the Chicago Metro Surface Hub and the Chicago Airmail Facility. In October, 1999, Kubick reported to J.T. Weeker, who was the area Vice President for the Great Lakes region. Tr. 367:16-24 (Kubick). More importantly, Kubick testified that Chicago Airmail Facility was a part of the Great Lakes area and not a part of the Chicago District. Tr. 369:17-25-37:1-9 (Kubick).

Some time in 1999 Gerald Kubick was contacted regarding the contract that Gemini Electronics had entered into with USPS. Kubick states that he had received a telephone call from Rufus Porter asking him to "meet with the Gemini folk about whether I (he), had any needs for any phones in the facility. Tr. 372:15-20 (Kubick). Prior to the telephone call from Rufus Porter, Kubick said that he had never heard of Gemini Electronics. Tr. 372:23-25 (Kubick). Some time in 1999 Kubick agreed to allow Gemini to place phones in his airmail facility at O'Hare Airport. Tr. 374:15-25, Tr. 375:1-3 (Kubick). Although the O'Hare Mail Facility was clearly not within the Chicago District, Kubick nevertheless agreed to allow Gemini Electronics to place its phones in his airmail facility.[10]

---

**that...**Tr.226:1-6 (Porter).

[10]Kubick stated that it was within his authority to grant approval for Gemini Electronics to place phones in his non-Chicago District facility. He stated in relevant part:'

**Q:** **When you gave approval to have these four or five phones installed at the airmail facility, did you enter into any written agreement with Gemini for the placement of those phones?**
**A:** **No.**
**Q:** **Did you believe it was within your authority to place those phones in your facility?**

Kubick testified that some time in 1999 he walked into the airmail facility and noticed that the Ameritech telephones had been removed from the facility. More specifically, the phones had been removed from the walls in the facility. Tr. 378:19-24 (Kubick). Kubick states that someone from Gemini had come in and removed the phones from the wall. Tr. 39:13-15 (Kubick). Kubrick believed that in 1999 and 2000 as a plant district manager, he was authorized to sign contracts on behalf of USPS. Tr. 385:1-5 (Kubick). Although Kubick could not specifically state as to who, if anyone, had delegated him any authority on behalf of USPS to sign his name on a contract. Tr. 385:9-13 (Kubick). Kubick, interestingly enough, states that he was authorized by USPS to sign on behalf of USPS a contract with Ameritech. Tr. 385:14-22 (Kubick)[11].

At some point, Mr. Wilson was informed by one of his employees that Gerald Kubick had stated that the Gemini Electronic phones would have to be taken out of the O'Hare Airmail Facility. Subsequent to learning of this, Mr. Wilson contacted Kubick. Tr.73:15-25, Tr. 74:1-9 (Wilson). In

---

**A: Yes.**
**Q: On what basis?**
**A: Because I am the plant manager of the facility. I am responsible for the budget and everything that goes in and out of the building.**
**Q: And do you enter contracts on behalf of the facility in your position?**
**A: I would...we would have our...in-Plant support would enter into it or finance would enter into it..."** Tr. 377:12-25, Tr. 378:1-2 (Kubick).

[11]Kubick's trial testimony is totally contradictory to the testimony of Porter and Maria Infanger. Both of these witnesses testified that they did not believe district managers had the authority to enter into contracts with agreements that binded USPS. Kubick in his above-referenced testimony unequivocally stated that he had a right to do so. More specifically, if Kubick had the right to enter into a binding agreement on behalf of USPS that affected an area beyond the scope of his work responsibility, so would have the same right inured to Rufus Porter.

his conversation with Kubick, Mr. Wilson inquired as to why his phones were being taken out. According to Mr. Wilson, Kubick stated "I don't want your phones in here and hung up on me (Wilson)". Tr. 74:1-3 (Wilson).

After this conversation between Wilson and Kubick, Gemini Electronics was denied the opportunity to place phones in the O'Hare facility. According to Mr. Wilson, the failure of USPS to allow him to place his telephones in the O'Hare Mail Facility and in the Great Lakes region resulted in financial damage to him. Mr. Wilson consider this to be a breach of contract. Tr. 104:11-15 (Wilson).

C. **MARIA INFANGER**

A final witness for the government was Maria Infanger, f/k/a Maria Furhmann. Sometime in September, 1999, after she returned from a trip to Washington, D.C., Ms. Infanger had occasion to review the proposed Public Telecommunications Service Agreement between Gemini Electronics and USPS. She recalls getting the draft of the agreement from either Greg Sackrider or Rufus Porter. Tr. 427:9-21 (Infanger). Ms, Infanger states that she had never seen a payphone service agreement "of this type". Tr. 427:22-24 (Infanger).

After reviewing the agreement, Ms. Infanger contacted Mr. Porter's office and was told that she should contact Phyllis Flynn who worked for Mr. Porter , and that Ms. Flynn was involved with the drafting and preparation of the agreement. Tr. 428:2-9 (Infanger).

Ms. Infanger was informed that there had been a previous public telecommunications service agreement with Ameritech that dated back to 1992. Tr. 428:21-25 (Infanger). She contacted an Ameritech employee by the name of Mary Giorgi. Phyllis Flynn, the Information Data Specialist, who was working with Rufus Porter had referred Ms. Infanger to Ms. Giorgi with Ameritech. Infanger

requested to see the contract between USPS and Ameritech that was purported to have been executed in 1992. Tr. 429:1-15 (Infanger). Unfortunately, according to Infanger, Ameritech was unable to provide her with a copy of the contract.[12] In 1999 according to the testimony of Ms. Infanger, she did not know who had the authority on behalf of USPS to enter into contracts for the region (Great Lakes region area). Tr. 472:6-25 (Infanger).[13]

---

[12]More importantly, Infanger states that USPS was also unable to provide any copy of the Ameritech contract. What seems to be incredible, Ms. Infanger testified that both Ameritech and USPS, two major American corporations had lost a contract or a number of contracts that purported involved millions of dollars exchanged between the two entities. Mary Infanger was asked the following:

**Q:** **And did you actually see a copy of the agreement that the Postal Service had with Ameritech at that time?**

**A:** **I had–was given a name of somebody with Ameritech. Her name was Mary Giorgi, and had contacted her on a couple of occasions and inquired of her to find for me a current contract....our people not find...our people could not find a contract. Our people (USPS) could not find a contract, so I contacted her...** Tr. 428:21-25; Tr. 429:1-10 (Infanger).

[13]Infanger testified:

**Q:** **Who would have been the person in USPS that had unlimited authority...to enter into contracts for the region?**

**A:** **I don't know that I can answer that specifically for you because I would say there is not one person who would have contracting authority...**

**Q:** **what was your understanding in 1999, who would, if it wouldn't be one person, give me the names of the persons who you recall who would have had contracting authority?**

**A:** **...You saying in the Great Lakes Area?**

**Q:** **...I'm saying region. I mean area. In the Great Lakes area, who would have had authority?**

**A:** **I can't name that for you because there were...there was a number of individuals with contracting office authority...**

According to Ms. Infanger, the Administrative Support Manual for the entire USPS did not outline and define who was considered a contracting officer for USPS. Tr. 474:16-24 (Infanger).[14] The testimony of Infanger reflects that after being engaged in a contract for seven (7) years with Ameritech, the parties to the contract could not find nor locate the agreement. Tr. 484:3-7 (Infanger)[15]; Tr. 316:3-20 (Flynn). When the Public Telecommunications Agreement was handed to Maria Infanger on October 18, 1999, Phyllis Flynn remembers having a discussion with Maria Infanger regarding the agreement. Tr. 320:16-18 (Flynn). Flynn said that when she personally handed the document to Maria Infanger there was a question as to where the attachments were. Tr. 321:6-9 (Flynn). Ms. Flynn told Ms. Infanger on October 18, 1999 that there were no attachments or "Attached A" to the agreement. Tr. 321:6-13 (Flynn). The trial testimony of Mary Infanger contradicted the trial testimony of Phyllis Flynn. Infanger stated that she did not have any recollection

---

Q: **And my question is, the Great Lakes area, who would have issued the warrant to the contracting officers?**
A: **I don't know...** Tr. 472:6-25; Tr. 473:1-11 (Infanger).

[14]Infanger further testified as the following:

Q: **Well, your testimony was in the case of this telecommunications agreement that there was nothing that you were able to find, and obviously you did an extensive search of documents within the possession of USPS. You couldn't find anything that would define the contracting authority in a situation like Gemini and the USPS agreement. Is that correct?**
A: **That's correct, yes.** Tr. 475:14-21 (Infanger).

[15]Infanger testified that she had inquired of Mary Giorgi from Ameritech as to why she felt the contract couldn't be found. Infanger states that Giorgi told her the following:

> **"...she had a couple of theories. One, it was lost. Two, it was sent to the Postal Service to be executed and had not been returned. But those were theories on her part."** Tr. 484:5-7 (Infanger).

of Phyllis Flynn bringing a signed copy of the proposed agreement between USPS and Gemini Electronics. In fact, Infanger stated that she does not ever recall Phyllis Flynn bringing to her a copy of the contract before October 21, 1999. Tr. 489:17-24 (Infanger). Flynn testified that she personally delivered the Public Telecommunications Service Agreement, which had been signed by Rufus Porter, to Maria Infanger on October 18, 1999. Tr. 316:7-13 (Flynn). Infanger states that she does not recall having a conversation with Phyllis Flynn about a missing "Attached A Exhibit to the contract that was delivered to her office on or about October 18, 1999. Tr. 490:1-12 (Infanger).

On October 21, 1999 Infanger was present for the execution and signing of the contract between Gemini Electronic, Inc. and USPS. However, she does not recall that there was an Attachment A to the document. Specifically, she's testified that she does not have a recollection of ever seeing an Attachment A to the document although an Attachment A was referred to within the agreement. Tr. 491:9-19 (Infanger.)

During Ms. Infanger's trial testimony, Ms. Infanger identified the document marked JE12. This document was received by her a day or so after the execution of the contract between Gemini and USPS. Tr. 492:9-25 (Infanger).

Ms. Infanger admits to having written a letter on October 13, 1999 to Mr. Hank Kelly who was then counsel for Mr. Willie Wilson and Gemini Electronics, Inc. Tr. 499:7-25; Tr. 500:1-5 (Infanger). In this correspondence, Ms. Infanger does not make reference to any Attachment A that was to be prepared or agreed upon between Gemini Electronics and USPS.[16] JE200 (letter to Hank

---

[16]In her trial testimony, Ms. Infanger specifically stated as follows:

**Q: ...this is a communication with you and Hank Kelly, who was a lawyer for Gemini. Is that right**
**A: That's correct.**
**Q: After having reviewed that letter, there is nowhere in**

Kelly from Maria Furhmann Infanger).

At the conclusion of the testimony for the attorney for USPS, the following question was asked by counsel for Plaintiff.

> **Q: By the way, is there any document anywhere, that specifically limits the authority of a contracting officer in USPS to signing contracts only in one area?**
> **A: You're speaking a geographic area...?**
> **Q: Yes, ma'am. Geographic, you know, like Chicago District...is there a document in the possession of USPS that limits the authority of a contracting officer from either delegating responsibility so other people, or, signing contracts only limited to that district?**
> **A: <u>Not having seen a warrant recently, I can't answer with certainty</u>.**
> **Q: Well...either you know or you don't know. My question is, do you know?**
> **A: No, I don't know that...** Tr. 502:9-23 (Infanger).

The above response from the lawyer representing Rufus Porter and the Great Lakes Region indicates that the legal department could not deny that a person could execute a contract beyond his or her district region. There was nothing limiting an individual from executing agreements beyond their specific districts or areas. Tr. 502:9-23 (Infanger).

## <u>SUMMARY OF ARGUMENT</u>

The parties entered into an agreement for the installation of pay phones in USPS facilities for the Great Lakes region area. The agreement was signed and executed on October 21, 1999.

Prior to the execution of the October 21, 1999 agreement, Mr. Willie Wilson, Chief Executive Officer ("CEO") of Gemini Electronics, Inc., had explicit conversations with Mr. J.T. Weeker, Vice

---

> **this correspondence where you make reference to an Attachment A or any facilities that might be covered.**
> **A: That's correct...** Tr.499:17-22 (Infanger).

President of the Great Lakes region area for USPS and Mr. Rufus Porter, Chicago District Manager and Lead Executive for the Chicago District of USPS. These conversations occurred in the late summer of 1999. At the time of the conversations between Weeker, Porter and Wilson, Mr. Wilson, Mr. Weeker told Mr. Wilson that the contract that he would be bidding on would cover the Great Lakes region area of Chicago. This included Northern Illinois, Central Illinois and the Chicago District.

During the conversations with Mr. Weeker and Mr. Porter, Mr. Weeker also informed Mr. Wilson that he would be eligible to install pay telephones as far away as Detroit, Michigan, which was in the Great Lakes region. There is no evidence or testimony in the trial proceedings that Mr. Weeker or Mr. Porter discussed with Mr. Wilson that the contract that he would be bidding on would be limited to the Chicago District. Mr. Porter stated in his trial testimony that it was the "intent" of J.T. Weeker to give Mr. Wilson the broader public telecommunications service area which included all of the Great Lakes region.

Mr. Wilson prepared a bid to be submitted to USPS for the Great Lakes region. He testified that he had requested "location information" from Phyllis Flynn, the Information Data Specialist for USPS concerning the locations that the contract would cover. According to Mr. Wilson, Ms. Flynn sent him a list of locations that included the Great Lakes region. However, Ms. Flynn denied this at the trial of this case.

On October 21, 1999, Mr. Wilson entered into a Public Telecommunications Service Agreement with USPS. At the time of the execution of the agreement, there is no evidence that Mr. Wilson and Gemini Electronics, Inc. had a dispute as to what areas the agreement would cover. More

importantly, USPS has failed to produce any documents that were prepared prior to the October 21, 1999 agreement that stated Mr. Wilson's bid and contract would be limited to the Chicago District. Mr. Wilson received notification in the latter part of the summer of 1999 that he had been the successful bidder. The government has failed to prove that Mr. Wilson and Gemini Electronics, Inc. was ever put on notice or told by the government of a limited contracting area for his company.

At the time of the execution of the agreement on October 21, 1999, the government did not integrate into the contract that it drafted which areas would be covered by the contract. In fact, at the signing of the contract and/or agreement on October 21, 1999 at the offices of USPS in Chicago, the government failed to provide a list of facilities that would be incorporated into the contract as the pay installation facilities that the Gemini Electronic Corporation would be placing their phones. The contract in Paragraph Six specifically refers to an Attachment A which was to give definition and an explanation to the areas of coverage.

However, each of the principal witnesses for the government testified that "Attached A" which was referenced in the contract on October 21, 1999 was not attached to the contract. In fact, Phyllis Flynn, Maria Fuhrmann Infanger and Rufus Porter testified that their was not an attachment of an "Attached A" to the contract. In fact, such an attachment did not exist on October 21, 1999.

The government now claims that the purported attachment that was to be placed on the contract executed on October 21, 1999 had not been submitted to the attorneys for the government or to the office of Phyllis Flynn, the Information Data Specialist, at the time of the execution of the contract. Flynn and Infanger testified that it was at least two weeks after the signing of the contract that they received a list from Ameritech that aided them in identifying the proposed locations of

coverage for the previously executed contract on October 21, 1999. As of October 21, 1999, all parties to the contract including Weeker, Porter and Wilson understood that he contract a service area beyond the Chicago District. Testimony of Phyllis Flynn and Maria Infanger indicates that they did not have any conversations with Mr. Weeker about the specific coverage area of the contract.

The statements of Mr. Weeker in the presence of Mr. Porter and Mr. Wilson demonstrates Mr. Weeker's intent to let Mr. Wilson and Gemini Electronics work beyond the Chicago District in fulfilling the Public Telecommunications Service Agreement of October 21, 1999. To the extent that the Chicago Postal Service, subsequent to the death of Mr. Weeker, prevented and barred Mr. Wilson from placing his telephones in areas beyond the Chicago District, this constituted a breach of contract. Mr. Porter and Mr. Wilson made affirmative and clear statements that Mr. Weeker intended for the contract to go beyond the Chicago District. Specifically, Mr. Weeker intended for the contract to cover the Great Lakes region of USPS.

Because the contract on October 21, 1999 did not have the proposed "Attached A" which would have given definition to the areas and locations covered by the contract, the contract is ambiguous as to the intent of the parties. Any ambiguity in the contract should be more strongly interpreted against the government who drafted the contract. Since the contract is reasonably susceptible to two different interpretations, based on the missing "Attached A", the interpretation placed on the contract by the non-drafting party, the Plaintiff, should be prevail.

Since there is an obvious ambiguity in the contract as to its meaning and intent regarding these areas of coverage, the conduct of the parties to the contract should be given great weight by this Court in interpreting the meaning of the ambiguity regarding coverage. In this regard, the conduct of the government in this case is consistent with Mr. Wilson's interpretation of the contract.

Specifically, Rufus Porter testified that he was in the presence of Mr. J.T. Weeker on more than four occasions wherein Mr. Weeker stated in his presence, and in the presence of Mr. Willie Wilson, that he intended for the Gemini Electronics contract to cover the Great Lakes region area which was above and beyond the Chicago District. This testimony is undisputed. Gerry Kubick testified that he had the authority as a plant manager at the O'Hare Air Mail Facility to enter into contracts, oral and written, without prior approval of the Vice President of the Great Lakes region. Kubick's testimony contradicts the testimony of Rufus Porter who claimed at trial that his contracting authority was limited to the Chicago District. Mr. Porter's testimony was contracted by Maria Infanger who stated there was no limitation on the contracting authority of district managers as it related to specific areas of coverage.

Rufus Porter has an expressed and implied authority to enter into any agreement on behalf of USPS. Specifically, Mr. Porter served for all practical purposes as an agent of J.T. Weeker who was the Regional Vice President for the Great Lakes region for USPS. Mr. Porter testified that he checked "everything" through J.T. Weeker before making decisions and deciding on procurement matters and contract matters at USPS. It is reasonable to assume that Rufus Porter was an agent of J.T. Weeker. In this regard, Mr. Porter was informed that Mr. Weeker wanted the Gemini Electronics contract to expand and cover an area beyond the Chicago District. When Mr. Porter signed the contract on October 21, 1999, he testified that he was aware that this was Mr. Weeker's intent. Specifically, on October 21, 1999, Mr. Porter was carrying out, with apparent authority, the will and wishes of his supervisor.

Mr. Porter had actual authority to carry out the contract. Inasmuch as the counsel for the legal department of USPS who had reviewed the contract in question, testified in court that she was

unaware of any authority limiting Mr. Porter's ability to sign a contract beyond the Chicago District. In fact, after a search of all of the manuals produced and promulgated by USPS, Ms. Infanger stated "that she was unable to find anything that would have limited the authority, actual or implied, of Mr. Porter to enter into the contract with Gemini even if the contract covered areas beyond the Chicago District".

Rufus Porter also had statutory authority to enter into contracts. Despite representations for over a year from the government that it could not provide or find any statutory authority as to who could bind the Postal Service contractually, a mere perusal of the USPS web site clearly indicates that "an operations manager, a postmaster or district manager has contracting authority to bind the government into a legal contract. See www.usps.com/cpim/stp/manuals. Mr. Porter had authority therefore, to enter into contracts on behalf of USPS in accordance with the procurement manual for the Postal Service.

This Court must decide the intent of the parties. The Plaintiff states that his conduct and past performance is consistent with the fact that Gemini Electronics was not restricted to the boundaries provided in the contract itself. The language in the written contract indicates that the location and quantity of phone placement would be determined by mutual agreement of the parties and not reduced to writing. Since there is a dispute as to certain terms of the contract/agreement, the Court must look to extrinsic circumstances in determining the mutual intent or real intent of the parties.

The Defendant USPS concedes that the agreement included areas they now seek to exclude. There is trial evidence that the O'Hare facility and several facilities on the various "Attached A list" were not within the province of the Chicago District. The government is in the unenviable position

of saying that the contract excluded going beyond the Chicago District and then having one of its principal witnesses, Gerald Kubrick, testify that his facility was outside of the Chicago District and contracted with Mr. Wilson to install phones from Gemini Electronics, Inc. into the non-Chicago District facility.

For over a year, Mr. Porter assisted Mr. Wilson in installing phones and locations which included the Chicago District and the Great Lakes region and in Northern Illinois.

The actions on the part of the government clearly indicates that even if the government originally planned to limit the contract to the Chicago District, its subsequent actions ratified the understanding between the parties. The conduct of the parties to a contract is a great weight in determining the contract, and the conduct of the parties in this case with respect to the area of coverage lends support to the conclusion that the contract was supposed to cover areas of the Chicago District.

Moreover, the actions by Kubick and Porter post-contract signing October 21, 1999 indicate that the parties intended to ratify the implicit and explicit understanding of the coverage area.

Rufus Porter attended all of the meetings between Mr. Weeker and Mr. Wilson. After the signing of the contract on October 21, 1999, Rufus Porter did not repudiate, attempt to cancel the contract by Mr. Wilson, express any disagreement with Mr. Wilson's interpretation of the contract or attempt to rescind the contract. Rufus Porter clearly knew that Willie Wilson was told that his company would be able to install phones in the Great Lakes region. Mr. Porter telephoned district managers in the Great Lakes region on behalf of Mr. Wilson. Mr. Wilson telephoned Mr. Porter and informed him that he had been barred from installing his phones at the O'Hare Mail Facility. Mr. Porter telephoned Gerald Kubick on behalf of Mr. Wilson to inform him that Gemini had been given

a contract at Kubick's facility.

Indeed, in January, 2000, Willie Wilson informed Maria Infanger that he had been given the contract for the Great Lakes region. This was on the same day of the memorial for J.T. Weeker. Ms. Infanger did not tell Mr. Wilson that this was in violation of his contract, in fact, she stated that she consulted her boss Mr. Sackrider regarding the matter. There is no evidence that Sackrider, Infanger, Porter, Flynn or Kubick ever placed into writing any recision of the October 21, 1999 contract regarding the coverage service area based on Willie Wilson's representation to Infanger. To the extent that this was not done, the actions of the government ratified the contract in favor or Mr. Wilson's interpretation granting him authority to install phones beyond phones beyond the Chicago District.

## ARGUMENT

### RUFUS PORTER HAD EXPRESSED AND IMPLIED AUTHORITY TO ENTER THE CONTRACT WITH GEMINI ELECTRONICS

Rufus Porter was employed by USPS as a district manager and a lead executive. Mr. Porter's areas of responsibilities included the Chicago District as well as a portion of the district in the Northern Illinois-O'Hare facility.

Porter held himself out to be the person with the responsibility and authority to oversee contracts and procurement at USPS. At some time early in the relationship between Porter and Wilson, Porter took Wilson to see his immediate supervisor and boss, J.T. Weeker. At the time that Wilson met with Weeker and Porter, it was obvious that J.T. Weeker was the Vice President of the Great Lakes region for USPS. It was equally as obvious that Rufus Porter worked for J.T. Weeker as Weeker's district manager. Tr. 219:9-15 (Porter). In Wilson's presence on more than four

successive occasions, Porter sat in on meetings with Weeker and Wilson where the discussion involved the terms, conditions and areas of the coverage of the other Gemini contract. In these meetings, it is apparent from the testimony that Weeker was giving instructions and orders in his capacity as a vice president of the Great Lakes region area for USPS. Porter testified that Weeker instructed him to contact district managers and others and ensure that Wilson would be allowed to expand his pay phone facilities throughout the Northern District of Illinois. There is no evidence from the trial testimony that Porter ever denied that he had the authority to carry out the wishes, desires and directives of his immediate superior, J.T. Weeker. In fact, the trial record reflects that Porter set about to implement the commands of Weeker in regards to Gemini's expansion of their phone services throughout the Great Lakes region.

Courts have held that there are four requirements for contracts with the United States government. These requirements are: Mutual intent to contract, an offer, acceptance and consideration and the authority on the part of the government representative who enters into and ratifies an agreement to bind the United States in these specific contracts. Total Medical Management 104 f.3d 1314. Moreover, the requisite elements of a contract should likewise include mutual intent, and unambiguous offer and acceptance and, of course, a government representative that can bind the government. First Commerce Corp. v. United States, 60 Fed. Cl. 570 (Fed. Cl. May 18, 2004).

It is indisputed that on October 21, 1999 USPS and Gemini entered into an express agreement for the provision of public telecommunications services for a sixty (60) month period beginning October 21, 1999 and expiring on October 21, 2004. The only dispute in this case concerns whether or not the Plaintiff, Gemini Electronics, Inc. contracted with the government to place its pay

telephone services in facilities beyond the Chicago District.

Rufus Porter had express authority to enter into an agreement with Gemini Electronics, Inc. to install telephones in facilities beyond the Chicago District. His authority was granted by way of Federal Statute. 5 U.S.C. 552; 39 U.S.C. 401, 104, 410, 411, 20058, 501, 265605, Subchapter 8, Procurement System for the USPS outlined and defined the purchasing power for district managers in the USPS system. Specifically, the USPS Procurement Manual and Title 39 of the U.S. Code states that a V.P., S.M., has unlimited contracting authority. This authority includes the authority to award and administer contracts and carry out all related responsibilities.[footnote]. Although the government maintained at trial that the reference to the VP refers to the Procurement Vice President, there is no evidence to support this claim. J.T. Weeker was a vice president. More specifically, the Procurement Manual 1.41b states... "the VP, SM, has delegated contracting authority, including redelegation authority, throughout Postal Service purchasing organizations. And individual contracting officers contracting and related authorities are enumerated in his or her letter of delegation (see 1.4.2). Again, the government's Procurement Manual which was introduced as Ex.___ at the trial of this matter outlines and defines procurement and purchasing authority for USPS facilities and personnel. At the time of the trial of this matter, the government's attorney, Maria Infanger, testified that she was unaware of the process and for the Procurement Manual gave statutory authority to USPS employees to engage in contractual relations. Ms. Infanger merely stated that she did not know. She could not, and did not state for a fact that the language of the Procurement Manual as well as Title 39 of the U.S. Code could be applied to allow Rufus Porter to enter into contracts with agreements beyond the scope of his designated district. In fact, Gerald Kubrick testified for the government that he freely entered into contracts that involved his plant area.

Some of these contracts were obviously beyond the O'Hare facility.

Government agents possession express actual authority to bind the government in contract only when the Constitution, a statute or a regulation grants it to the agent in unambiguous terms. Mark L. McAfee v. United States 46 Fed. Cl. 428, at P7. See also Trauma Service Group v United States 104 F.3d 1321.

Rufus Porter had implied authority to enter into the contract with Gemini Electronics, Inc. beyond the Chicago District. In Lewis v United States 70 F.3d 597 (1995), the Court held:

> "...an implied-in-fact contract is one "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred as a fact, from conduct of the parties, in the light of the surrounding circumstances, their tacit understanding"...like an express contract, an implid-in-fact contract requires "one mutuality of intent to contract; two, consideration; and three, lack of ambiguity in offer and acceptance"...where United States is a party a fourth requirement is added: the government representative "whose conduct is relied upon must have actual authority to bind the government in contract"." (At P600).

Maria Infanger in her testimony at the trial stated that she was unaware as the lawyer for USPS of any statute, rule or regulation that limited the authority of Rufus Porter in executing a contract concerning matters beyond his district. Tr. 502:13-23 (Porter). Porter clearly had authority to enter into contracts and make procurements. Much of this authority was derived from Title 5 U.S.C. 552 et. sec.

Rufus Porter also had implied authority. There was no question that Weeker, Porter and Wilson had a meeting of the minds as to the areas that Gemini Electronics would cover in its Public Telecommunications Agreement. Porter testified that he had met with Wilson and Weeker wherein Weeker, Wilson and Porter had discussed Wilson's company going beyond the Chicago District. In

these discussions, Porter did not deny that the contract allowed Wilson to go beyond these areas. Porter never attempted to rescind the Gemini contract by claiming that Wilson was violating his terms by going into areas beyond the "alleged" jurisdictional boundaries of the contract. In fact, Porter assisted Wilson in fulfilling Weeker's intent by contacting other district managers on behalf of Wilson to expand Wilson's pay phone services into their respective areas. Tr. 241-242: 23-25; Tr. 243:1-10 (Porter).

**CAUSE OF THE AMBIGUITIES IN THE CONTRACT**
**THE PAROLE EVIDENCE RULE APPLIES**

At the time of the execution of the Public Telecommunications Service Agreement on October 21, 1999, Section 6 of the agreement stated as follows:

> "...the premises are described in the following locations that are owned, managed, leased or operated by USPS and that are subject to this agreement: (See Attached Exhibit A)...the parties agree that the defined premises may be supplemented with addtional locations from time to time, and that these additional locations shall be subject to the terms and conditions of this agreement. The installation of addtional phones should be agreed upon mutually by USPS and Gemini..." JX3.9.

When the contract was consummated on October 21, 1999, there was no Exhibit A attached to the contract. The testimony of Maria Infanger, Phyllis Flynn and Rufus Porter attest to the absence of an attachment to the contract labeled "Exhibit A". In fact, Infanger and Flynn state that the so-called "Exhibit A" was not produced until after the contract had been signed on October 21, 1999. Flynn testified that the so-called "Exhibit A" was not delivered to Rufus Porter until approximately three weeks after the signing of the original contract. Infanger states that she did not recall whether or not she took the contract to Rufus Porter's office after she had received it which was some time after October 21, 1999. However, Infanger, Porter nor Flynn sent the so-called "Attached A" that was

produced post-October 21, 1999 signing to Willie Wilson or any representative of Gemini.

"Exhibit A" was supposed to specifically outline and designate the areas and localities that Gemini Electronics, Inc. would be allowed to install its equipment and pay telephones.

In ascertaining the intentions of the parties to a contract, the Court should construe the contract in it's entirety so as to harmonize and give meaning to all of its provisions. 47 Fed. Cl. 745. More importantly, contracts may be considered ambiguous if they are susceptible to more than one reasonable interpretation. If a contract's provisions are clear and unambiguous, they must be given their plain and ordinary meaning. When a contract is amenable to only a reasonable construction upon its face, it would not be appropriate to strain the language of other contractual provisions to create an ambiguity. See Metric Constructors Inc. v. N.A.S.A., 169 F.3d at 751; see also Blinderman Construction Co. v. United States 17 Cl. Ct. 860, 863 (1989); see also, Bishop Eng'g Co. v. United States 180 Ct. Cl. 411, 416.

Because Attachment A is vigorously disputed as to its' contents by both parties, this has created an ambiguity in the alleged mutual intent between the parties. At the trial of this matter, the government admitted that there is no correspondence or document demonstrating or proving that they informed Gemini Electronics, Inc. and Willie Wilson that the jurisdictional boundaries of his contract under the Public Telecommunications Service Agreement would be limited to the Chicago District. In fact, there is no evidence that the government, subsequent to the execution of the contract, ever communicated with Mr. Wilson that the boundaries and limitations of his contract would be the Chicago District. Indeed, Wilson had telephoned Maria Infanger, counsel for the USPS Legal Department, in January 2000, three months after the execution of the contract and informed her that J.T. Weeker had agreed that he would be able to install his phones in areas beyond the Chicago

District including the Great Lakes region Tr. 456:16-25 (Infanger).

In this case, the Court has been compelled to examine evidence outside of "the four corners of the corners of the contract" to aid in its interpretation. In this regard, the Parole Evidence Rule must be applied. General Warehouse Two, Inc., v. United States 181 Ct. Cl. 180, 187, 389 F.2d 1016, 1020 (1967); PCL Construction Services, Inc., v. United States 47 Fed. Cl. 745 at P45.

Finally, in Gutz v United States 45 Fed. Cl. 291 at P9, the United States Federal Court of Claims in a 1999 case held:

> **"...because an ambiguous or uncertain writing sometimes can only be understood upon consideration of the surrounding circumstances, including prior negotiations, expressive evidence will be allowed to interpret ambiguous clauses in written agreements...a contract is deemed ambiguous, "expressions of the parties during negotiations for the contract are thus a frequent source for interpretation of this text"."** At P9.

The court continues by adding:

> **"The function of the Parole Evidence Rule is to prevent inconsistent contemporaneous or prior statements from changing the terms of an integrated agreement..." Gutz v United States** at P9.

## THE AMBIGUITIES IN THE CONTRACT SHOULD BE INTERPRETED MOST STRONGLY BY THE GOVERNMENT BECAUSE THE GOVERNMENT DRAFTED THE CONTRACT

The testimony is indisputed that the Legal Department of USPS drafted the contract that was executed on October 21, 1999. At the time of the execution of the contract, the attorney for the government testified that she read the contract. She states that at the execution of the contract, there was not an Exhibit A as referenced in Paragraph 6 of JE3. Moreover, the attorney for the government submitted the contract to the parties on October 21, 1999 for signature. The law in this

area seems to be as old as its ages. In General Warehouse Two, Inc. v. United States 181 Ct. Cl. 180 held that where certain contract provisions can be read to support the plaintiff contractor's interpretation and also are susceptible of the interpretation placed on them by the government, the provisions are ambiguous. The court in General Warehouse Two found that ambiguities in a contract should be interpreted most strongly against the party who drafted the contract, and if the contract is reasonably susceptible of two differing interpretations, the one placed on the contract by the non-drafting party will prevail. In General Warehouse Two, the court specifically held: **"...if the contract is reasonably susceptible of two differing interpretations, that interpretation placed on the contract by the non-drafting party will prevail..."** General Warehouse Two at P187. See also Lillie-Ames Co. v. United States 154 Ct. Cl. 544, 293 F.2d 630 (1961).

## THE PUBLIC TELECOMMUNICATIONS AGREEMENT WAS TO APPLY BEYOND THE CHICAGO DISTRICT

In the summer of 1999, J.T. Weeker, Rufus Porter and Mr. Wilson met on at least two occasions to discuss the area of coverage for the proposed Gemini Electronics contract. Mr. Porter has testified that Mr. Weeker informed him that it was his "intent" to have Mr. Wilson and Gemini Electronics, Inc. install its telephones beyond the Chicago District. Tr. 242:1-3 (Porter). In this regard, there is no evidence in the trial record that anyone from the government specifically told Mr. Wilson that his contract would not be allowed to expand into areas beyond the Chicago District.[17].

[17]Phyllis Flynn testified that she informed Mr. Wilson that his proposed contract would cover only the Chicago District. However, Flynn states that she informed Mr. Wilson of this in the summer of 1999 and prior to his successfully winning the bid. Flynn further testified that she did not receive a document from Ameritech until late September, 1999, which was supposed to inform her of what constituted the Chicago District and beyond per the 1992 Ameritech contract. It is simply unbelievable that Flynn could tell Mr. Wilson in the summer of 1999 what his area of coverage would be and she did not know, by her own admission, until September, 1999 what

In determining the intent of the parties the Court should look to the circumstances surrounding the contract. In this regard, extrinsic evidence is important in making a determination as to what the actual intent of the parties was. PCL Construction Services, Inc. v. United States 47 Fed. Cl., Supra. In reviewing the circumstance surrounding the formation and execution of the October 21, 1999 contract, the Court should look at the actual facts that transpired. First, the government has never produced any evidence or documents indicating that prior to October 21, 1999 that Mr. Willie Wilson was ever put on notice that his contract would be limited to the Chicago District. Second, the government has not contradicted or contested the statements of Rufus Porter which clearly demonstrate that J.T. Weeker intended for Willie Wilson and Gemini Electronics to install telephones and equipment beyond the Chicago District. Third, the testimony of Maria Infanger that as a lawyer, she attended a contract signing representing the government and allowed her client to sign a document when a key, integral, essential and important part of the document was missing. This testimony borders on the incredulous. Fourth and more importantly, the testimony of Phyllis Flynn and Infanger reflects that Wilson was never provided with the so-called "Exhibit A" attachment that the government received post-signing of the Public Telecommunications Agreement on October 21, 1999. Obviously, Flynn and Infanger knew that it was palpably and egregiously wrong to attach an exhibit onto a contract after the contract had been executed, consummated and completed. As an attorney, Infanger's testimony on this point is not credible. Phyllis Flynn testified that she did not provide the Exhibit A Attachment to Rufus Porter's office until approximately three weeks after she had received it on or about October 18, 1999. Clearly, Ms. Flynn knew better than to submit an

areas the Ameritech contract covered. In fact, Flynn had never seen the Ameritech contract. Indeed, she never did see the Ameritech contract because the contract was lost, misplaced or somehow disappeared.

attachment without sharing that attachment with an essential party to the agreement. Flynn's testimony was that she did not send the post-signing attachment to Wilson or any Gemini representative.

This Court should find the testimony of the government's witnesses not credible. The evidence clearly supports an interpretation that the contract should expand beyond the Chicago District.

**CONCLUSION**

For the foregoing reason, we respectully request that this Court enter a Judgement for breach

Respectfully Submitted,

/s Lewis Myers, Jr.

Lewis Myers, Jr.
Counsel for Plaintiff
25 E. Washington Street
Suite 1225
Chicago, IL 60602
(312) 236-8004
(312) 236-8804
lmyersatt@aol.com