# In the United States Court of Federal Claims

**No. 04-166C**
**Filed: April 8, 2005**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * | * | |
| **GEMINI ELECTRONICS, INC.,** | * | **Breach of Contract; United States Postal Service; Telecommunications Service Agreement; Authority to Contract; Parol Evidence.** |
| **Plaintiff,** | * | |
| **v.** | * | |
| **UNITED STATES,** | * | |
| **Defendant.** | * | |
| * * * * * * * * * * * * * * * * * * * | * | |

**Lewis Myers, Jr.**, Chicago, Illinois, for the plaintiff.

**David B. Stinson, Carolyn J. Craig**, Trial Attorneys, **David M. Cohen**, Director, Commercial Litigation Branch, Civil Division, **Peter D. Keisler**, Assistant Attorney General, Department of Justice, Washington, D.C., for the defendant. **Christopher J. Burton**, United States Postal Service, Washington, D.C., of counsel.

## O P I N I O N

**HORN, J.**

This case arises from a 1999 "Public Telecommunications Service Agreement" (the Agreement) between the plaintiff, Gemini Electronics, Inc. (Gemini) and the United States Postal Service (USPS) to install and maintain pay telephones in USPS facilities. The plaintiff, Gemini, argues that the USPS breached the Agreement by not permitting Gemini to install pay telephones in USPS facilities outside of the USPS Chicago District, a geographic region that includes the City of Chicago and certain surrounding areas. The defendant claims that the Agreement with Gemini was limited only to the USPS Chicago District.

## FINDINGS OF FACT

This case was originally filed in the United States District Court for the Northern District of Illinois and was transferred to this court. Initially, the plaintiff's complaint in this court was dismissed, without prejudice, because the plaintiff had failed to submit its claim to the contracting officer before filing suit. See 41 U.S.C. § 605(a) (2000) ("All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision."). The plaintiff subsequently submitted its claim to the USPS contracting officer. The USPS contracting officer denied plaintiff's claim,

whereupon the plaintiff filed a second amended complaint in this court. A trial was held in Chicago, Illinois.

In 1992, the USPS executed an Agreement with Illinois Bell Telephone Company, subsequently Ameritech, for the installation and maintenance of pay telephones in USPS facilities throughout the State of Illinois, including the Northern, Central and Southern Illinois USPS Districts. Attached to the 1992 Agreement with Ameritech was an "Exhibit A – Rider Illinois," which listed pay telephones to be installed in USPS facilities throughout the State of Illinois, including the Northern, Central, and Southern Illinois Districts. The Ameritech Agreement expired on September 30, 2000.

In 1999, the USPS, specifically, the Chicago District, which at the time covered the City of Chicago and a limited, defined geographic region of the surrounding area, solicited bids for pay telephone services for certain USPS facilities. The USPS received responses to its solicitations from three providers, Ameritech, Gemini, and MCI. After presentations by two of the bidders, Ameritech and Gemini, the USPS ultimately awarded Gemini the Agreement to install and maintain pay telephones in the USPS facilities. The terms of this Agreement are the subject of the present suit.

At the trial, Willie Wilson, the President and Chief Executive Officer of Gemini, testified that the idea for Gemini to bid for pay telephone services with the USPS derived from conversations between himself, Chicago Congressman Danny Davis and Rufus Porter, the District Manager and Postmaster of the USPS Chicago District, as well as an employee of Mr. Wilson and several ministers, regarding minority participation in federal contracts and community outreach through Gemini's involvement. Conversations also occurred between Mr. Wilson, Mr. Porter and J. T. Weeker, the former Vice President of the USPS Great Lakes Region, who was Mr. Porter's immediate supervisor. Mr. Wilson stated that he intended for the profits from the Agreement to go to local churches. In furtherance of the Agreement's public purpose, after Gemini won the Agreement, and before it actually entered into the Agreement with the USPS, a celebratory, mock signing ceremony of the Agreement was held at Chicago's Navy Pier on September 27, 1999. According to Mr. Wilson, among those present during the mock singing were Willie Wilson, Congressman Danny Davis, Congressman Bobby Rush, Rufus Porter and J. T. Weeker, among others.

After the USPS had solicited bids for pay telephone services, and before Gemini bid on the Agreement, Gemini requested, and the USPS provided, information on the facilities where the new pay telephones could be installed. The parties disagree as to the specific information provided to the bidders with respect to the facilities to be included in the Agreement. Phyllis Flynn was a USPS Information Technology Specialist for the Chicago District when the USPS solicited the telephone Agreement. At the trial, Ms. Flynn testified that she provided all bidders with information on the solicitation and the Agreement, and that the information she provided included locations only within the Chicago District.

Mr. Wilson, however, stated that he remembered reviewing the information provided by Ms. Flynn, and testified in court that the information included locations inside and outside the Chicago District. According to Mr. Wilson, "Mr. Weeks [sic] said we would be covering all of his area, which was the Chicago area, O'Hare, the Northern District and Central Illinois." Additionally, at one point before the Agreement was executed, Rufus Porter assigned Wiley Barnes, of his staff, to provide Gemini a tour of the areas in which Gemini was to install its telephones. According to Mr. Wilson, during this tour, Mr. Barnes brought personnel from Gemini to USPS facilities in the Chicago District, as well as in the Central Illinois District. During the trial, Mr. Wilson also testified that when preparing his bid, he referred to and relied upon the Ameritech Agreement and the "Exhibit A – Rider Illinois" list of locations attached to the Ameritech Agreement, which included areas outside of the Chicago District.

Before the Agreement with the USPS was executed, Gemini provided a draft of the Agreement to Maria Fuhrmann, now Maria Infanger, an attorney for the USPS's Law Department in Chicago, Illinois, for review and comments. On October 13 and 14, 1999, Ms. Infanger provided her written comments regarding Gemini's draft Agreement to counsel for Gemini. Ms. Infanger also was the attorney for the USPS who was present when the USPS and Gemini signed the Agreement.

The Agreement between the USPS and Gemini was signed on October 21, 1999, by Rufus Porter, on behalf of the USPS, and Willie Wilson, on behalf of Gemini.[1] Present at the signing of the Agreement on October 21, 1999, were Rufus Porter, Willie Wilson, Maria Infanger, Phyllis Flynn and several Gemini employees. The Agreement provided for a five-year term and gave Gemini the right to install and maintain public telephones in certain USPS facilities. According to the Agreement, Gemini would pay the USPS a commission of 25 percent of the telecommunications revenue received by Gemini from the pay telephones.

Most of the language and terms set forth in the Agreement between Gemini and the USPS are not in dispute, with the exception of one key disagreement – the precise locations where Gemini was to be permitted to install its telephones. The signed Agreement between the USPS and Gemini, references an Exhibit A. Specifically, Section 6 of the Agreement between Gemini and the USPS states, in relevant part that:

> 6. <u>Premises</u>. The Premises are described as the following locations that are owned, managed, leased, or operated by USPS and that are subject to this agreement:

---

[1] Although the first page of the Public Telecommunications Service Agreement, signed by Willie Wilson, as President and Chief Executive Officer of Gemini, and Rufus Porter, as District Manager and Postmaster for the Chicago District, states that: "[t]his Agreement is made as of October 18, 1999," the signature page is "[d]ated as of October 21, 1999."

See attached Exhibit A.

A dispute exists as to which Exhibit A, if any, was attached to the Agreement when it was executed by the parties, and as to whether the Exhibit A attached, or intended to be attached, to the Agreement included USPS facilities outside of the Chicago District. Mr. Wilson testified that when the Agreement was signed, an Exhibit A was attached that listed locations and telephones numbers in the "Northern Illinois, Central Illinois, O'Hare Field, and Chicago area." During his testimony, however, Mr. Wilson, failed to identify which of the several versions of Exhibit A in the trial record he was referring to during his testimony. The defendant, through the testimony of Mr. Porter and Ms. Infanger, asserts that when the Agreement was signed, there was no Exhibit A attached to the Agreement. The USPS also asserts that the Exhibit A intended to be attached to the Agreement was one which listed locations only within the Chicago District. The defendant also argues that the Agreement could not have included areas outside of the Chicago District because Rufus Porter, the individual who signed the Agreement for the USPS, had authority to bind the USPS only within the Chicago District.

According to testimony offered by Rufus Porter and Phyllis Flynn at the trial, when compiling the pay telephone numbers and locations to be included in Exhibit A, Vernon Sims, the USPS Chicago District's Information Systems Manager for the USPS Chicago District, and Phyllis Flynn started with the telephone list from the Ameritech Agreement and removed those telephone numbers and locations that were not within the Chicago District. According to Rufus Porter, he asked the information systems personnel to "pare" down the Ameritech list to those locations only within the Chicago District. According to Mr. Porter and USPS personnel, the USPS "sanitized" the Ameritech phone listings for two reasons: to identify those telephones outside of the Chicago District for which it was receiving revenues from the Ameritech Agreement entered into in 1992, and to create a list of pay telephone numbers and locations for only the Chicago District, to be included in the Agreement to follow the expiring Ameritech Agreement.

On October 22, 1999, one day after the USPS signed the Agreement with Gemini, Yasmine Clark, an Information Systems Coordinator for the USPS sent to Ms. Infanger, the USPS attorney, a letter to which she attached "a list of Ameritech payphones that are located within the Chicago District." Ms. Infanger testified that she asked the Chicago District for Exhibit A to attach to the Agreement with Gemini, and that she received the sanitized list from Yasmine Clark on October 22, 1999, the day after the Agreement was signed. Upon receiving the list from Ms. Clark, Ms. Infanger testified that she attached the list to the Agreement at issue and stated at the trial that she believed she had a "final agreement."

Between late 1999 and early 2000, the plaintiff installed approximately sixty telephones in two USPS facilities in the vicinity of O'Hare Airport. The two USPS facilities located at O'Hare are the Irving Park Road Processing and Distribution Center (Irving Park Plant),

located at 11560 West Irving Park Road, and the O'Hare Airmail Facility, located at 11600 West Irving Park Road. The two facilities are physically separate and, at the time the Agreement was executed, were separately managed. When the Agreement was signed, the Irving Park Plant fell under the authority of Rufus Porter, as Postmaster and District Manager of the Chicago District. The O'Hare Airmail Facility, however, was managed by Jerry Kubick. Mr. Kubick reported directly to the Great Lakes Regional Vice President, who at the time was J. T. Weeker. Mr. Kubick did not report to Rufus Porter. After the Agreement between Gemini and the USPS was signed, and before Gemini installed any telephones in the O'Hare Airmail Facility, Rufus Porter contacted Jerry Kubick and asked him to assist Gemini by permitting Gemini to install pay telephones in the O'Hare Airmail Facility. Mr. Kubick initially agreed to permit Gemini to install telephones in his facility; however, after he discovered that Gemini had removed the existing Ameritech telephones, and that Gemini had installed fewer telephones, with no telephones equipped for the hearing impaired, Mr. Kubick directed Gemini to remove its telephones from his facility. Mr Kubick then had the Ameritech telephones reinstalled. A Gemini accounting commission statement for May, 2001, indicates that Gemini provided telephone services and paid the Postal Service for pay telephones located only at the Irving Park Plant. The parties provided no evidence to the court that the USPS ever received any revenue from Gemini telephones located in the O'Hare Airmail Facility.

According to both Mr. Wilson and Mr. Porter, J. T. Weeker, the Area Vice President for the Postal Service's Great Lakes Area, indicated his desire to help Gemini expand the Gemini telecommunications services to areas beyond the Chicago District. The plaintiff argues that Mr. Weeker orally agreed to allow Gemini to service areas outside the Chicago District, including Northern Illinois and Central Illinois. The evidence, however, suggests that at Mr. Weeker's request, Rufus Porter spoke with other USPS District Managers to determine whether they had any interest in having Gemini provide pay telephone services in their Districts. J. T. Weeker died in January, 2000. On January 28, 2000, after Mr. Weeker's death, Gemini sent a letter to Danny Jackson, Mr. Weeker's successor and acting Vice President of the USPS Great Lakes Area. In the letter, signed by Mr. Wilson, Gemini stated that Mr. Weeker "was extremely encouraging and instructed his staff to help us expand our services immediately to the outlying Chicagoland areas such as Fox Valley, Carol Stream, South Suburban and Palatine as we make long range plans to provide public phone service to your facilities in other States of the Great Lake [sic] Region." Mr. Wilson also met with USPS procurement personnel at the USPS headquarters in Washington, D.C., regarding expansion, but the record does not indicate an outcome of that meeting.

On September 9, 2002, Jon Michelle Richardson, an attorney representing Gemini, wrote a letter to Vernon Sims, the Information Systems Manager at the USPS's Chicago District Office, unilaterally notifying the USPS of Gemini's intent to terminate performance of Gemini's October, 1999 Agreement with the USPS. Ms. Richardson's letter included the following explanation for Gemini's termination of the Agreement:

> Due to the poor economic climate of the country and most notably in the

> telecommunications industry, Gemini Electronics, Inc. has experienced severe financial loss in servicing the subject Public Telecommunications Service Agreement dated October 18, 1999, entered into between Gemini Electronics, Inc. and the USPS.
>
> Be hereby advised that Gemini Electronics, Inc., hereby tenders notice to the USPS of its intent to terminate performance under the afore mentioned Agreement. Said termination of performance by Gemini Electronics, Inc. will be effective October 11, 2002.

Although in its termination letter to the USPS Gemini did not claim that the termination resulted from any breach by the USPS, at the trial, Mr. Wilson stated that by not allowing plaintiff to expand, the USPS had "created an economic climate that was unsuitable to be profitable, that we had to terminate our contract."[2] Additionally, in the complaint filed in this court, Gemini claims that the USPS breached the Agreement between the parties by not permitting Gemini to install pay telephones "in certain profitable facilities that the contract had designated," including "O'Hare Airport," and by denying Gemini access to install and maintain telecommunications equipment in a significant part of the Great Lakes Region. For the reasons discussed below, this court finds that the Agreement between the USPS and Gemini was limited to the Chicago District, and that, therefore, the defendant did not breach its Agreement with the plaintiff.

## DISCUSSION

The issue in this case is whether the Agreement between Gemini and the USPS permitted Gemini to install pay telephones outside of the Chicago District, and, if so, whether the USPS breached the Agreement. The facts presented to the court at trial establish that when the Agreement was signed, Exhibit A, designed to list the locations and telephone numbers where the plaintiff would be permitted to install its pay telephones, was not attached to the Agreement. Because the parties failed to ensure that an Exhibit A was attached to the Agreement when it was signed, and now dispute the version of and locations included in Exhibit A, critical terms of the parties' Agreement are in dispute. The parties agree that the missing terms render the Agreement between the USPS and Gemini ambiguous and that to the extent that the contract is ambiguous the court may consider extrinsic evidence.

In this case, not only was Exhibit A not attached to the Agreement at the time it was signed, but several inconsistent Exhibit A lists and listings of locations and telephone numbers have been presented to the court by the parties as part of the trial record. Specifically, there

---

[2] Although the government has not raised the issue, the court recognizes that the plaintiff, Gemini, ultimately terminated the Agreement with the USPS, almost one year before the Agreement was to expire, with no provision in the contract permitting early termination.

is an "Exhibit A – Rider Illinois" attached to the Agreement between the USPS and Ameritech that covers areas in multiple USPS Districts in Illinois. See Joint Trial Exhibits 13 and 14. There also is a different list of locations and telephone numbers, attached to a letter to the USPS, dated June 13, 2000, from Mary Giorgi, an account manager for Ameritech. The letter states that Ameritech will "orchestrate an orderly transition of your pay phones in the Chicago district to Gemini Electronics," and attached to the letter is a list of telephone numbers with addresses in the Chicago District. See Joint Trial Exhibit 9. There also is a list of telephone numbers titled "Ameritech Payphones – Chicago District (10/22/99)," which was sent to Ms. Infanger, the USPS attorney, from Yasmin Clark, the USPS information systems coordinator, the day after the Agreement with Gemini was signed. See Joint Trial Exhibit 12. Mr. Porter testified that the "10/22/99" list "appears to be" the list of telephone numbers put together for attachment as Exhibit A to the Agreement. Ms. Infanger also testified that she attached the "10/22/99" list to the Agreement the day after the Agreement was signed. Mr. Wilson, however, recalls a different list attached to the Agreement that had telephone numbers and locations in Northern Illinois, Central Illinois, O'Hare Field, and the Chicago area.

To resolve the dispute concerning the Exhibit A attachment, the plaintiff relies upon conversations between Mr. Wilson, J. T. Weeker, the USPS Great Lakes Regional Vice President, and Rufus Porter, the USPS Chicago District Manager and Postmaster. The plaintiff alleges that, based on these conversations, the Agreement between Gemini and the USPS covered areas outside of the Chicago District. Conversely, the defendant asserts that the parties' Agreement covered facilities only within the Chicago District, arguing that the actions of both parties were consistent with their mutual understanding that the October, 1999 Agreement was limited to the Chicago District, that any statement by J. T. Weeker about Gemini expanding into other Districts was not included in the October, 1999 Agreement, and that Rufus Porter's authority was limited only to the Chicago District. Finally, the defendant argues that although Gemini briefly was permitted to install pay telephones at the O'Hare Airmail Facility, the O'Hare Airmail Facility was not part of the Chicago District at the time the agreement was signed, and was not intended for inclusion in the October, 1999 Agreement.

The elements of an express contract are "a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract." Total Medical Mgmt., Inc. v. United States, 104 F.3d 1314, 1319 (Fed. Cir.) (citations omitted), cert. denied, 522 U.S. 857(1997). The United States Court of Appeals for the Federal Circuit stated in Jowett, Inc. v. United States:

> In interpreting a contract, we begin with the plain language. We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning. In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense.

Jowett, Inc. v. United States, 234 F.3d 1365, 1368 (Fed. Cir. 2000) (citations omitted); see also Hunt Constr. Group, Inc. v. United States, 281 F.3d 1369, 1372 (Fed. Cir. 2002) ("We begin with the plain language when interpreting a contract. . . . The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts.") (citations omitted); Giove v. Dep't of Transp., 230 F.3d 1333, 1340-41 (Fed. Cir. 2000) ("In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. Further, business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs.") (citations omitted); Hol-Gar Mfg. Corp. v. United States, 169 Ct. Cl. 384, 388, 351 F.2d 972, 975 (1965) (The language of the "contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances.").

When the terms of a contract are clear and unambiguous, there is no need to resort to extraneous circumstances for its interpretation. See Sea-Land Serv., Inc. v. United States, 213 Ct. Cl. 555, 567, 553 F.2d 651, 658 (1977), cert. denied, 434 U.S. 1012 (1978). However, because an ambiguous or uncertain writing sometimes can only be understood upon consideration of the surrounding circumstances, extrinsic evidence will be allowed to interpret an ambiguous clause. See Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004) (holding that extrinsic evidence is permissible to interpret an ambiguous contract); Sylvania Elec. Prods., Inc. v. United States, 198 Ct. Cl. 106, 126, 458 F.2d 994, 1005 (1972); Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 662 (2003).

The parol evidence rule "prohibits the admission of extrinsic evidence of prior or contemporaneous oral agreements, or prior written agreements, to explain the meaning of a contract when the parties have reduced their agreement to an unambiguous integrated writing." 11 Williston on Contracts § 33:1 (4th ed. 1999). "At common law and by statute in most States, the parol evidence rule prevents the variations of the terms of a written contract by oral testimony." Cruzan v. Director, Missouri Dept. of Health, 497 U.S. 261, 284 (1990). The function of the parol evidence rule (which is not a rule of evidence, but a rule of substantive law) is to prevent inconsistent, contemporaneous or prior statements from changing the terms of an integrated Agreement. See Sylvania Elec. Prods., Inc. v. United States, 458 F.2d at 1005. Extrinsic evidence is not admissible to add to or modify a fully integrated contract. See McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1434 (Fed. Cir.), reh'g denied, en banc suggestion declined (1996). What the parol evidence rule prohibits is the use of external evidence to add to or otherwise modify the terms of a written agreement in instances where the written agreement has been adopted by the parties as an expression of their final understanding. See Barron Bankshares, Inc. v. United States, 366 F.3d at 1375 (holding that the rule renders inadmissable evidence used to "modify, supplement, or interpret the terms of an integrated agreement.") (citing McAbee Constr., Inc. v. United States, 97 F.3d at 1435); David Nassif Assocs. v. United States, 214 Ct. Cl. 407, 419, 557 F.2d 249, 258 (1977). The parol evidence rule provides that when a document is fully integrated, "barring certain limited exceptions (e.g., fraud), a party to a written contract cannot supplement or interpret that

agreement with oral or parol statements that conflict with, supplant, or controvert the language of the written agreement itself." Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1327 (Fed. Cir. 2003), reh'g en banc denied, 346 F.3d 1359 (2003), cert. denied, 541 U.S. 987 (2004) (quoting Schism v. United States, 316 F.3d 1259, 1278 (Fed. Cir. 2002), cert. denied, 539 U.S. 910 (2003)).

Whether a contract is integrated is a question of law. See Sylvania Elec. Prods., Inc. v. United States, 458 F.2d at 1007 n.9. To determine whether a contract is fully integrated, courts may look to extrinsic evidence. See McAbee Constr., Inc. v. United States, 97 F.3d at 1434. Proof of a fully integrated agreement can be established by the presence of an integration clause in the agreement. The United States Court of Appeals for the Federal Circuit has stated that an integration clause "conclusively establishes that the integration is total unless (a) the document is obviously incomplete or (b) the merger clause was included as a result of fraud or mistake or any other reason to set aside the contract." Barron Bancshares, Inc. v. United States, 366 F.3d at 1375 (quoting Rumsfeld v. Freedom NY, Inc., 329 F.3d at 1329). An integration clause, by its definition, disposes of prior "oral agreements." Tiburzi v. Dep't of Justice, 269 F.3d 1346, 1354 (Fed. Cir. 2001). When a document is completely integrated, no additional terms may be added, whether consistent or inconsistent, through parol evidence. See Rumsfeld v. Freedom NY, Inc., 329 F.3d at 1327; McAbee Constr., Inc. v. United States, 97 F.3d at 1434. If the agreement is partially integrated, parol evidence may be introduced only to add consistent additional terms. See McAbee Constr., Inc. v. United States, 97 F.3d at 1434. When both the written agreement and extrinsic evidence establish that the writing constitutes a complete integration of the parties' agreement, the parol evidence rule bars the utilization of such extrinsic evidence to vary or contradict the terms of the written agreement. See David Nassif Assocs. v. United States, 557 F.2d at 246.

The Agreement between Gemini and the USPS contained an integration clause, which stated :

> 15. Entire Agreement. This Agreement shall constitute the sole Agreement of the parties relating to the Premises. Neither party will be bound by statements, warranties, or promises, oral or written unless such statements, warranties or promises are set forth specifically in this Agreement.

In the case before the court, however, the difficulty of applying the integration clause rule is that the signed Agreement was "obviously incomplete," and could not have represented an expression of the parties' final understanding without the inclusion of the Exhibit A referenced in Section 6 of the Agreement, which was to list the locations for installation of the pay telephones. See Barron Bankshares, Inc. v. United States, 366 F.3d at 1375; Rumsfeld v. Freedom NY, Inc., 329 F.3d at 1329.

Although the Agreement between the parties in this case was express, signed by both parties, and even included an integration clause, because critical terms of the Agreement (the

information on Exhibit A describing the locations for placement of the telephones) were missing at the time of execution, the court may review the relevant extrinsic evidence to determine the intent of the parties. See David Nassif Assocs. v. United States, 214 Ct. Cl. at 423, 557 F.2d at 258 ("[T]he task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court."). It is a fundamental precept of common law that the intention of the parties to a contract controls its interpretation. See Beta Systems Inc. v. United States, 838 F.2d 1179, 1185 (Fed. Cir. 1988) (quoting Firestone Tire & Rubber Co. v. United States, 444 F.2d 547, 551 (Ct. Cl. 1971)); Alvin v. United States Postal Service, 816 F.2d 1562, 1565 (Fed. Cir. 1987) ("In the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intent of the parties.").

As evidence that the Agreement covered areas outside of the Chicago District, the plaintiff asks the court to consider the conversations between J. T. Weeker and Mr. Wilson. Specifically, the plaintiff alleges that "Mr. Weeker told Mr. Wilson that the contract [the Agreement] he would be bidding on would cover the Great Lakes Region area of Chicago. This included Northern Illinois, Central Illinois and the Chicago District." The plaintiff further alleges that: "The statements of Mr. Weeker in the presence of Mr. Porter and Mr. Wilson demonstrate Mr. Weeker's intent to let Mr. Wilson and Gemini Electronics work beyond the Chicago District in fulfilling the Public Telecommunications Service Agreement of October 21, 1999."

The defendant responds that any oral representations made by Mr. Weeker were not specifically incorporated into the Agreement and, therefore, did not alter the terms of the Agreement. The defendant also asserts that "there is insufficient evidence of the contractual requirements necessary for any alleged oral agreement for the provision of Gemini's telecommunications services outside of the Postal Service's Chicago District." Finally, the defendant argues that no implied-in-fact contract came into existence based on the representation of Mr. Weeker and, in fact, could not have come into existence between the USPS and the plaintiff because the actions of the USPS evidence an intent to contract only within the Chicago District. Therefore, according to the defendant, no meeting of the minds to contract outside of the Chicago District was established because: "There is simply no evidence indicating that Gemini and the Postal Service agreed upon a contract for Gemini's services for any specific Postal Service facilities outside the Chicago District."

As testified to at the trial by employees of the USPS, including Mr. Porter and Ms. Flynn, before entering into the Agreement with Gemini, the Chicago District reviewed the then existing, but expiring pay telephone Agreement with Ameritech to determine which Ameritech telephones were within the Chicago District. The unrefuted testimony establishes that the reason the Chicago District undertook this review was because when the USPS initially entered into the Agreement with Ameritech, the USPS Districts were different and the Chicago District believed it was receiving revenue from pay telephones that were no longer in its District. At the trial, Mr. Porter also testified that the Information Systems Department of the USPS Chicago District was instructed to put together a list of locations and telephone

numbers to attach to the October 21, 1999 Agreement, and was to include only locations within the Chicago District. Moreover, according to Phyllis Flynn, when the solicitation for pay telephones was issued, the written information contained information only "for the Chicago district."

As described above, despite the importance of Exhibit A to the terms of the Agreement, both Mr. Porter and Ms. Infanger, the USPS attorney, testified that there was no Exhibit A attached to the Agreement when it was signed. Ms. Infanger testified, however, that she subsequently, and apparently unilaterally, attached the "10/22/99" list of locations and numbers, sanitized from the Ameritech Agreement so that the "10/22/99" list attached to the Gemini Agreement included only Chicago District locations and numbers. Ms. Infanger testified that after attaching the "10/22/99" list, she believed she had a complete Agreement, which included locations only within the Chicago District.

As the court in Fincke v. United States commented, the "actions and conduct [of the parties] before the inception of a controversy is of much greater weight than what they said or did after a dispute arose." Fincke v. United States, 230 Ct. Cl. 233, 244, 675 F.2d 289, 295 (1982) (citing Truong Xuan Truc v. United States, 212 Ct. Cl. 51 (1976); Macke v. United States, 199 Ct. Cl. 552, 467 F.2d 1323 (1972)). "The paramount focus is the intention of the parties at the time of contracting; that intention controls in any subsequent dispute." King v. Dep't of the Navy, 130 F.3d 1031, 1033 (Fed. Cir.1997); see also Edward R. Marden Corp. v. United States, 803 F.2d 701, 705 (Fed. Cir.1986) ("It is the general law of contracts that in construing ambiguous and indefinite contracts, the courts will look to the construction the parties have given to the instrument by their conduct before a controversy arises."); Atchison, Topeka and Santa Fe Ry. Co. v. United States, 216 Ct. Cl. 54, 65, 572 F.2d 843, 849 (1978) ("It is axiomatic that the intent of the parties is controlling, and such intent is to be gathered from the whole of the documents involved.").

Regardless of the claims now being made by the plaintiff, or the various versions of Exhibit A presented to the court in the complaint filed with this court, in the separate complaint filed in the District Court, and in the exhibits that became part of the trial record in this court, as is discussed below, when the Agreement was signed, Gemini understood or should have understood, that its Agreement with the USPS, signed by Rufus Porter, was limited to the Chicago District. Although multiple versions of Exhibit A, containing lists of locations and pay telephone numbers were presented to the court, at the trial, the plaintiff did not identify a single list of locations or telephone numbers which it could assert with any degree of certainty represented the Exhibit A intended to be attached to the October 21, 1999 Agreement. The plaintiff's sole witness, Mr. Wilson, only broadly asserted that the relevant list also included locations outside of the Chicago District. Furthermore, the plaintiff has made several contrary statements indicating its awareness of the limitations of the Agreement to the Chicago District, in the filings in two federal courts. When Gemini filed its complaint in this court, the plaintiff attached as an exhibit to the complaint a list of telephone numbers that includes

locations and numbers only within the Chicago District. This same list, with only Chicago District locations and numbers, was attached to the June 13, 2000 letter from Ameritech to the USPS which stated that Ameritech would assist Gemini in transitioning the telephones "in the Chicago District" from Ameritech to Gemini. In addition, in its complaint filed in the United States District Court for the Northern District of Illinois, prior to the transfer of plaintiff's case to this court, the plaintiff attached the same list and stated that: "On or about August 26, 1999, Gemini Electronics, Inc. entered into a [sic] the bidding process for the contract for providing pay telephone management services to the United States Postal Service facilities within the Chicago District . . . ." Also in the same District Court complaint, Gemini stated that it "was chosen as a provider for pay telephone management services at the United States Postal Service facilities in the Chicago District."

Plaintiff's reliance on the conversations between Willie Wilson, J. T. Weeker, and Rufus Porter, in which Mr. Weeker asked Mr. Porter to contact his counterparts, other USPS District Managers, and ask them to assist Gemini in obtaining Agreements with them is misplaced. That Mr. Porter did so, and that at some point Gemini met with Managers from other Districts, supports defendant's view that the October, 1999 Agreement between Gemini and the USPS was limited to the Chicago District. Furthermore, on July 13, 2000, almost nine months after the plaintiff entered into the October, 1999 Agreement with Rufus Porter, the plaintiff sent a letter to James Holmes, District Manager for the USPS Central Illinois District. In that letter, the plaintiff refers to a meeting Mr. Wilson held with Mr. Holmes, and stated that it was "grateful for the opportunity to present, by this writing, our proposal to provide public telephone service to your personnel and customers." The letter from the plaintiff to Mr. Holmes states that it is a proposal to reach an agreement with Mr. Holmes to place pay telephones into USPS facilities in the Central Illinois District. Specifically, the letter emphasizes plaintiff's "competitive rates" and "state-of-the-art" telephones. The letter does not read like a letter from a company that has already secured an Agreement with the District controlled by Mr. Holmes, once again suggesting the plaintiff's understanding that the Agreement Gemini had signed with Rufus Porter was limited to the Chicago District.

Equally telling as the July 13, 2000 letter to Mr. Holmes, regarding plaintiff's understanding of the limitations of the October, 1999 Agreement, is another letter from Gemini to Mr. Holmes on July 27, 2000. In the July 27, 2000 letter, the plaintiff references the September 27, 1999 Agreement signed at the mock signing ceremony at Chicago's Navy Pier, and states that "[w]e, in fact, have a standard public telephone contract, however, I thought it best to send you a copy of the contract prepared by the United States Postal Service ('Rider' prepared by Gemini) as a template to be used in whole or part." This court finds these letters from Gemini to the District Manager of the USPS Central Illinois District, Mr. Holmes, to be further evidence that the plaintiff understood that in order to install pay telephones outside of the Chicago District, it would have to enter into separate "public telephone contract[s]" with the appropriate signing official in each USPS District. Had the plaintiff thought that it already had an enforceable Agreement to install pay telephones in the Central Illinois District, there would have been no need for Gemini to send these two letters to the

Central Illinois District Manager, Mr. Holmes. In the letters, Gemini clearly proposes to enter into a separate Agreement for placement of pay telephones in the Central Illinois District and even references its October 21, 1999 Agreement "as a template" for the proposed contract with the Central Illinois District. Thus, the court finds that the plaintiff knew, or certainly should have understood that Gemini did not have an Agreement to install pay telephones in facilities in the Central Illinois District, or in locations outside the Chicago District, even though it had already entered into a signed Agreement with Mr. Porter for the Chicago District.

At the trial, Mr. Wilson claimed that the USPS Agreement signed by himself and Mr. Porter was intended to cover USPS facilities outside the Chicago District. The plaintiff offered no other supporting witnesses at the trial. The testimony of the USPS witnesses at the trial, and the documents in the record, establish that the contemporaneous actions of the parties exhibited an understanding that the Agreement signed by Rufus Porter for the USPS was limited to the Chicago District. Mr. Porter offered somewhat evasive or even conflicting testimony on the issue of whether Gemini's pay telephone service Agreement was intended to cover USPS Districts outside of Chicago. Based on the court's observance of Mr. Porter during his testimony, however, the court concludes that, as he stated several times, Mr. Porter understood the geographic limitations of his authority to the Chicago District and understood that the Gemini Agreement was designed to cover only the Chicago District. Mr. Porter, who acknowledged an ongoing relationship with Mr. Wilson including, if not a social relationship, a business relationship, seemed uncomfortable on the stand, appearing to try to please all parties. Specifically, Mr. Porter stated:

> Q: [By defendant's attorney] Okay. What was the area that the Postal Service was interested in covering by virtue of the agreement that you were negotiating at that time with Gemini?
>
> A: [By Mr. Porter] Pay phone services?
>
> Q: Yes. What area? What area were you concerned with covering in terms of the pay phone services?
>
> A: Geographical area?
>
> Q: Yes.
>
> A. Chicago and - at the time, all of the Chicago area.
>
> Q: And would that be the - all the different Chicago areas within your district?
>
> A: Yes, correct.

When later questioned, however, Mr. Porter responded:

> Q: Was it your understanding that Gemini was to replace all of the telephones that Ameritech had, both inside Chicago as well as outside the Chicago District?
>
> A: Yes.

But moments later, still on direct testimony, Mr. Porter responded to the following question, as follows:

> Q: [By defendant's attorney] And would that include pay phones outside the Chicago district?
>
> A: [By Mr. Porter] That's correct.
>
> Q: But would those pay phones that were outside the Chicago district be covered by this agreement?
>
> A: The agreement that I signed in October, no it would not have.

Balancing the totality of Mr. Porter's testimony and the testimony of the other USPS witnesses, the court concludes that Mr. Porter, when signing for the USPS, understood that the Agreement he entered into in October, 1999 with Gemini was intended to cover only the Chicago District, even though when asked if there was a specific Exhibit A that he recalled, Mr. Porter could not respond except to say that he was familiar with the list of telephone numbers and locations in the Chicago District he had ordered to be put together for the Agreement.

After reviewing the testimonial and documentary evidence presented at trial, this court finds that, at the time the Agreement was signed, the only mutual intent achieved by the parties was to contract for USPS facilities within the Chicago District. Although there may have been discussion of Gemini expanding into other Districts in Illinois, or even beyond, that expansion was not intended to, and could not have occurred through an Agreement signed by Gemini and Rufus Porter. The authority to install pay telephones in facilities in other USPS Districts would have required separate Agreements with USPS officials authorized to enter into such Agreements for those other Districts. Furthermore, the actions and statements of the government officials are consistent, and exhibit an intent to enter an Agreement with Gemini only for the Chicago District. These include the orders by Mr. Porter to create a list of telephone numbers containing locations only within the Chicago District, and Ms. Infanger attaching to the Agreement the list containing only locations and pay telephone numbers in the Chicago District.

The plaintiff also alludes to the existence of an implied-in-fact contract. An implied-in-fact contract is an agreement "'founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the

parties showing, in the light of the surrounding circumstances, their tacit understanding.'" Trauma Serv., Group v. United States, 104 F.3d 1321, 1326 (1997) (quoting Hercules, Inc. v. United States, 516 U.S. 417, 424 (1996) (quoting Baltimore & Ohio R.R. Co. v. United States, 261 U.S. 592, 597 (1923))). Based on the trial testimony and the documents in the record, the court finds that an implied-in-fact contract did not exist between the USPS and Gemini for telephone services outside of the USPS Chicago District. Had the USPS received revenue for pay telephones installed by Gemini outside of the Chicago District, the court might be inclined to explore the possibility that an implied-in-fact contract came into existence for areas outside of the Chicago District. However, neither party has brought forth such evidence, or brought forth any other evidence to support an implied-in-fact contract beyond the Chicago District. The reported conversations with J. T. Weeker do not evince an intent on behalf of the USPS to enter into one Agreement which covered all USPS Districts in the State of Illinois. To the contrary, the actions by the USPS show an intent and understanding that the October, 1999 Agreement covered only the Chicago District and that no implied-in-fact Agreement was created by the actions of the USPS or the statements made by J. T. Weeker.

Regardless of the disagreement between the parties as to whether an Exhibit A was attached to the Agreement when it was signed, or their disagreement regarding which version of Exhibit A was intended to be attached, also fatal to plaintiff's claims is that Rufus Porter did not have the authority to sign an Agreement which would bind the USPS beyond the Chicago District. It is well established that the government is not bound by the acts of its agents beyond the scope of their actual authority. See Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947); Trauma Serv. Group v. United States, 104 F.3d at, 1325. Moreover, contractors dealing with the United States must inform themselves of a representative's authority and the limits of that authority. See Federal Crop Ins. Corp. v. Merrill, 332 U.S. at 384 ("[A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority."); Trauma Serv. Group v. United States, 104 F.3d at 1325 ("[T]his risk remains with the contractor even when the Government agents themselves may have been unaware of the limitations on their authority."); see also Total Medical Mgmt, Inc. v. United States, 104 F.3d at 1321; Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001); Jones v. United States, 49 Fed. Cl. 516, 518 (2001); Starflight Boats v. United States, 48 Fed. Cl. 592, 598-99 (2001), appeal dismissed, 13 Fed. Appx. 960 (Fed. Cir. 2001).

A government representative with the requisite authority is a required element of both express and implied-in-fact federal contracts. The government "is not bound by its agents acting beyond their authority and contrary to regulation." Urban Data Sys., Inc. v. United States, 699 F.2d 1147, 1153 (Fed. Cir. 1983) (quoting Fed. Crop Ins. Corp. v. Merrill, 32 U.S. at 384); see also Office of Personnel Mgmt v. Richmond, 496 U.S. 414, 428 (1990) (agencies' unauthorized statements to citizens cannot obligate the Treasury for the payment of funds), reh'g denied, 497 U.S. 1046 (1990). The parties in this case clearly entered into an express Agreement to allow plaintiff to install telephones in certain USPS facilities. Rufus Porter, who signed the Agreement for the defendant, was the USPS District Manager and Postmaster of the Chicago District. For Rufus Porter to bind the government to terms of an Agreement with

Gemini that included areas outside of the Chicago District, Rufus Porter must have had the authority to bind the government to commitments outside the Chicago District. Gemini bears the burden of proving that Rufus Porter had such authority. The fact that Gemini may have believed that Rufus Porter held such authority is not sufficient; Gemini must prove that Mr. Porter had actual authority. See Harbert/Lummus Agrifuels Projects v. United States, 142 F.3d 1429, 1432 (Fed. Cir.), reh'g denied, en banc suggestion declined (1998), cert. denied, 525 U.S. 1177(1999) (citations omitted); see also Trauma Serv. Group v. United States, 104 F.3d at 1327 (stating that the plaintiff "must prove all of the requirements for a binding contract in order to prevail"). Plaintiff must show "that the officer whose conduct is relied upon had actual authority to bind the government in contract." H.F. Allen Orchards v. United States, 749 F.2d 1571, 1575 (Fed. Cir. 1984), cert. denied, 474 U.S. 818 (1985); see also City of El Centro v. United States, 922 F.2d 816, 820-21 (Fed. Cir. 1990) (("[I]t is ECCH's [plaintiff's] responsibility to show that Agent Hernandez had the requisite contracting authority.") (citing Housing Corp. of America v. United States, 199 Ct. Cl. 705, 711, 468 F.2d 922, 925 (1972)), cert. denied, 501 U.S. 1230 (1991).

An officer of the United States who does not possess express contracting authority may nevertheless bind the United States, but only if he has "implied actual authority." Fifth Third Bank of W. Ohio v. United States, No. 04-5009, 2005 WL 730282, at *13 (Fed. Cir. Mar. 31, 2005); see also Salles v. United States, 156 F.3d 1383, 1384 (Fed. Cir. 1998); H. Landau & Co. v. United States, 886 F.2d 322, 324 (Fed. Cir. 1989) ("Authority to bind the [g]overnment is generally implied when such authority is considered to be an integral part of the duties assigned to a [g]overnment employee.") (quoting J. Cibinic & R. Nash, Formation of Government Contracts 43 (1982)); see also United States v. Bissett-Berman Corp., 481 F.2d 764, 768-69 (9th Cir. 1973) (holding that the government's attorney had the implicit authority to bind the government although the contracting officer had the express authority); Son Broadcasting, Inc. v. United States, 52 Fed. Cl. 815, 820 (2002) ("Actual authority may be implied when such authority is an integral part of the duties assigned to a [g]overnment employee."). Although apparent authority will not suffice to hold the government bound by the acts of its agents, see Federal Crop Ins. Corp. v. Merrill, 332 U.S. at 384, implied actual authority, like express actual authority, will suffice.

The plaintiff argues that Mr. Porter had authority to bind the government and enter into an Agreement with the plaintiff to install telephones in facilities beyond the Chicago District, and did so. The plaintiff claims that Mr. Porter's authority was derived from several sources, including federal statute, the USPS Purchasing Manual, and delegation of authority from J. T. Weeker. In particular, the plaintiff claims that Mr. Porter's authority to contract arises from "5 U.S.C. 552; 39 U.S.C. 401, 104, 410, 411, 20058 [sic] 501, 265605 [sic], Subchapter 8, Procurement System for the USPS . . . ." The plaintiff also argues that section 1.4.2 of the USPS Purchasing Manual permits the "VP, SM" to contract and delegate that contracting authority for the USPS. Plaintiff argues that the reference to "VP" includes any Vice President, including J. T. Weeker. "VP, SM," however, actually is defined in the purchasing manual as "VP, P&M," the Vice President for Purchasing and Material. Plaintiff claims that since any Vice President may contract for the USPS, J. T. Weeker had authority to enter into an

Agreement on behalf of the USPS. Finally, the plaintiff states "Rufus Porter also had implied authority" to enter into the contract with the plaintiff beyond the Chicago District, and that Mr. Porter "assisted Wilson in fulfilling Weeker's intent by contacting other District Managers on behalf of Wilson to expand Wilson's pay phone services into their respective areas."

The defendant argues that Mr. Porter's authority was limited only to the Chicago District. To support its argument, the defendant cites to 39 C.F.R. § 229.2(a) (1999), which states that: "The field divisions are responsible for the day-to-day management of all operations and facilities within a geographic area. Each field division is headed by a Field Division General Manager/Postmaster who reports to the Regional Postmaster General." 39 C.F.R. § 229.2(a) (emphasis added). According to Ms. Flynn of the USPS, field divisions are the same as Districts except for a name change that occurred during the 1992 USPS restructuring. The defendant also supports its argument that Mr. Porter's authority was limited to the Chicago District by relying on the USPS Administrative Support Manual § 863.2 (Issue 13, 1999), which states that: "The district manager, through the information systems manager at the district, manages voice, video, facsimile, and data telecommunications systems within a geographic boundary including processing and distribution installations." (emphasis added). Finally, the defendant argues that the conclusion that Mr. Porter's authority was limited to the Chicago District is consistent with Mr. Porter's own understanding that his authority was limited to the Chicago District. The defendant argues that if District Managers were not limited to authority only within their limited geographic regions, the USPS would be exposed to multiple and potentially inconsistent commitments.

In this case, it was Gemini's responsibility to ensure that Mr. Porter had the appropriate authority to enter into the terms of the Agreement before signing the October, 1999 Agreement. See Trauma Serv. Group v. United States, 104 F.3d at 1325 ("Anyone entering into an agreement with the Government takes the risk of accurately ascertaining the authority of the agents who purport to act for the Government."). Based on the documents in the record and the testimony offered at the trial, Mr. Porter's authority clearly was limited to the Chicago District. There is no basis for concluding from the record before the court that, in the time leading up to the execution of the October, 1999 Agreement between Gemini and the USPS, Mr. Porter's authority was expanded by any delegation of authority from J. T. Weeker, oral or otherwise. To be sure, the record suggests that J. T. Weeker was supportive of the community development project proposed by Mr. Wilson. Nonetheless, while promoting Mr. Wilson's project, Mr. Weeker continued to suggest opportunities for Mr. Wilson to expand his activities through normal government channels by contacting other District Managers to explore expanding Gemini's telephone services into those other Districts.

Although the plaintiff cites to several statutes to argue that Mr. Porter's authority extended beyond the Chicago District, the court does not find any of plaintiff's citations particularly helpful or persuasive. For example, the plaintiff, without further discussion, cites to portions of the Administrative Procedure Act (APA) to argue that Mr. Porter's authority extended beyond the Chicago District. Plaintiff states that: "Much of this authority was derived from Title 5 U.S.C. 552 et seq." Plaintiff, however, fails to explain how the APA provides such

authority to Mr. Porter or to identify a bonafide source of authority for Mr. Porter to enter into an Agreement extending beyond the Chicago District. Similarly, the plaintiff cites to the general authority of the Postal Service or to non-existent sections of the code. At the trial in this case, when questioned on Mr. Porter's authority to enter into the Agreement on behalf of the USPS, the USPS attorney, Ms. Infanger, stated that she could not find any manual that covered these kinds of Agreements or that documented Mr. Porter's authority. Ms. Infanger also stated that she had discovered that different levels of employees had entered into similar Agreements, including District Managers such as Mr. Porter.

The record does not reflect that Mr. Porter was a warranted contracting officer, with authority to contract on behalf of the USPS for materials or services. However, the court finds relevant the Postal Regulations set forth at 39 C.F.R. § 229.2(a) (1999), the Administrative Support Manual § 863.2, and the USPS Purchasing Manual effective when this Agreement was executed. These sources evidence that Mr. Porter's authority to enter into contracts or agreements of any variety derived from his position as District Manager and Postmaster of the Chicago District and was limited to the geographic region that he managed. Nothing in the record, the documents introduced or the trial testimony, suggests otherwise.

The Postal Regulations at 39 C.F.R. § 229.2(a), describing the USPS field organization, limit the Field Division Manager's/Postmaster's authority to "the day-to-day management of all operations and facilities within a geographic area." 39 C.F.R. § 229.2(a) (emphasis added). Rufus Porter was the District Manager and Postmaster for the Chicago District. He, therefore, was responsible for, and had the authority to manage facilities only within the Chicago District. The Postal Regulations do not specifically mention the authority to enter into telephone service Agreements, pursuant to which the USPS can authorize the installation of telephones in USPS facilities in return for a percentage of commission. Nevertheless, the installation of telephones in USPS facilities pursuant to such an Agreement can be considered part of a District Postmaster's facilities, management responsibilities, in which case, telephone installation would be authorized only within a specific region. Although entering into the Agreement with Gemini to allow access for telephone installations in USPS facilities in return for a percentage of the commissions from the plaintiff is not a typical contract for procurement of goods or services, it implicates the "day-to-day" operations of the Postal Service by providing availability of pay telephone services to USPS employees and the public. With respect to the Gemini Agreement, no Treasury funds were to be obligated by Mr. Porter to be paid to the plaintiff, rather, pursuant to the Agreement, plaintiff was to submit a certain portion of its revenue to the government. Mr. Porter's authority to contract and manage facilities in his District was inherent in his position as the District Manager and Postmaster. As the District Manager, Mr. Porter's authority, however, was specifically limited only to a geographic region. There is no indication in the record to the contrary. Therefore, under the Postal Regulations, it is logical to conclude that Mr. Porter could not bind the government to any obligations outside of his area of control, the Chicago District.

This court also finds instructive the contracting procedures and authorities set forth in

the USPS Purchasing Manual.[3] The Purchasing Manual sets forth the contracting authority and procedures required to be followed by the USPS and was incorporated by reference into the Postal Regulations through 39 C.F.R. § 601.100 (1999), which states: "In conformity with [5 U.S.C. § 552(a)], with 39 U.S.C. section 410(b)(1), and as provided in this part, the U.S. Postal Service hereby incorporates by reference its Procurement Manual (PM), Publication 41, a loseleaf [sic] publication." Section 601.100 later replaced the term Procurement Manual with the term Purchasing Manual. Modern Systems Tech. Corp. v. United States, 979 F.2d 200, 203 (Fed. Cir. 1992) ("Because of its incorporation by reference in regulations issued pursuant to statutory authority, the Manual has the force and effect of law."); De Matteo Constr. Co. v. United States, 220 Ct. Cl. 579, 591, 600 F.2d 1384, 1391 (1979) ("As such regulations were issued pursuant to statutory authority . . . they have the force and effect of law . . . .").

The Purchasing Manual applies to all procurement contracts entered into by the USPS. See Banknote Corp. of America v. United States, 365 F.3d 1345, 1349 n.1 (Fed. Cir. 2004) ("The Purchasing Manual, not the Federal Acquisition Regulations (FAR), applies to USPS procurements."). A review of the Purchasing Manual, however, reveals no section directly addressing the kind of Agreement entered into in this case. The defendant contends that because the Agreement in question is not one for the purchase of supplies or equipment by the USPS, the Purchasing Manual has no application to the instant case. The government's argument, however, flies in the face of the USPS's own agency decision in Protest of U.S. Sprint Communications Company, P.S. Protest No. 91-27 (USPS July 15, 1991). The government's argument also is inconsistent with the actions the USPS undertook in entering into the Agreement with Gemini. At the trial, through the testimony of Mr. Porter and Ms. Flynn, the USPS acknowledged that when the Chicago District solicited bids for the Agreement, it employed competitive procedures, as required by the Purchasing Manual, to select the recipient of the Agreement. The Agreement between Gemini and the USPS created revenue for the USPS by permitting Gemini to install its telephones and pay the USPS a portion of its proceeds from the pay telephones. In short, this was a commission-based, management Agreement. Implicit in that Agreement is the responsibility for Gemini to install working telephones, as well as manage and maintain those telephones in working order, despite defendant's counsel's statement to the contrary in her brief that the USPS Agreement with Gemini was not a management Agreement.

In AT&T Corporation v. United States Postal Service,[4] the United States District Court

---

[3] The USPS Purchasing Manual replaced Publication 41, the USPS Procurement Manual, on January 31, 1997. The manual effective at the time of the Agreement in the present case was the USPS Purchasing Manual.

[4] The direct history of the AT&T case includes the following opinions: AT&T Corp. v. United States Postal Service (AT&T I), 21 F. Supp. 2d 811 (N.D. Ill.) (denying injunctive relief); recons. denied, AT&T II, 57 F. Supp. 2d 517 (1997); AT&T III, 57 F. Supp. 2d 518 (N.D. Ill. 1997) (denying AT&T's motion for summary judgment ); AT&T IV, 57 F. Supp. 2d 522 (N.D.

for the Northern District of Illinois reviewed a commission-based, management contract similar to the Agreement in this case. In AT&T I, AT&T initiated a protest of a sole source award of a pay telephone commission-based, management contract, arguing that the USPS had violated the competition requirements set forth in the USPS Procurement Manual. See AT&T I, 21 F. Supp. 2d at 812. The contract in AT&T was to provide pay telephone management services and primary interexchange carrier services for 0+ (operator assisted) calls on pay telephones in USPS facilities. See AT&T IV, 57 F. Supp. 2d at 523-24. The winning company in AT&T was not paid by the USPS directly, but instead acquired revenue from retention of commissions from the money generated by the 0+ service on the pay telephones. See AT&T III, 57 F. Supp. 2d at 521. In AT&T, the USPS took the same position as it does in this case, and argued that the contract to manage public pay telephones on USPS property was not a "purchase" within the meaning of the Procurement Manual, and that, therefore, the Procurement Manual did not apply to the Agreement. Id. The District Court rejected the USPS's argument that the Procurement Manual did not apply to the contract. To support its finding, the District Court cited to Protest of U.S. Sprint Communications Company, a USPS protest decision decided by the USPS Assistant General Counsel, and available on the USPS website.

In Sprint Communications, the USPS Assistant General Counsel of the Procurement Division reviewed Sprint's protest of a two-year extension on a contract to AT&T to supply 0+ telephone service to USPS pay telephones located in the Eastern Region. Sprint alleged that the two-year extension of the AT&T contract violated the Purchasing Manual's requirements for competitive procurement. Like the contract in this case, a percentage of AT&T's revenue recovered from telephone calls made from pay telephones installed in USPS facilities was to be paid to the government. To determine whether the USPS violated the Purchasing Manual's competitive procedure requirements, the USPS first asked what was being procured by the USPS. The deciding official observed that the agreement did not involve acquisition of goods, in that the USPS was not acquiring pay telephones themselves, only pay telephone services, and that the USPS was not paying any money directly to AT&T for those services. Noting that the Administrative Support Manual did not provide guidance on the telephone agreement and analogizing the situation to coin-operated photocopiers installed in USPS facilities using structured contracting procedures "to award to the contractor offering the highest commission to the USPS," the USPS stated that "the PM [Procurement Manual] is the controlling regulation." Sprint Communications Company, P.S. Protest No. 91-27.

In the USPS's Sprint Communications administrative decision, the USPS found the instructions in the Purchasing Manual to apply to commission-based Agreements. See Sprint Communications Company, P.S. Protest No. 91-27; see also AT&T III, 57 F. Supp. 2d at 521. Similarly, in the cases which comprised AT&T v. United States Postal Service, the District Court held that the USPS was required to adhere to the Procurement Manual, even though the procurement was not an acquisition in the traditional sense. See AT&T III, 57 F.

Ill. 1998) (denying the USPS's motion for summary judgment).

Supp. 2d at 521 ("[T]he Procurement Manual's competitive regulations are applicable to this case."). This court similarly finds the application of the Purchasing Manual to a commission-based Agreement by the USPS itself persuasive, and finds that in this case, the Agreement between Gemini and the USPS was controlled by the Purchasing Manual.

Although no portion of the applicable Purchasing Manual directly addresses the kind of Agreement entered into by the parties in this case, it provides insight into Mr. Porter's authority. In particular, Purchasing Manual section 1.4.2.c, and an accompanying exhibit addressing local buying authority, clearly state that a District Manager is authorized to contract for local purchases up to $10,000 for day-to-day operations. Therefore, Mr. Porter had authority to enter into certain contracts by nature of his position, even without a more extended contracting warrant. Nowhere in the Purchasing Manual, however, does is it indicate that District Managers had authority to contract outside of his local area or in other Districts.

The court notes that section 4.6.8 of the Purchasing Manual addresses "Structured Contracts and Controlled Contracts," and limits the authority to enter into those contracts. Section 4.6.8.a(2) defines a controlled contract as one in which "authority is restricted" and gives as an example a contract for "revenue production." However, section 4.6.8.b(2) states that the "Manager, Policies, Planning, and Diversity, may designate any category of contract as controlled." The Procurement Manual gave as an example of a controlled contract coin-operated photocopiers. See Sprint Communications Company, P.S. Protest No. 91-27 (citing Procurement Manual § 8.6.1). In this case, however, neither party has produced evidence that USPS pay telephone contracts, or the Gemini Agreement, have been designated as controlled contracts as defined by section 4.6.8.a(2) of the applicable Purchasing Manual.

The parties in this case also have included as an exhibit USPS Management Instruction No. AS-840-95-6, titled "Acquiring Pay Telephones." Similar to the Purchasing Manual, USPS Management Instructions are incorporated into the Postal Regulations through 39 C.F.R. § 211.2 and, therefore, also have the force and effect of law. During the trial, Ms. Infanger, the reviewing attorney for the USPS when the Agreement was signed, testified that she reviewed the Instruction before the USPS entered into the Agreement with Gemini and believed that the Instruction did not apply because the USPS was not "going to be leasing or owning these pay phones," but only acquiring pay telephone service. Mr. Porter testified that he had never seen the Instruction.

The USPS Management Instruction No. AS-840-95-6 "provides policy and basic information for acquiring pay telephone service for Postal Service facilities. It includes guidance in setting up pay telephone leasing agreements with the most cost-competitive leasing agents and provides the structure for effective management at the district level." The goal articulated by the Instruction is to promote leasing pay telephones as the preferred method, rather than purchasing, with the objective of "maximizing the revenue from negotiated commissions." Id. Although the instruction states that "Purchasing and Materials will negotiate lease terms and conditions," it does not directly state who has the authority to sign contracts for pay telephone services. In AT&T, the United States District Court for the Northern District

of Illinois found that the Management Instruction applied only when the USPS actually leased pay telephones, and did not apply to service contracts. See AT&T IV, 57 F. Supp. 2d at 524-25 ("[T]he Management Instruction provides guidance on leasing pay telephones. . . . However, the contracts at issue here are not leasing agreements. Instead, they involve provision of management services and other services for pay phones already installed at Postal Service facilities. The U.S. Sprint decision distinguished between leasing agreements for the pay phones themselves and service agreements for already existing pay phones. This court makes the same distinction . . . ."). Thus, pursuant to the guidance in the AT&T case, the Management Instruction applies when the USPS leases actual pay telephones. In the case currently before the court, actual pay telephones were physically put into USPS facilities by Gemini. If the USPS Management Instruction applied, the USPS failed to follow its guidance. Arguably, the USPS did not enter into a leasing agreement for telephones, but instead it entered into a service Agreement whereby Gemini would provide telephones and their related service. Either way, however, the Agreement, whether entered into in accordance with the Management Instruction or not, was limited to the Chicago District.

The primary evidence the plaintiff offers to support its allegations that Gemini was wrongfully prohibited from installing its pay telephones outside of the Chicago District related to the O'Hare Airmail Facility, although there was some testimony at the trial of trying to expand Gemini's pay telephones into other USPS facilities. As described earlier, there are two USPS facilities at O'Hare; the Irving Park Plant and the O'Hare Airmail Facility. Mr. Porter's and Mr. Kubick's uncontroverted testimony establishes that Mr. Porter managed and controlled the Irving Park Plant at O'Hare and that in October, 1999, Mr. Kubick managed and controlled the O'Hare Airmail Facility. Mr. Kubick stated that the Airmail Facility was overseen by the Great Lakes Area Vice President, Mr. Weeker, and that as the manager of the O'Hare Airmail Facility, Mr. Kubick reported directly to Mr. Weeker, and never to Mr. Porter. At trial, Mr. Kubick stated that the Airmail Facility did not fall under the auspices of the Chicago District because it handled mail flying to and from other regions outside of Chicago, including Indiana and Milwaukee. The management of the O'Hare Airmail Facility changed only in 2001, when it became part of the Chicago District. The record clearly establishes, therefore, that, in 1999, when the October, 1999 Agreement was signed, Rufus Porter had no authority over the operations at the O'Hare Airmail Facility, although he managed the separate Irving Park Plant at O'Hare. If Mr. Porter actually had the ability to enter into an Agreement for the Airmail Facility, there would have been no need for Mr. Porter to ask permission from Mr. Kubick or to encourage Mr. Kubick to install Gemini's telephones in the Airmail Facility.

Regarding the telephones Gemini installed at the O'Hare Airmail Facility, they were installed with Mr. Kubick's permission after Mr. Porter spoke with Mr. Kubick. When Gemini removed all of the existing Ameritech telephones and replaced them with their own, however, Mr. Kubick told Gemini to reinstall the Ameritech telephones and had all of Gemini's telephones removed. Mr. Kubick, however, did not have the authority to have the pay telephones removed from the Irving Park Plant, which was under the authority of Mr. Porter.

Although at trial Mr. Porter acknowledged the limitations of his authority several times,

including no authority over Mr. Kubick's Airmail Facility, at one point, he offered somewhat hesitant testimony, indicating that he thought he "had authority over the phones" in Mr. Kubick's operation administratively and could enter into the Agreement with Gemini. There is, however, no other support for this statement in the record. In addition, the "10/22/99" list of telephone numbers put together by the Chicago District under the direction of Mr. Porter, and attached by Ms. Infanger as Exhibit A to the Gemini Agreement, listed only telephone numbers and locations for the Irving Park Plant.

Of interest also is that, at the trial, Mr. Porter mentioned that there was one incident in which Gemini faced resistance to being able to install its telephones in a USPS facility within the Chicago District. Mr. Porter stated that he resolved that problem "swiftly." As the record indicates, Mr. Porter could not and did not resolve the problems encountered by Gemini at Mr. Kubick's facility because the Airmail Facility was not part of the Chicago District and Mr. Porter had no authority over Mr. Kubick. Accordingly, since the Agreement between Gemini and the defendant did not include the O'Hare Airmail Facility, the USPS did not act inappropriately or breach any Agreement when Mr. Kubick ordered Gemini to remove its telephones from the O'Hare Airmail Facility, despite the clear animosity towards the plaintiff exhibited by Mr. Kubick at the trial.

To the extent the plaintiff argues that Mr. Porter had the authority to carry out the "wishes, desires and directives of his immediate superior, J. T. Weeker," that may be true, but only to the extent of his authority within the Chicago District. Mr. Weeker may have hoped or even intended for Gemini to expand its Agreement and in the future obtain Agreements with USPS Districts outside of the Chicago District, and he may have asked Mr. Porter to assist Gemini in obtaining such Agreements with other Postal Districts. Indeed the testimony at trial suggests that Mr. Weeker asked Mr. Porter to assist Gemini in this regard. There is no evidence, however, that Mr. Weeker intended for Mr. Porter to enter into a single Agreement with Gemini to cover all of the USPS Districts in Illinois, or that Mr. Weeker delegated to Mr. Porter any authority greater than that which Mr. Porter already possessed for the Chicago District. The evidence demonstrates the opposite. That Mr. Weeker asked Mr. Porter to speak with the other District Managers shows that Mr. Weeker respected the USPS organization and intended for other District Managers to enter into separate Agreements with Gemini for pay telephone services in their areas. As the plaintiff states in its brief, "In fact, Porter assisted Wilson in fulfilling Weeker's intent by contacting other district managers on behalf of Wilson to expand Wilson's pay phone services into their respective areas." If Mr. Porter had the authority to enter into Agreements outside of the Chicago District, there would have been no need to convince other District Managers to permit Gemini to install telephones in their locations.

Unfortunately for the plaintiff, although it may have had a worthy public purpose in mind when it conceived and pursued the Agreement at issue in this case, it appears that Gemini failed to ascertain the extent of the authority held by Mr. Porter before entering into the Agreement with the USPS. See Trauma Serv. Group v. United States, 104 F.3d at 1325 ("Anyone entering into an agreement with the Government takes the risk of accurately

ascertaining the authority of the agents who purport to act for the Government."). Specifically, at the trial in this case, Mr. Wilson, the President and CEO of Gemini testified that he did not understand the limitations placed on Mr. Porter's authority. Mr. Wilson was asked at trial:

> Q: [By defendant's attorney] Were you not aware then that Mr. Porter's authority to enter the agreement with Gemini was limited to the district over which he presided, which was Chicago?
>
> A: [By Mr. Wilson] No. If that was the case – our bid was based upon all this information that we just referred to – if that had been the case, I would not have done it, because it just doesn't add up, it doesn't make business sense.
>
> Q: But I don't think you answered my question.
>
> A: Oh, okay. No, I'm not.
>
> Q: You weren't aware that his authority was limited to his particular district, which did not include the O'Hare Airport mail center, it did not include Northern Illinois, and it did not include Central Illinois. You were unaware of that?
>
> A: No.
>
> * * * * * * *
>
> Q: But, again, you were unaware that Mr. Porter had no authority over the airport mail center at O'Hare, correct?
>
> A: I guess that'd be a correct statement, right.

As discussed above, at the trial, Mr. Porter acknowledged a history of knowing and working with Mr. Wilson, as well as a continuing relationship after Mr. Porter's departure from government service. Nonetheless, on direct examination, although visibly uncomfortable on the stand, Rufus Porter ultimately acknowledged the limitations of his authority at the time the Agreement at issue in this case was signed and the extent of the geographical area for which he, personally, could enter into Agreements. Specifically, Mr. Porter acknowledged that:

> Q: [By defendant's attorney] And regarding the provision of pay phone services, which later became the subject of the Gemini agreement, how were your responsibilities as district manager for Chicago limited with respect to that agreement?
>
> A: [By Mr. Porter] We were – I was limited only to those areas within the Chicago District.

After reviewing the authority granted to Rufus Porter and the intent and actions of the

parties when they entered into the October 21, 1999 Agreement, the court finds that the only listing of telephone numbers the parties could have mutually agreed upon as the Exhibit A to be attached the Agreement is the "10/22/99" list of locations and telephone numbers constructed by the USPS Information Systems Department, which was limited to the Chicago District. This list was ordered by Rufus Porter to be prepared as the list for the October 21, 1999 Agreement and was the list which was eventually attached by the USPS to the Agreement by Ms. Infanger. No other list was prepared within the same time frame as the Agreement. Furthermore, applying this list to the Agreement is consistent with the other terms of the Agreement. See McAbee Constr., Inc. v. United States, 97 F.3d at 1434 (stating that parol evidence only permits "consistent additional terms" to supplement an agreement). The broader, public spirited goals of the plaintiff, although laudable, could not be carried out through an Agreement signed by Rufus Porter. Unfortunately, neither party to this Agreement paid sufficient attention to detail before entering into the Agreement. The short Agreement contained two effective dates, October 18, 1999 and October 21, 1999, and Exhibit A was not attached to the Agreement at the time of execution.

## CONCLUSION

When the Agreement between Gemini and the USPS was signed, the list of specific facilities in which Gemini could install its pay telephones was not attached to the Agreement. The USPS official who signed the Agreement on behalf of the USPS was Rufus Porter, the District Manager and Postmaster of the Chicago District. After reviewing the authority possessed by Rufus Porter, and the actions and circumstances surrounding the execution of the Agreement, this court finds that the Agreement between Gemini and the USPS was limited to the USPS Chicago District. After reviewing the exhibits submitted to the court and the testimony offered at trial, the court concludes that the plaintiff has failed to carry its burden of proof and has brought forth insufficient evidence that the USPS breached its Agreement with the plaintiff. Therefore, the plaintiff's complaint is **DISMISSED**. The clerk of the court shall enter **JUDGMENT** for the defendant in accordance with this opinion. Each party shall bear its own costs.

**IT IS SO ORDERED**.

**s/ Marian Blank Horn**
**MARIAN BLANK HORN**
**Judge**